DAVID L. HENKIN #6876
HARLEY M. BROYLES #11640
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawaiʻi 96813
T: (808) 599-2436
Email: dhenkin@earthjustice.org
hbroyles@earthjustice.org

CHRISTOPHER D. EATON
(*pro hac vice* pending)
EARTHJUSTICE
810 3rd Avenue, Suite 610
Seattle, Washington 98104
T: (206) 343-7340
Email: ceaton@earthjustice.org

JOSEPH V. LANGKILDE III
(*pro hac vice* pending)
EARTHJUSTICE
1250 I Street NW, Fourth Floor
Washington, DC 20005
T: (202) 667-4500
Email: jlangkilde@earthjustice.org

Attorneys for Plaintiffs
Faʻasao Amerika Samoa and
Conservation Council for Hawaiʻi

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAIʻI

| | |
|---|---|
| FAʻASAO AMERIKA SAMOA and CONSERVATION COUNCIL FOR HAWAIʻI,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL MARINE FISHERIES SERVICE and HOWARD LUTNICK, in his official capacity as Secretary of Commerce of the United States,<br><br>Defendants. | CIVIL NO. CV-26-438<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Fa‘asao Amerika Samoa and Conservation Council for Hawai‘i (collectively, Plaintiffs) hereby complain of the actions of Defendants National Marine Fisheries Service (NMFS) and Secretary of Commerce Howard Lutnick as follows:

## INTRODUCTION

1. The United States has never opened its waters to deep-sea mining. Until now. The Marine Minerals Administration (MMA) recently announced plans to sell leases allowing mining of over 31 million acres of seabed off American Samoa. Before it can do so, MMA must complete consultation with NMFS under section 7(a)(2) of the Endangered Species Act (ESA), 16 U.S.C. § 1536(a)(2), to ensure that deep-sea mining activities off American Samoa will not push any endangered or threatened species closer to extinction or destroy the critical habitat that those species need to survive and eventually recover. This consultation process is a central feature of the ESA's framework for protecting endangered and threatened species.

2. Earlier this year, NMFS issued a final determination (Letter of Concurrence) that deep-sea-mining leases off American Samoa are not likely to adversely affect any threatened or endangered species or critical habitat, giving MMA the green light under the ESA to hold the sale. Fa‘asao Amerika Samoa and

Conservation Council for Hawai‘i challenge NMFS's arbitrary and unlawful determination.

3. The Samoan people rely upon a healthy ocean ecosystem in the waters that surround their islands. This ecosystem feeds Samoan households, protects shorelines, and has formed the basis of many cultural practices that have existed for over a millennium. To ensure ocean ecosystems are healthy and abundant, traditional Samoan marine management practices prohibit harming marine mammals, sea turtles, sharks, and other wildlife that today are recognized as endangered or threatened. Many of these animals found around American Samoa also migrate to and are found in Hawai‘i's waters.

4. Deep-sea mining entails using heavy machinery to scour the seabed for potato-sized mineral aggregations called polymetallic nodules or, in some cases, to strip mine mineral-laden crusts from the sea floor. The machinery can destroy nearly all life in its path. Mining stirs up sediments that can introduce toxic substances into the food web and that can smother seafloor ecosystems, like coral reefs, 100 kilometers (over 60 miles) away. Even just exploring for seabed minerals introduces extremely loud noise into the marine environment that can harm marine mammals and other wildlife. While much is known about the threats of environmental destruction that these largely untested activities pose, the full extent of potential harm is still coming into view.

5. In early 2026, MMA (then known as the Bureau of Ocean Energy Management or BOEM[1]) asked NMFS to concur that its lease sale off American Samoa is "not likely to adversely affect" any species or critical habitat. Shortly thereafter, in a four-page letter with no analysis and without even considering the effects from most exploration activities or any mining, NMFS concurred.

6. NMFS's Letter of Concurrence violates key legal requirements under the ESA and reflects a wholly arbitrary and capricious determination. First and foremost, NMFS did not analyze all effects of MMA's action on ESA-listed species or critical habitat, ignoring the effects from the exploration and mining that will result from the lease sale. Even for the more limited "preliminary activities" on a lease that NMFS did consider, the Letter of Concurrence does not address many of the ways those activities harm ESA-listed marine mammals, sea turtles, and other wildlife.

7. Plaintiffs therefore ask this Court to declare that NMFS's Letter of Concurrence is arbitrary and capricious and contrary to law, in violation of the

[1] The Secretary of the Interior recently merged BOEM and the Bureau of Safety and Environmental Enforcement into a single agency, the Marine Minerals Administration. *See* Secretarial Order 3451, "Establishment of the Marine Minerals Administration" (July 10, 2026) https://www.doi.gov/sites/default/files/document_secretarys_orders/so-marine-minerals-administration_final_508.pdf. Both the applicable regulations and the Letter of Concurrence challenged here refer to BOEM. This Complaint will use the current name of the agency (MMA) rather than BOEM.

Administrative Procedure Act (APA) and ESA, and to vacate the Letter of Concurrence.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 1361 (actions to compel officers and agencies of the United States to perform their duty); 28 U.S.C. §§ 2201–2202 (power to issue declaratory judgments in cases of actual controversy); and 5 U.S.C. §§ 701–706 (actions under the APA).

9. Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because this is a civil action in which officers or employees of the United States or an agency thereof are acting in their official capacity or under color of legal authority and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district and also because Plaintiff Conservation Council for Hawaiʻi resides in this judicial district.

10. This Court has authority to grant Plaintiffs' requested relief pursuant to the APA, 5 U.S.C. § 706(2), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

11. The Court has authority to award costs and attorneys' fees under 28 U.S.C. § 2412.

PARTIES

12. Plaintiff FA‘ASAO AMERIKA SAMOA (FAS) is a non-profit community organization incorporated in Hawai‘i and based in American Samoa. FAS's mission is to safeguard American Samoa's culture, traditions, and natural resources from exploitation, and, in doing so, preserve Samoan culture and traditions that are deeply interconnected with the land and sea in American Samoa.

13. FAS members include scientists, educators, fishers, and *matai* (traditional leaders) who live in American Samoa, who regularly visit, study, work, and recreate in areas near the planned lease areas, and who derive recreational, professional, scientific, educational, aesthetic, cultural, and spiritual benefits from those activities. These members also study and observe ESA-listed species that are present within and travel through the planned lease areas. FAS members' use and enjoyment of these imperiled species will be harmed by deep-sea mining-related activities in the planned lease areas.

14. For example, one of FAS's members is a coral ecologist who lives in American Samoa. She researches coral resiliency in American Samoa and is currently working on projects: to grow heat-tolerant corals; to monitor coral health impacted by bleaching and marine debris; and to sample, identify, and categorize corals in American Samoa's marine waters. These projects include work to survey and identify ESA-listed corals in American Samoa, including *Isopora*

*crateriformis* and *Acropora globiceps*. She has participated in scientific research trips to Muliava (also referred to as Rose Atoll)—which is immediately adjacent to the planned lease areas—and has plans to return in the next year to build out a taxonomy of the corals present in American Samoa. In addition to relying on healthy corals for her scientific studies, this member derives pleasure from observing and photographing healthy corals, including ESA-listed corals in American Samoa. Seabed mining and mineral exploration off American Samoa threaten to harm the ESA-listed corals and their ecosystems that this member studies and observes, thereby injuring her professional, scientific, and aesthetic interests.

15. Another FAS member is a conservation educator who lives in American Samoa. She has visited Muliava to conduct foundational *i'a sa* ("sacred fish," referring to sea turtles) population surveys. She teaches place-based science lessons to youth, which involve observing sacred Samoan animals like ESA-listed sea turtles in the oceans around American Samoa. Seabed mining and mineral exploration will harm these sea turtle populations, making it more difficult for her to carry out her place-based education, thereby injuring her professional, cultural, and aesthetic interests.

16. A third FAS member hails from Manu'a, the American Samoa islands closest to the planned lease areas, which have traditionally governed the waters

where the lease sale is planned. Traditional Samoan governance standards practiced in Manu‘a recognize certain animals as sacred—including all ESA-listed whales, sea turtles, sharks, and giant manta rays in American Samoa’s waters—and, accordingly, place traditional prohibitions on catching or harming these species. This member observes and implements these prohibitions, including when he observes these species in American Samoa’s waters. Deep-sea mining and exploration would harm these animals that are sacred to the Samoan people and to this member, injuring his cultural and spiritual interests.

17. Plaintiff CONSERVATION COUNCIL FOR HAWAI‘I (CCH) is a non-profit citizens’ organization incorporated and based in Hawai‘i with approximately 4,000 members in Hawai‘i, the United States mainland, and foreign countries. CCH is the Hawai‘i affiliate of the National Wildlife Federation, a non-profit membership organization with over 5.8 million members and supporters nationwide.

18. CCH’s mission is to protect Hawai‘i’s native wildlife, including threatened and endangered species, and to restore the ecosystems on which those species depend for future generations. The wildlife species that CCH has worked to protect include ESA-listed species of whales, sea turtles, sharks, rays, and seals that are found in American Samoa’s and Hawai‘i’s waters. CCH’s members’ interests in these species will be harmed by allowing deep-sea mining-related

activities in and around the proposed lease areas in American Samoa, as well as by associated increased vessel traffic in Hawai‘i’s waters.

19. CCH members include marine biologists and cultural practitioners who regularly visit, study, work, and recreate in marine waters within and near the planned lease areas and in Hawai‘i that would be affected by deep-sea mining-related activities. CCH members study, enjoy, and benefit from the threatened and endangered species in waters over American Samoa’s outer continental shelf (OCS) and in the affected waters around Hawai‘i—including, but not limited to, ESA-listed whales, sea turtles, sharks, and rays that migrate between the two areas—for recreational, professional, scientific, educational, aesthetic, spiritual, and cultural purposes. CCH members’ use and enjoyment of the marine environment around American Samoa and around Hawai‘i will be harmed by deep-sea mining and mineral exploration activities on the planned leases.

20. For example, one of CCH’s members has conducted extensive scientific research regarding the marine environment around American Samoa for more than two decades. This member previously participated in two scientific research trips to the Rose Atoll Marine National Monument to study ESA-listed corals. He is currently working on a study of coral reef health using data collected on ESA-listed corals in American Samoa (particularly *Acropora globiceps*, *Acropora retusa*, *Acropora speciosa*, *Fimbriaphyllia paradivisa*, and *Isopora*

*crateriformis*), which will involve additional research trips to Rose Atoll during the next two years. In addition to relying on healthy corals for his scientific studies, this member derives pleasure from observing and photographing healthy corals. Deep-sea mining and mineral exploration activities off American Samoa threaten to harm the ESA-listed corals and their ecosystems that this member studies and observes, thereby injuring his professional, scientific, and aesthetic interests.

21. Another one of CCH's members is a Native Hawaiian professional diver and cultural practitioner who has observed and studied—and will continue to observe and study—ESA-listed species in the ocean surrounding the Hawaiian Islands. This member has a cultural and spiritual connection to the ESA-listed species that occur in Hawai'i's waters that will be affected by deep-sea mining exploration and exploitation activities. This member regularly takes friends and family on nearshore diving tours to *kilo* (Native Hawaiian observational technique) for Central North Pacific green sea turtles, hawksbill turtles, giant Pacific manta rays, Hawaiian monk seals, and oceanic whitetip sharks. This member also regularly ventures on boats to deeper waters around the Hawaiian Islands to *kilo* for species including false killer whales, sperm whales, olive ridley sea turtles, and leatherback sea turtles. This member also has a deep cultural and familial connection to Hawai'i's sharks, including the oceanic whitetip shark, which he regards as *'aumakua* (embodiment of ancestral guardians), and which his family

and ancestors, with lineage as *kahu manō* (shark keepers), have advocated to protect since time immemorial. Deep-sea mining-related activities in American Samoa, as well as related vessel traffic in Hawai‘i’s waters, threaten to harm the ESA-listed species that this member observes (many of which are highly migratory), thereby injuring his cultural, spiritual, and aesthetic interests.

22. NMFS’s failure to comply with the ESA and APA has caused and is causing Plaintiffs’ members procedural harms connected to their substantive professional, scientific, educational, aesthetic, spiritual, and cultural interests in ESA-listed species in American Samoa’s and Hawai‘i’s waters. Plaintiffs’ members rely on NMFS to comply with the requirements of the ESA to guide federal authorizations of OCS activities so as to protect endangered and threatened species from harmful effects of those activities. MMA will issue mineral leases that result in such harmful effects in reliance on NMFS’s Letter of Concurrence.

23. The interests of Plaintiffs and Plaintiffs’ members have been, are being, and will be adversely affected by NMFS’s violation of federal law, as described herein. These harms can only be remedied if the Court orders NMFS to comply with the ESA and APA and conduct a legally adequate consultation for MMA’s planned lease sale. Plaintiffs have no other adequate remedy at law.

24. Defendant NATIONAL MARINE FISHERIES SERVICE is the federal agency within the U.S. Department of Commerce’s National Oceanic and

Atmospheric Administration with responsibility for administering and implementing the ESA with respect to marine species, including sea turtles while they are in the water. *See* 50 C.F.R. § 402.01(b); *id.* §§ 223.102, 224.101. Among other responsibilities, NMFS is responsible for complying with ESA section 7, 16 U.S.C. § 1536, in connection with the issuance of Letters of Concurrence and biological opinions.

25. Defendant HOWARD LUTNICK is sued in his official capacity as the Secretary of Commerce. In that capacity, Secretary Lutnick is responsible for ensuring that the Department of Commerce and its constituent agencies (including NMFS) comply with applicable law, including the ESA.

## LEGAL FRAMEWORK

### I. ENDANGERED SPECIES ACT

26. Congress enacted the ESA in 1973 in response to the extinction crisis to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

27. The ESA's "language, history, and structure . . . indicate[] beyond doubt that Congress intended endangered species to be afforded the highest of priorities." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174 (1978). "The plain intent

of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184.

28. In broad strokes, the ESA seeks to protect and recover imperiled species and populations by first listing them as threatened or endangered based on enumerated statutory factors. 16 U.S.C. § 1533(a)(1)(A)–(E); *see id.* § 1532(6), (20). The Act further provides for the designation of critical habitat to protect areas essential to the survival and eventual recovery of threatened and endangered species. *Id.* § 1533(a)(3)(A)(i); *see id.* § 1532(5).

29. Section 7(a)(2) of the ESA then requires each federal agency, including MMA, to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." *Id.* § 1536(a)(2). "Jeopardize the continued existence of" is defined as engaging in an action that "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. "Destruction or adverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." *Id.*

30. The ESA and its implementing regulations establish an interagency consultation process to assist federal agencies in complying with this duty. Each agency, including MMA, must "review its actions at the earliest possible time to determine whether any action *may affect*" any endangered or threatened species or critical habitat. *Id.* § 402.14(a) (emphasis added). If so, the agency planning to undertake the action (the action agency) must consult the appropriate wildlife service—the U.S. Fish and Wildlife Service or, as here, NMFS—to ensure compliance with ESA section 7(a)(2)'s mandate. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.01(b), 402.14.

31. In fulfilling the requirements of ESA section 7, both the action agency and the consulting wildlife agency must "use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

32. Moreover, when engaging in ESA section 7 consultation, the consulting wildlife agency must analyze the effects of the entire agency action, which include "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action." 50 C.F.R. § 402.02.[2] "Indirect effects are those

[2] On March 30, 2026, the U.S. District Court for the Northern District of California held that the definition of "effects of the action" promulgated in 2019 was facially invalid and reinstated the definition that was in effect prior to 2019.

that are caused by the proposed action and are later in time, but still are reasonably certain to occur." 50 C.F.R. § 402.02. "Interrelated actions are those that are part of a larger action and depend on the larger action for their justification." *Id.* "Interdependent actions are those that have no independent utility apart from the action under consideration." *Id.*

33. To facilitate compliance with ESA section 7(a)(2), the action agency must prepare a biological assessment to "evaluate the potential effects of [its] action on listed and proposed species and designated and proposed critical habitat and determine whether any such species or habitat are likely to be adversely affected by the action." *Id.* § 402.12(a); *see also* 16 U.S.C. § 1536(c)(1).

34. As a general rule, the action agency must then engage in formal consultation with the consulting wildlife agency, unless the action agency determines and the consulting wildlife agency concurs in writing that the action is "not likely to adversely affect" any listed species or critical habitat. 50 C.F.R. §§ 402.13(c), 402.14(a), (b)(1).

35. If the consulting wildlife agency concurs and makes a final determination that the action is not likely to adversely affect any listed species or critical habitat, "the consultation process is terminated, and no further action

---

*Center for Biological Diversity v. U.S. Dep't of Interior*, Case No. 24-cv-04651-JST, 2026 WL 898264, at *15, *25 (N.D. Cal. Mar. 30, 2026).

[under ESA section 7(a)(2)] is necessary." *Id.* § 402.13(c). The concurrence letter must, at a minimum, document the consulting wildlife agency's "analysis, based on review of all potential effects, direct and indirect." U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv., *Endangered Species Consultation Handbook* 3-12 (1998) [hereinafter *ESA Handbook*].

36. If the consulting wildlife agency does not concur that the action is not likely to adversely affect any listed species or critical habitat, then formal consultation is required. 50 C.F.R. § 402.14(a). Formal consultation involves a more comprehensive evaluation of the effects of the action that culminates in the consulting wildlife agency's biological opinion on whether the action is likely to jeopardize the continued existence of the species or to destroy or adversely modify critical habitat. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(c)–(h).

37. If the consulting wildlife agency concludes in the biological opinion that the proposed action is likely to jeopardize a species, the agency must specify reasonable and prudent alternatives, if any, that would avoid the likelihood of jeopardy, or specify that no such alternatives exist. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2). If the consulting wildlife agency concludes that the action is not likely to jeopardize the continued existence of the species, but that incidental take of a listed species will occur, the agency must produce a written "statement concerning incidental take" that "[s]pecifies the impact of incidental taking as the

amount or extent of such taking" on the species. 50 C.F.R. § 402.14(i)(1)(i); *see* 16 U.S.C. § 1536(b)(4). An incidental take statement must also specify "reasonable and prudent measures" that are "necessary or appropriate to minimize [the] impact of incidental taking on the species" and the "terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency" to implement the measures. 50 C.F.R. § 402.14(i)(1)(ii), (iv); *see* 16 U.S.C. § 1536(b)(4).

38. The ESA regulations provide for consultation to occur in stages "[w]hen the action is authorized by a statute that allows the [action] agency to take incremental steps toward the completion of the action." 50 C.F.R. § 402.14(k). When such a statute is involved, the consulting wildlife agency "shall, if requested by the [action] agency, issue a biological opinion on the incremental step being considered." *Id.* In its biological opinion, the consulting wildlife agency must "includ[e] its views on the entire action," *id.*—not just the first incremental step—and determine, among other things, whether "[t]here is a reasonable likelihood that the entire action will not violate [ESA] section 7(a)(2)." *Id.* § 402.14(k)(5).

39. Consultation for the first phase of an incremental step action must always be conducted formally, concluding with the consulting wildlife agency issuing a biological opinion. *See id.* § 402.14(k).

40. Compliance with the ESA's section 7 consultation requirement is essential to prevent later substantive violations of the ESA.

II. OUTER CONTINENTAL SHELF LANDS ACT

41. OCSLA governs the leasing, exploration, and development of minerals on the "Outer Continental Shelf." 43 U.S.C. § 1331 *et seq.* OCLSA defines the Outer Continental Shelf as the seabed extending from the outer boundary of state waters—typically three miles from shore—to the outer boundary of the United States' Exclusive Economic Zone, 200 nautical miles from shore. *Id.* §§ 1301(a)(2), 1331(a); 48 Fed. Reg. 10605 (Mar. 14, 1983).

42. OCSLA authorizes Interior to sell "leases of any mineral other than oil, gas, and sulphur in any area of the outer Continental Shelf." 43 U.S.C. § 1337(k); *see* 30 C.F.R. § 581.0–.47.

43. Upon receiving a lease, the holder may conduct "preliminary activities," which include "bathymetric, geological, geophysical, mapping, and other surveys." 30 C.F.R. § 582.21(d).

44. Lessees then conduct further exploration, testing, and development activities "in accordance with a plan submitted by the lessee and approved by the Director" of MMA. *Id.* § 582.21(a). "Exploration" includes geophysical surveys, drilling, and sampling of mineral deposits. *Id.* § 582.3. "Testing" includes "removing bulk samples for processing tests and feasibility studies and/or the

testing of mining equipment." *Id.* "Development" includes "geophysical activities, drilling, construction of offshore facilities, and operation of all onshore support facilities" in preparation for production of minerals. *Id.* "Production" is the mining and processing of minerals from the seabed. *See id.* § 582.24.

III. ADMINISTRATIVE PROCEDURE ACT

45. The APA confers a right of judicial review on any person who is adversely affected by agency action. 5 U.S.C. § 702.

46. The APA provides that the reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

## STATEMENT OF FACTS

I. THE WATERS AROUND AMERICAN SAMOA ARE HOME TO THREATENED AND ENDANGERED WILDLIFE.

47. The ocean surrounding American Samoa supports rare and diverse marine species, including a rich mosaic of shallow and mesophotic coral reefs, sponges, crabs, deep-sea cucumbers, sea turtles, hundreds of coral and fish species, and a variety of migratory species. Many of the species found in American Samoa's waters are listed as endangered or threatened under the ESA.

48. The endangered blue whale, fin whale, sei whale, and sperm whale are found in waters around American Samoa.

49. All five sea turtle populations found in American Samoa's waters are listed as endangered or threatened: the green sea turtle (Central South Pacific Distinct Population Segment (DPS)),[3] hawksbill sea turtle, loggerhead sea turtle (South Pacific DPS), and leatherback sea turtle are listed as endangered, while the olive ridley sea turtle is listed as threatened.

50. The oceanic whitetip shark, giant manta ray, scalloped hammerhead shark (Indo-West Pacific DPS), and chambered nautilus are also found in American Samoa's waters and are listed as threatened.

51. Five coral species in American Samoa's waters (*Acropora globiceps*, *A. retusa*, *A. speciosa*, *Fimbriaphyllia paradivisa*, and *Isopora crateriformis*) are listed as threatened. Additionally, NMFS has designated critical habitat in American Samoa for all five coral species.

## II. DEEP-SEA MINING ACTIVITIES WILL HARM ESA-LISTED SPECIES.

52. Several areas of the deep seabed around the world—including around American Samoa—contain polymetallic nodules, potato-shaped balls of minerals that formed over millions of years as minerals from seawater accrete. They hold

---

[3] The ESA allows NMFS to separately list individual DPSs of species as threatened or endangered. *See* 16 U.S.C. § 1532(16) (defining "species" to include "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature"). NMFS identifies DPSs based on the population's "discreteness," "significance," and "conservation status." 61 Fed. Reg. 4722, 4725 (Feb. 7, 1996).

minerals like nickel, cobalt, and manganese, which can be used to construct electronics, batteries, and other products. Accordingly, companies have expressed interest in mining the nodules from the seabed for profit.

53. To date, there has not been a commercial seabed mining operation established anywhere in the world. Mining the deep sea is technologically and financially difficult. Equipment must operate at depths of thousands to tens of thousands of feet where water pressure is immense.

54. There has been a limited amount of seabed mining exploration and testing activities in international waters and in other countries. Those tests have demonstrated that commercial mining, and even the initial exploration activities, will have devastating effects on the marine environment.

55. Mining activities—whether at the testing phase or production phase—involve scouring the seabed to extract nodules. Mining equipment stirs up toxic sediment and kills the biota in its path. Mining disturbance studies have found that impacts to the ecosystem persist for at least 44 years, with estimates that ecosystem recovery will take over 100 years. Scientists estimate that sediment plumes from mining can extend for up to 100 kilometers (over 60 miles) from the mining site, smothering corals and other habitats even far distant from the mining site. Such plumes harm not only the corals themselves, but also the sea turtles, sharks, rays, and other species that depend on coral reef ecosystems.

56. Nodules and the sediment collected with them are then transported to a vessel on the surface, which separates the nodules from the sediment. That sediment waste is then discharged higher in the water column. The sediment waste contains toxic metals such as copper, cadmium, zinc, and lead, as well as rare earth elements, that can enter the food chain and bioaccumulate in species like giant manta rays and whales.

57. Exploration for seabed minerals uses a variety of technologies to map and sample the seafloor, including hull-mounted multibeam echosounders, dynamic positioning vessels, autonomous underwater vehicles, remotely operated vehicles, and other autonomous or robotic equipment. The noise from these activities can damage hearing and interfere with essential behaviors in marine mammals and other animals.

58. There are also numerous ways that the vessels used for surveying and mining can harm ESA-listed species, including injury or death from ship strikes, masking of communication, and behavioral disturbance from noise, and air and water pollution. Vessel impacts can occur not only where exploration or development activities are taking place, but also while vessels are traveling to or from the project location and when mined nodules are transshipped, potentially to distant ports.

59. For example, the issuance of seabed mining leases offshore of American Samoa can increase vessel traffic to and from Hawai‘i’s ports and through Hawai‘i’s waters from the ships conducting activities on those leases. That vessel traffic can harm ESA-listed species in Hawai‘i’s waters.

III. MMA PLANS TO HOLD THE FIRST EVER DEEP-SEA MINING LEASE SALE OFF AMERICAN SAMOA.

60. On June 16, 2025, MMA published a “Request for information and interest” (RFI) for a potential mineral lease sale in an area offshore of American Samoa. 90 Fed. Reg. 25369 (June 16, 2025). MMA described the “RFI Area” as 18.1 million acres “located near the eastern limit of the American Samoa OCS bordering the Cook Islands Exclusive Economic Zone, northeast of the Manu’a [*sic*] Islands and Rose Atoll (roughly 70 nautical miles northeast of Rose Atoll).” *Id.* at 35371.

61. On November 20, 2025, after receiving over 76,000 comments in response to the RFI—the overwhelming majority of which explained why MMA should not proceed with leasing—MMA announced an “Area ID” that nearly doubled the size of the proposed area for leasing to over 33 million acres.

62. On July 17, 2026, MMA published a notice of availability in the Federal Register of the Proposed Leasing Notice for American Samoa Outer Continental Shelf (OCS) Pacific Mineral Lease Sale 1 (PACM-1). 91 Fed. Reg. 44870 (July 17, 2026). MMA proposes to hold the lease sale on November 19,

2026, and will offer for sale two leases encompassing almost all the area described in the Area ID, over 31 million acres total.

63. The Proposed Leasing Notice specifies, "Any lease(s) that are issued will grant rights to develop these deposit types [polymetallic nodules and ferromanganese crust deposits] and any minerals found in direct association with those specified deposits." The primary lease term will be 20 years, although the term can be extended if a lease enters production. The proposed leases include lease stipulations governing exploration, testing, survey, and mining activities.

64. MMA will publish a final leasing notice at least 30 days before the sale date. *See* 30 C.F.R. § 581.17(a).

## IV. NMFS ISSUES AN ARBITRARY AND UNLAWFUL LETTER OF CONCURRENCE THAT MINERAL LEASING WILL NOT ADVERSELY AFFECT ANY ESA-LISTED SPECIES OR CRITICAL HABITAT.

65. On or about January 16, 2026, NMFS received a written request from MMA to initiate expedited informal consultation under the ESA on the proposed lease sale. MMA sought NMFS's concurrence that the proposed action "may affect, but is not likely to adversely affect" any species listed as threatened or endangered or any critical habitat designated under the ESA, avoiding the need to engage in formal consultation under ESA section 7.

66. On or about February 3, 2026, MMA submitted an updated biological assessment to NMFS on its proposed action.

67. In its biological assessment, MMA determined that the "action area" (*i.e.*, the "areas to be affected directly or indirectly by the Federal action," 50 C.F.R. § 402.02) for the planned lease sales "encompasses a big area which includes waters nearby American Samoa where most of the Proposed Action will take place as well as waters near Hawaii and the West Coast, where vessels may start their transit(s)." *See* Biological Assessment, Figure 1.




**Figure 1. Map of the Proposed Action, which includes the American Samoa OCS, Hawaiian waters, and the U.S. West Coast**

68. MMA's biological assessment states that the "need" for the lease sale is "to provide access to marine minerals that could potentially be an important and

underutilized domestic source." The proposed sale "aims to facilitate the potential development" of those minerals. MMA states its proposed "seabed leasing aligns with ensuring secure and sustainable domestic supply of strategic minerals."

69. Despite MMA's stated purpose for the lease sale, its biological assessment does not include the intended mineral exploration, development, and extraction in the "Effects of the Action." Rather, the biological assessment evaluates only the effects of "preliminary activities" on the leases and concludes they will be insignificant.

70. The biological assessment indicates that preliminary activities will entail the use of High-Resolution Geophysical (HRG) surveys (including multibeam echosounders, side-scan sonar, and sub-bottom profilers), seabed sampling by remotely operated vehicles, anchors on the seafloor for buoys and data collection instruments, and seabed box core sampling, among other actions.

71. The biological assessment identifies several potential impacts of preliminary activities to ESA-listed marine mammals and sea turtles, including 1) noise from HRG surveys, geotechnical surveys, aircrafts, and vessels; 2) potential collisions with project-related vessels; 3) potential entanglement in mooring systems associated with the installation of buoys and with the deep-tow survey systems; 4) disturbance to feeding or modified prey abundance; 5) habitat disturbance; and 6) accidental release of pollutants and marine debris. While the

biological assessment states the impacts are anticipated to be "insignificant," it indicates that MMA could not estimate the extent of many impacts.

72. The biological assessment states that the effects of preliminary activities on ESA-listed sharks and rays include habitat disturbance, sediment resuspension (from sampling), fish aggregating device effects of buoys and mooring lines, entanglement, noise from surveys and vessels, artificial light, electromagnetic field alteration, ship strikes, and pollution from oil spills and marine debris. The biological assessment concludes the action is not likely to adversely affect listed fishes.

73. The biological assessment concludes that effects to ESA-listed corals and other invertebrates will be "insignificant" because the species "are primarily associated with benthic habitats that do not overlap with the proposed lease areas." However, that conclusion is inconsistent with the biological assessment's inclusion of all five coral species' critical habitats in the "action area," which is defined as "all areas to be affected directly or indirectly by the federal action."

74. Finally, the biological assessment asserts effects to designated critical habitat for several species will be either "discountable" or "short term and temporary," so concludes the action is not likely to adversely affected any designated critical habitat.

75. On February 13, 2026, NMFS issued a four-page letter concurring in MMA's assessment that its "proposed action to issue up to two leases for the purpose of commercial mining and authorize early-stage data collection . . . may affect, but is not likely to adversely affect" approximately 60 ESA-listed species, including: endangered blue whales, fin whales, sei whales, and sperm whales, five listed sea turtle populations, five threatened coral species, and threatened oceanic whitetip sharks, giant manta rays, scalloped hammerhead sharks, and chambered nautilus, all of which are found in American Samoa waters. The list of species that NMFS concluded MMA's planned leasing action "may affect" also includes several imperiled species that are endemic to Hawaiʻi, including the critically endangered Main Hawaiian Island insular false killer whale and Hawaiian monk seal. NMFS's Letter of Concurrence states that it "concludes informal consultation under section 7 of the ESA" for the action.

76. Like MMA's biological assessment, NMFS's Letter of Concurrence does not contain any analysis of the effects of exploration, testing, development, or production on the leases, even though the stated intent of MMA's lease sales is to cause seabed mineral exploration, testing, development, and production in the areas offered for lease. Those post-lease activities are likely to harm ESA-listed marine mammals, sea turtles, sharks, manta rays, and corals, as well as critical habitat for corals, in the numerous ways discussed above.

77. Even for preliminary activities, NMFS's Letter of Concurrence does not evaluate the full scope of their effects. It discusses only potential acoustic impacts from survey equipment. While the Letter of Concurrence mentions the placement of moorings and other equipment during collection of seabed samples, it does not evaluate the potential impacts of any of those activities (*e.g.*, entanglement) on any species. The Letter of Concurrence also does not evaluate potential impacts from the vessels conducting preliminary activities on any listed species—specifically vessel strikes, vessel noise, or vessel discharges.

78. For the only stressor NMFS did purport to evaluate—HRG surveys—the Letter of Concurrence explains that some equipment has "the potential to produce acoustics which may produce noise sufficient to produce harm through auditory injury, temporary threshold shifts, or behavioral reactions." NMFS nonetheless concluded that no adverse effects would occur from that equipment based on its assumption that MMA "is implementing the criteria that equipment meet certain source levels, transmission frequencies, directionalities, beamwidths, tow depths, and pulse repetition rates to avoid potential adverse effects to the ESA-listed species under consideration." The Letter of Concurrence does not identify any binding way in which MMA is implementing those criteria. And there is nothing in MMA's biological assessment, proposed notice of sale, proposed lease stipulations, or proposed information to lessees that would impose such criteria.

79. NMFS assumed that "[n]o equipment will be allowed to operate at decibels greater than 160 dB." The biological assessment, however, indicates that MMA considers multibeam echosounders, side-scan sonar, and sub-bottom profilers to be permissible equipment for preliminary surveys. Published operating levels for that equipment are significantly higher than 160 decibels. And given the water depths of the area proposed for lease, it is virtually certain that HRG equipment will need to operate at decibels greater than 160 dB to obtain usable data. NMFS did not address these issues in its Letter of Concurrence.

80. Even if the equipment were limited to operating at 160 decibels, published research shows that marine mammals suffer behavioral disturbance at even lower sound levels. Further, published research shows that responses to a given sound level differ among marine mammal species. The Letter of Concurrence does not address this research or assess species-specific effects for the ESA-listed marine mammals that occur in the action area.

81. Chronic, ongoing sound also has different effects on marine mammals than short, discrete pulses. MMA estimates that the proposed lease sale will result in up to 1,716 days of geological, geotechnical, and biological sampling, with surveys occurring 24 hours a day. NMFS did not address the duration of surveys or the effect that lengthy, ongoing surveys will have on marine mammals, even if they were to operate below 160 decibels. Plaintiffs are informed and believe, and

on the basis of that belief allege, that NMFS reached its "not likely to adversely affect" conclusion based solely on its consideration of the acute effects of short bursts of sound below 160 decibels, ignoring impacts from chronic exposure.

82. Overall, NMFS's concurrence is unsupported by any reasoned analysis and is contrary to the best available science. There is no evidence that NMFS had sufficient information to reach a rational and well-supported conclusion concurring that the action is "not likely to adversely affect" any species or critical habitat.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION – NMFS's Letter of Concurrence Is Arbitrary and Capricious and Contrary to Law, in Violation of the APA and ESA.

83. Plaintiffs reallege and incorporate by this reference the preceding paragraphs of this Complaint.

84. Section 7(a)(2) of the ESA requires each federal agency, in consultation and with the assistance of the relevant wildlife agency, to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2). Such consultations must use the best available scientific information. *Id.*

85. In an informal consultation, NMFS, as the consulting wildlife agency, must review all relevant information and make a reasonable, factually supported decision as to whether to concur in the action agency's determination that the action is not likely to adversely affect any listed species or critical habitat. 50 C.F.R. §§ 402.12(j)–(k), 402.13; *see ESA Handbook* 3-6 ("All decisions reached during the [informal] consultation process must be based on sound science."). If NMFS "do[es] not agree with the action agency's determination of effects or if there is not enough information to adequately determine the nature of the effects," it may not issue a letter of concurrence. *ESA Handbook* 3-13.

86. NMFS's Letter of Concurrence is a final agency action as defined by the APA, for which there is no other adequate remedy in a court.

87. NMFS was required to consider and analyze all effects of the entire agency action in determining whether to concur in MMA's not likely to adversely affect determination. 50 C.F.R. §§ 402.12(a), 402.13; *ESA Handbook* 3-6 (stating concurrence must be "based on review of all potential effects, direct and indirect"). When a federal agency sells leases for resource extraction, the entire agency action includes not just leasing, but also exploration, development, and production from the leases. Accordingly, the entire agency action under consultation here includes leasing, exploration, testing, survey, and mining activities.

88. Even if exploration, testing, survey, and mining activities were not part of the agency action, their effects are nonetheless "indirect effects" of leasing because exploration, testing, survey, and mining activities "are caused by the proposed action." 50 C.F.R. § 402.02. Alternatively, exploration, testing, survey, and mining activities are "interrelated or interdependent with [MMA's leasing] action." *Id.*

89. NMFS did not include the effects of exploration, testing, survey, or mining activities in reaching its concurrence that the action is not likely to adversely affect any species or critical habitat. Therefore, NMFS's concurrence is arbitrary and capricious and contrary to the ESA and its implementing regulations.

90. In evaluating the effects of preliminary activities on leases, the Letter of Concurrence evaluates only impacts from HRG surveys. The Letter of Concurrence does not assess the effects of vessel strikes, vessel noise, vessel discharges, or mooring lines and buoys in reaching its concurrence that the action is not likely to adversely affect any species or critical habitat. Therefore, NMFS's concurrence is arbitrary and capricious and contrary to the ESA and its implementing regulations.

91. NMFS's conclusion that impacts from HRG surveys during preliminary activities would not cause adverse effects on species or critical habitat is premised on the assumption that MMA will implement requirements to limit

sound from survey equipment. There is, however, no evidence that MMA has committed to implementing HRG limits through binding measures. The Letter of Concurrence contains no evidence that NMFS considered whether MMA can or will do so, or whether HRG surveys are likely to satisfy such limits given the operating specifications of the equipment. NMFS's reliance on HRG limits to reach its concurrence decision is arbitrary and capricious and contrary to the ESA and its implementing regulations.

92. For the foregoing reasons, NMFS's Letter of Concurrence is arbitrary, capricious, an abuse of discretion, and not in accordance with section 7 of the ESA or its implementing regulations, in violation of the APA. 5 U.S.C. § 706(2)(A).

**SECOND CAUSE OF ACTION – NMFS Failed to Issue a Biological Opinion that Evaluated MMA's Entire Action, in Violation of the APA and ESA.**

93. Plaintiffs reallege and incorporate by this reference the preceding paragraphs of this Complaint.

94. To the extent that NMFS claims to have engaged in incremental step consultation pursuant to 50 C.F.R. § 402.14(k), that regulation requires NMFS to "issue a biological opinion on the incremental step being considered, including its views on the entire action." Among other things, the regulation requires NMFS to determine whether "[t]here is a reasonable likelihood that the entire action will not violate section 7(a)(2) of the Act." *Id.* § 402.14(k)(5).

95. NMFS did not issue a biological opinion for MMA's planned lease sale and did not express any views on whether the entire action, including exploration, testing, survey, and mining activities, would likely violate ESA section 7(a)(2).

96. For the foregoing reasons, NMFS's failures to issue a biological opinion and to express the required views are arbitrary, capricious, an abuse of discretion, and not in accordance with section 7 of the ESA or its implementing regulations, in violation of the APA. 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

97. Enter a declaratory judgment that NMFS's Letter of Concurrence violates the ESA, its implementing regulations, and the APA;

98. Hold unlawful and set aside NMFS's Letter of Concurrence;

99. Issue appropriate injunctive relief;

100. Maintain jurisdiction over this action until NMFS complies with the ESA, APA, and every order of this Court;

101. Award Plaintiffs the costs of this litigation, including reasonable attorney fees; and

102. Provide such other relief as may be just and proper.

DATED: Honolulu, Hawai‘i, August 18, 2026.

Respectfully submitted,

/s/ David L. Henkin
DAVID L. HENKIN
HARLEY M. BROYLES
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawai‘i 96813
T: (808) 599-2436
Email: dhenkin@earthjustice.org
hbroyles@earthjustice.org

CHRISTOPHER D. EATON
(*pro hac vice* pending)
EARTHJUSTICE
810 3rd Avenue, Suite 610
Seattle, Washington 98104
T: (206) 343-7340
Email: ceaton@earthjustice.org

JOSEPH V. LANGKILDE III
*(pro hac vice* pending)
EARTHJUSTICE
1250 I Street NW, Fourth Floor
Washington, DC 20005
T: (202) 667-4500
Email: jlangkilde@earthjustice.org

Attorneys for Plaintiffs
Fa‘asao Amerika Samoa and
Conservation Council for Hawai‘i