EARTHJUSTICE

August 18, 2026

**VIA CERTIFIED U.S. MAIL**
**RETURN RECEIPT REQUESTED**

Douglas Burgum
Secretary
U.S. Department of the Interior
1849 C Street, N.W.
Washington, DC 20240

Matthew Giacona
Acting Director
Marine Minerals Administration
1849 C Street, N.W.
Washington, DC 20240

Douglas Boren
Pacific Regional Director
Marine Minerals Administration
Pacific Office
760 Paseo Camarillo
Suite 102 (CM102)
Camarillo, CA 93010

Howard Lutnick
Secretary
U.S. Department of Commerce
1401 Constitution Avenue, NW
Washington, DC 20230

National Marine Fisheries Service
Office of Protected Resources
1315 East-West Highway
13th Floor
Silver Spring, MD 20910

National Marine Fisheries Service
Pacific Islands Regional Office
1845 Wasp Blvd., Bldg 176
Honolulu, HA 96818

Re: 60-Day Notice of Intent to Sue Over Violations of the Endangered Species Act and Outer Continental Shelf Lands Act

To whom it may concern:

On behalf of Faʻasao Amerika Samoa (FAS) and Conservation Council for Hawaiʻi (CCH), we serve this letter pursuant to 16 U.S.C. § 1540(g) and 43 U.S.C. § 1349(a)(2)(A) as official notice to the Secretary of the Interior, the Acting Director of the Marine Minerals Administration (MMA), and the Director of the MMA's Pacific Office for violations of the Endangered Species Act (ESA) and Outer Continental Shelf Lands Act (OCSLA) related to MMA's leasing of minerals off American Samoa. Specifically,



Exh A to Defendants' First Motion to Continue Hearing Date(s)

DEFENDANT'S EXHIBIT
A

MMA has announced plans to hold a lease sale for minerals off American Samoa on November 19, 2026, without first completing a legally sufficient consultation under section 7(a)(2) of the ESA[1] and without first conducting legally required studies of the environment and potential impacts under OCSLA before leasing in a new area.[2] If MMA does not remedy these legal errors before publishing a final notice of sale, we will file suit in federal court to resolve the matter.[3]

I. BACKGROUND

On June 16, 2025, MMA[4] published a "Request for information and interest" (RFI) for a potential mineral lease sale in an area offshore of American Samoa.[5] MMA described the "RFI Area" as 18.1 million acres "located near the eastern limit of the American Samoa [Outer Continental Shelf (OCS)] bordering Cook Islands Exclusive Economic Zone, northeast of the Manu'a [*sic*] Islands and Rose Atoll (roughly 70 nautical miles northeast of Rose Atoll)."[6]

MMA received over 76,000 comments in response to the RFI—the overwhelming majority of which explained why MMA should not proceed with leasing. This included unified opposition to the continued lease process by American Samoa's elected leaders, and a unanimous resolution in opposition to MMA's lease process by the American Samoa Legislature.

On November 20, 2025, MMA continued with its lease process and announced an "Area ID" that nearly doubled the size of the proposed area for leasing to over 33 million acres. On January 16, 2026, MMA submitted a request to the National Marine Fisheries Service for an "expedited informal ESA and [Essential Fish Habitat] consultation" for its proposed action of selling two leases, approximately 67,000 km$^2$ in

---

[1] 16 U.S.C. § 1536(a)(2).

[2] 43 U.S.C. § 1346.

[3] The National Marine Fisheries Service (NMFS) has also violated its duties under ESA section 7(a)(2) with respect to the consultation regarding MMA's leasing of minerals off American Samoa, as detailed in the complaint that FAS and CCH filed today, which is attached hereto and is incorporated herein by reference

[4] Many of the actions and documents referenced in this letter involved MMA's predecessor agency, the Bureau of Ocean Energy Management (BOEM). This letter uses "MMA" to refer to both agencies.

[5] 90 Fed. Reg. 25369 (June 16, 2025).

[6] *Id.* at 25371.

size each.[7] On February 17, 2026, MMA received NMFS's Letter of Concurrence (LOC),[8] concurring with MMA's assessment that the Proposed Action is not likely to adversely affect any ESA-listed species, including, but not limited to:

- Blue whale*
- Fin whale*
- Sei whale*
- Sperm whale*
- Main Hawaiian Island insular false killer whale
- Hawaiian monk seal
- Central North Pacific green turtle
- Central South Pacific green turtle*
- Hawksbill turtle*
- Leatherback turtle*
- North Pacific Loggerhead turtle
- South Pacific Loggerhead turtle*
- Olive ridley sea turtle*
- Oceanic whitetip shark*
- Giant manta ray*
- Chambered nautilus*
- *Acropora globiceps**
- *Acropora retusa**
- *Acropora speciosa**
- *Fimbriaphyllia paradivisa**
- *Isopora crateriformi**

* Species found in American Samoa's waters

In addition to the species listed in the LOC, MMA's BA also considers effects on five clam species found in American Samoa's waters that are currently proposed for listing,[9] including:

- Fluted giant clam
- Horse's hoof clam
- Small giant clam
- Smooth giant clam
- True giant clam

[7] BOEM, *Commercial Leasing for Minerals Offshore American Samoa: Biological Assessment and Essential Fish Habitat Assessment* 11 (Apr. 2026) [hereinafter BA or Biological Assessment].

[8] After receiving NMFS's LOC, the agencies apparently discovered an operational error in the BA regarding the sound source level used in its acoustic analysis. MMA then issued a new BA in April 2026, but the impact determinations made in the February BA remain unchanged. *Id.*

[9] *Id.* at 81–82; 89 Fed. Reg. 60498 (Jul. 25, 2024).

Additionally, the BA considers effects on the critical habitats of leatherback turtles[10] and the above-listed corals,[11] and acknowledges NMFS and the U.S. Fish and Wildlife Service (FWS) proposed critical habitat designations for distinct population segments (DPS) of green turtles, including for the endangered Central South Pacific DPS and the threatened Central North Pacific DPS.[12]

Both MMA's BA and NMFS's LOC assessments of these species and critical habitats consider only direct effects from "preliminary activities" on the leases. They do not consider any effects from lease exploration, development, or production, or any other cumulative or indirect effects of the Proposed Action.

On July 17, 2026, MMA published a notice of availability in the Federal Register of the Proposed Leasing Notice for American Samoa Outer Continental Shelf (OCS) Pacific Mineral Lease Sale 1 (PACM-1).[13] MMA proposes to hold the lease sale on November 19, 2026, and will offer for sale two leases encompassing almost all of the area described in the Area ID—over 31 million acres total. The Proposed Leasing Notice specifies, "Any lease(s) that are issued will grant rights to develop these deposit types [polymetallic nodules and ferromanganese crust deposits] and any minerals found in direct association with those specified deposits."[14] The proposed leases include lease stipulations governing exploration, testing, survey, and mining activities.

MMA also published an Environmental Assessment (EA) with its Proposed Leasing Notice.[15] The EA states that the "need" for the lease sale is "to provide access to marine minerals that could potentially be an important and underutilized domestic source."[16] The proposed sale "aims to facilitate the potential exploration and development" of those minerals.[17] The BA contains essentially identical language. And like the BA, the EA does not include any evaluation of impacts from exploration,

---

[10] BA at 104; 77 Fed. Reg. 4170 (Jan. 26, 2012).

[11] BA at 104; 90 Fed. Reg. 31800 (Jul. 15, 2025); 90 Fed. Reg. 39339 (Aug. 14, 2025).

[12] BA at 106; 88 Fed. Reg. 46572 (Jul. 19, 2023).

[13] 91 Fed. Reg. 44870 (Jul. 17, 2026).

[14] BOEM, *Proposed Leasing Notice (PACM-1)* at 4 (2026).

[15] BOEM, *Commercial Leasing for Minerals Offshore American Samoa Environmental Assessment* (Jul. 2026) [hereinafter EA].

[16] *Id.* at 2.

[17] *Id.* at 1.

testing, development, or mining on the leases; it evaluates only direct effects of preliminary activities.

## II. THE ENDANGERED SPECIES ACT

Section 7(a)(2) of the ESA imposes a continuing and affirmative duty on federal agencies to "insure that any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of" its critical habitat.[18] The ESA and its implementing regulations establish an interagency consultation process to assist federal agencies in complying with this duty. Congress established the section 7 consultation process explicitly to "ensur[e] agency compliance with the [ESA's] substantive provisions."[19] The duty to consult is triggered whenever an action "may affect" a listed species or critical habitat, or when a new species is listed that may be affected by the action, or new information reveals that the action may affect an endangered or threatened species in a manner or to an extent not previously considered.[20]

To facilitate compliance with section 7(a)(2), the action agency must prepare a biological assessment to "evaluate the potential effects of [its] action on listed and proposed species and designated and proposed critical habitat and determine whether any such species or habitat are likely to be adversely affected by the action."[21] In fulfilling section 7(a)(2)'s requirements, both the action agency and the consulting wildlife agency must "use the best scientific and commercial data available."[22] Moreover, when engaging in ESA section 7 consultation, the agencies must analyze the effects of the entire agency action.[23] "Effects of the action refers to the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action that will be added to the environmental baseline."[24] Indirect effects include "those that are caused by the proposed action and are later in time, but still are reasonably certain to occur."[25]

---

[18] 16 U.S.C. § 1536(a)(2).

[19] *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1223 (9th Cir. 2008).

[20] 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.12, .16.

[21] 50 C.F.R. § 402.12(a); *see also* 16 U.S.C. § 1536(c)(1).

[22] 16 U.S.C. § 1536(a)(2).

[23] 50 C.F.R. § 402.02.

[24] *Id.*

[25] *Id.*

Interrelated actions include "those that are a part of a large action and depend on the larger action for their justification," and interdependent actions consist of "those that have no independent utility apart from the action under consideration."[26] The ESA requires analyzing these effects before taking any action, even "[w]hen the action is authorized by a statute that allows the agency to take incremental steps toward the completion of the action."[27]

Once an action agency concludes that its planned action "may affect" ESA-listed species or critical habitat, it must initiate formal consultation with NMFS, unless the action agency determines and NMFS concurs in writing that the action is "not likely to adversely affect" any listed species or critical habitat.[28] A concurrence letter must document NMFS's "analysis, based on review of all potential effects, direct and indirect."[29] "If the nature of the effects cannot be determined, benefit of the doubt is given to the species," and NMFS may "not concur."[30]

If NMFS does not reasonably and legally concur in writing that the action is not likely to adversely affect any listed species or critical habitat, then formal consultation is required.[31] Formal consultation involves a more comprehensive evaluation of the effects of the action that culminates in a biological opinion on whether the action is likely to jeopardize the continued existence of the species or to destroy or adversely

---

[26] *Id.*

[27] *Id.* § 402.14(k).

[28] *Id.* §§ 402.13(c), 402.14(a), (b)(1).

[29] U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv., *Endangered Species Consultation Handbook* 3-12 (1998) [hereinafter *ESA Handbook*].

[30] *Id.*

[31] 50 C.F.R. § 402.14(a). The ESA regulations provide for consultation to occur in stages "[w]hen the action is authorized by a statute that allows the [action] agency to take incremental steps toward the completion of the action." *Id.* § 402.14(k). *But see Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 890 (9th Cir. 2022) ("[I]incremental-step consultation is inadequate to comply with the ESA."). When such a statute is involved, the consulting wildlife agency "shall, if requested by the [action] agency, issue a biological opinion on the incremental step being considered." 50 C.F.R. § 402.14(k). In its biological opinion, the consulting wildlife agency must "includ[e] its views on the entire action," *id.*,—not just the first incremental step—and determine, among other things, whether "[t]here is a reasonable likelihood that the entire action will not violate [ESA] section 7(a)(2)." *Id.* § 402.14(k)(5).

modify critical habitat.[32] If NMFS concludes in the biological opinion that the proposed action is likely to jeopardize a species, it must specify reasonable and prudent alternatives, if any, that would avoid the likelihood of jeopardy, or specify that no such alternatives exist.[33] If it concludes that the action is not likely to jeopardize the continued existence of the species, but that incidental take of a listed species will occur, NMFS must produce a written "statement concerning incidental take" that "[s]pecifies the impact of incidental taking as the amount or extent of such taking" on the species.[34] An incidental take statement must also specify "reasonable and prudent measures" that are "necessary or appropriate to minimize [the] impact of incidental taking on the species" and the "terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency" to implement the measures.[35]

## III. MMA'S VIOLATION OF THE ESA

It is undisputed that the planned lease sale "may affect" numerous ESA-listed species and critical habitats.[36] MMA accordingly was correct to initiate consultation with NMFS. However, MMA improperly and unlawfully limited the scope of the action and its effects to only "preliminary activities" on leases, and on that basis concluded that the action is not likely to adversely affect any listed species or critical habitat. In turn, NMFS inappropriately and unlawfully limited the scope of effects it considered to concur that the action is not likely to adversely affect any listed species or critical habitat. NMFS's LOC is therefore legally invalid. It cannot satisfy MMA's duty under section 7 to consult on the full scope of the action and its effects.

In addition, MMA's and NMFS's assessments of the effects of preliminary activities are arbitrary and capricious and contrary to the ESA. The agencies did not rationally evaluate the effects of High-Resolution Geophysical (HRG) surveys or harm from vessels. NMFS's LOC is thus legally invalid, and MMA may not rely on it to meet its section 7 duty to complete consultation on even just preliminary activities.

---

[32] 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(c)–(h).

[33] 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2).

[34] 50 C.F.R. § 402.14(i)(1)(i); *see* 16 U.S.C. § 1536(b)(4).

[35] 50 C.F.R. § 402.14(i)(1)(ii), (iv); *see* 16 U.S.C. § 1536(b)(4).

[36] *See generally* BA.

A. MMA's Consultation Did Not Include the Full Scope of the Effects of the Action.

Section 7(a)(2) requires MMA to evaluate the full scope of effects of an action, including "direct and indirect effects of an action on the species or critical habitat," as well as "other activities that are interrelated or interdependent with that action."[37] Not only preliminary activities, but also exploration, testing, survey, and mining activities, are effects of the proposed lease sale. Accordingly, the ESA and its implementing regulations require MMA and NMFS to include the effects of those activities in consultation at the lease sale stage. Neither agency did so, in violation of the ESA.

It cannot be disputed that exploration, development, and production on a lease are "caused by" the proposed lease sale and are "reasonably certain to occur," so are by definition "indirect effects."[38] MMA's BA and EA both state that the "need" for the lease sale is "to provide access to marine minerals that could potentially be an important and underutilized domestic source."[39] If it is not reasonably foreseeable that mineral extraction will occur, then the proposed sale does not meet the stated "need," and it would be arbitrary and capricious for MMA to select a leasing alternative. Further, the stated purpose of the lease sale in both the BA and EA is to "facilitate the potential development" of deep-sea minerals.[40] Even if exploration, testing, survey, and mining activities were not indirect (or direct) effects of leasing, they are interrelated and/or interdependent actions: leasing and exploration/extraction serve no independent utility apart from one another, and they depend on one another for their justification. Exploration and extraction activities and their effects are "effects of the action" that must be included in the scope of section 7 consultation under the ESA and its implementing regulations.

Despite the law and MMA's stated purpose for the lease sale, MMA's consultation with NMFS omitted the intended mineral exploration, development, and production from the "Effects of the Action." Rather, the BA evaluates—and NMFS concurred on—only the effects of "preliminary activities" on the leases. MMA apparently attempts to unlawfully segment its consultation by claiming "future plans" for exploration and development would "be evaluated under separate environmental

[37] 50 C.F.R. § 402.02.

[38] *Id.*

[39] EA at 2; *see also* BA at 9 (stating proposed "seabed leasing aligns with ensuring secure and sustainable domestic supply of strategic minerals").

[40] EA at 1; BA at 9.

review."[41] Even if MMA sought to engage in an incremental step consultation, however, the ESA regulations require completion of formal consultation and a biological opinion at the initial step of the action: at the lease sale stage.[42] MMA and NMFS did not comply with that requirement here.

There are multiple ways in which exploration, testing, surveying, and mining activities on the proposed leases would adversely affect ESA-listed species and critical habitats. MMA must include all the effects of the Proposed Action in a consultation before leasing, including but not limited to those discussed below. The extent and degree of these impacts require formal consultation; MMA and NMFS cannot rationally conclude that the effects of MMA's entire action are not likely to adversely affect any ESA-listed species.

1. Sediment Disturbance

Deep-sea mining activities will cause sediment disturbance and plumes that negatively impact ESA-listed species and their critical habitats. Two types of plumes will result from seabed mining: collector plumes (sediment particles kicked up by mining equipment disturbing the seabed) and midwater plumes (fine sediment particles and residual mineral fragments released from a collector vehicle or surface vessel after filtering out selected nodules).[43] Both plumes both pose the same types of risks to species.

Sediment plumes will release toxic substances into the water column. Seabed sediments contain toxic substances including copper, cadmium, zinc, and lead, as well as rare earth elements. When these substances are discharged into the water column, they harm the habitat and can enter the food chain and bioaccumulate in species like

---

[41] EA at 3.

[42] 50 C.F.R. § 402.14(k) (requiring NMFS to include in a biological opinion "its views on the entire action" and determine, among other things, whether "[t]here is a reasonable likelihood that the entire action will not violate [ESA] section 7(a)(2)").

[43] *See* Jeffrey C. Drazen et al., *Report of the Workshop Evaluating the Nature of Midwater Mining Plumes and Their Potential Effects on Midwater Ecosystems*, RESEARCH IDEAS AND OUTCOMES (Feb. 6, 2019). Earthjustice provided MMA with PDFs of these and other documents cited herein with its comments on the RFI, so MMA already has these documents in its administrative record for the proposed lease sale.

giant manta rays and whales, as well as other imperiled species.[44] Sediment plumes also absorb light and change backscatter properties, reducing visual communication and bioluminescent signaling that is essential for prey capture and reproduction in midwater species,[45] such as ESA-listed whales that occur in the proposed lease area. Accordingly, animals living in the midwater or vertically migrating from deep waters for feeding—including ESA-listed whales, sea turtles, sharks, rays, and chambered nautilus—are likely to be harmed by sediment plumes through "clogged gills, impaired feeding, a reduced ability to communicate, and effects from increased toxicity."[46]

Sediment plumes can extend beyond the area where mining is occurring because ocean currents can transport sediment plumes beyond the immediate mining area, up to 100km or farther.[47] As the plumes settle in neighboring regions, they alter the physicochemical conditions of the seafloor and affect the ocean species thereupon.[48] This will impact ESA-listed coral species—as well as clam species proposed for listing—that live in the waters in and around Rose Atoll. When the plumes resettle, they could affect sessile fauna, clog filter-feeding mechanisms, and, depending on the spatial and temporal scales of the plume and its nature, cause changes in ecosystems and habitats.[49] In one study considering a series of simulated disturbances, the decline in diversity and biomass of marine organisms in disturbed areas was particularly evident among benthic organisms, including corals.[50] Increased sedimentation and turbidity from nearshore mining waste have also been shown to have a substantial impact on coral assemblages that are otherwise not naturally exposed to elevated sediment levels for

---

[44] Chris Hauton et al., *Identifying Toxic Impacts of Metals Potentially Released during Deep-Sea Mining-A Synthesis of the Challenges to Quantifying Risk*, 4 FRONTIERS IN MARINE SCIENCE 9 (2017).

[45] Jeffrey C. Drazen et al., *Midwater ecosystems must be considered when evaluating environmental risks of deep-sea mining*, 117 PNAS 17458 (2020).

[46] Diva J. Amon et al., *Assessment of scientific gaps related to the effective environmental management of deep-seabed mining*, 138 MARINE POLICY 8 (2022).

[47] *See* Smith et al., *Deep-sea Misconceptions Cause Underestimation of Seabed-Mining Impacts*, 35 SCIENCEDIRECT 10, at 855–56 (Oct. 2020).

[48] Wen Yao et al., *Development of deep-sea mining and its environmental impacts: a review*, 12 FRONTIERS IN MARINE SCIENCE 5 (2025).

[49] Luc Cuyvers et al., *Deep seabed mining: A rising environmental challenge*, INTERNATIONAL UNION FOR CONSERVATION OF NATURE 63–64 (2018).

[50] Yao et al., *supra* note 48, at 05.

extended periods.[51] After such exposure, it is difficult for coral communities to recover, given that sediment from mining reduces the availability of substrate suitable for the settlement of juvenile corals.[52] The same effects may result from ocean transportation of deep-sea mining waste and sediments.

2. Noise Pollution

Seabed mining creates noise that will disturb ESA-listed species and their ability to communicate and navigate. Noise will occur near the deep seabed where mining occurs and throughout the water column to the surface near mining and support vessels, affecting a broad range of organisms in different ways. Tracked mining equipment can produce high levels of sound as it travels across the seafloor and utilizes heavy suction. Intensive vessel operations and use of acoustic survey equipment during extraction activities will further ensonify the water column.[53]

Sound is the primary modality for many marine organisms to probe their environment and to communicate, either through sensing of pressure or particle motion.[54] Most deep-sea species typically experience only low levels of noise. Continuous anthropogenic noise will significantly increase ambient sound levels, negatively affect the normal life activities of marine organisms, and potentially disturb the communication and navigational functions of some species.[55] Noise from human activities can impact organisms ranging from plankton to whales and can directly damage acoustic sensors or induce certain unusual behavior, especially in marine mammals.[56] Indeed, the BA already recognizes that ESA-listed marine mammals and sea turtles suffer harm and significant behavioral effects from anthropogenic sound. Furthermore, vessels operating at the surface increase noise in the ocean and, combined with vibration, can affect the auditory systems of species, inducing behavioral changes,

---

[51] *See* M. D. E. Haywood et al., *Mine waste disposal leads to lower coral cover, reduced species richness and a predominance of simple coral growth forms on a fringing coral reef in Papua New Guinea*, 115 MARINE ENVIRONMENTAL RESEARCH 42–43 (2016).

[52] *Id.* at 46.

[53] Exploration, testing, and extraction are likely to involve more frequent and more numerous activities than the "preliminary activities" assessed in the BA.

[54] Rob Williams et al., *Noise from deep-sea mining may span vast ocean areas: Potential harm is understudied and largely overlooked*, 377 SCIENCE 1 (2022).

[55] Yao et al., *supra* note 48, at 06.

[56] Williams et al., *supra* note 54, at 1–2; *see* Bernd Christiansen et al., *Potential effects of deep seabed mining on pelagic and benthopelagic biota*, 114 MARINE POLICY 4 (2020).

masking communication, and even causing temporary or permanent changes in hearing thresholds.[57] Deep-sea mining will significantly interfere with essential behaviors of ESA-listed ocean species that use sound to navigate, feed, reproduce, and survive, including imperiled species such as blue whales, fin whales, sei whales, sperm whales, and sea turtles.

3. Water Pollution

Aside from sediment discharges, intensive seabed mining activities are likely to result in oil spills, chemical leaks, garbage dumping from mining vessels, introduction of invasive species (e.g., transport of animals, microorganisms, and viruses from the seafloor to the water surface), and emissions of carbon dioxide and sulfur dioxide.[58] Water pollution can introduce toxins into the water, disrupting ecosystems and causing illness in ESA-listed species. Marine debris can entangle ESA-listed whales, sea turtles, and fishes. Entanglement or ingestion of fishing gear can impede the ability of marine species to feed and can cause injuries that eventually lead to infection and death.

4. Vessel Impacts

Vessels harm the environment in many ways, including through air emissions, fluid discharges and oil spills, marine debris, noise, and vessel strikes.[59] These impacts will not only occur at the lease site, but also along the entire route between the lease and ports. Deep-sea mining activities will increase vessel traffic in American Samoa's waters, threatening harm to highly migratory species such as ESA-listed whale, turtle, shark, and ray species that live in and around the proposed lease area. Increased vessel traffic to and within Hawai'i's waters from the proposed lease area increases vessel threats to Hawai'i-based species, such as the Main Hawaiian Islands Insular False killer whale and Hawaiian monk seal.

---

[57] Yao et al., *supra* note 48, at 07.

[58] *Id.*

[59] *See generally* BOEM, *Gulf of Mexico Regional OCS Oil and Gas Lease Sales, Draft Programmatic Environmental Impact Statement* (2024); NMFS, *Biological and Conference Opinion on Bureau of Ocean Energy Management and Bureau of Safety and Environmental Enforcement's Oil and Gas Program Activities in the Gulf of America* (2025) [hereinafter Gulf BiOp].

5. Light Pollution

Light from deep seabed mining will adversely affect marine wildlife, from the ocean floor to the surface. The seafloor and abyssal zone have no sunlight, so light emanating from seafloor mining equipment can disrupt bioluminescence and harm the eyes of species that otherwise do not experience light. Surface lights on boats and mining equipment are also known to be harmful to ocean life.[60] Light pollution will be especially harmful for the natural behavior of species such as the chambered nautilus—which lives in deeper waters and migrates vertically to the midwater for feeding. Light pollution can also affect prey distribution for whales and sea turtles, affecting their ability to feed.

* * *

Holding the lease sale in reliance on an informal consultation that does not include all effects of the action violates section 7 of the ESA. Further, MMA's limitation on the scope of effects caused it (and NMFS) to disregard the best available scientific and commercial data on exploration and mining impacts.[61] MMA may not hold the proposed lease sale without first conducting a legally sufficient section 7 consultation.

Given the reasonably foreseeable effects of the proposed action, formal consultation is required here. Formal consultation is further required if MMA sought to engage in an incremental step consultation.[62]

B. The Evaluation of Preliminary Activities in the Informal Consultation Is Arbitrary and Contrary to Law.

Even if the ESA did not require an evaluation of activities beyond preliminary activities (and it does), relying on NMFS's LOC to hold the lease sale violates section 7(a)(2) because the agencies' evaluation of the effects of preliminary activities is arbitrary and contrary to law. First, NMFS did not evaluate the full scope of effects from preliminary activities. Second, the agencies' "not likely to adversely affect" conclusion unlawfully relies on nonbinding mitigation. And third, the agencies'

---

[60] *See* Jorgen Berge et al., *Artificial light during the polar nights disrupts Arctic fish and zooplankton behaviour down to 200 m depth*, COMMUNICATIONS BIOLOGY (2020); Laura Marangoni et al., *Impacts of artificial light at night in marine ecosystems—A review*, GLOBAL CHANGE BIOLOGY (2022).

[61] 16 U.S.C. § 1536(a)(2).

[62] 50 C.F.R. § 402.14(k).

evaluation of effects from HRG surveys is arbitrary and contrary to the best available science.

The BA concludes that the effects of "preliminary activities" on the leases will be insignificant, and NMFS concurred. The BA indicates that preliminary activities will entail the use of HRG surveys (including multibeam echosounders, side-scan sonar, and sub-bottom profilers), seabed sampling by remotely operated vehicles, anchors on the seafloor for buoys and data collection instruments, and seabed box core sampling, among other actions.

Preliminary activities will affect ESA-listed species in the action area in several ways. The BA indicates preliminary activities will harm marine mammals and sea turtles through: 1) noise from HRG surveys, geotechnical surveys, aircrafts, and vessels; 2) potential collisions with project-related vessels; 3) potential entanglement in mooring systems associated with the installation of buoys and with the deep-tow survey systems; 4) disturbance to feeding or modified prey abundance; 5) habitat disturbance; and 6) accidental release of pollutants and marine debris. The BA further states that the effects of preliminary activities on sharks and rays include habitat disturbance, sediment resuspension (from sampling), fish aggregating device effects of buoys and mooring lines, entanglement, noise from surveys and vessels, artificial light, electromagnetic field alteration, ship strikes, and pollution from oil spills and marine debris. While the EA (as well as the BA) states the impacts are anticipated to be "insignificant," it indicates that MMA could not estimate the extent of many impacts.[63]

NMFS's LOC addresses only potential acoustic impacts from survey equipment. While NMFS mentions the placement of moorings and other equipment during the collection of seabed samples, the LOC does not evaluate the potential impacts of any of those activities (*e.g.*, entanglement) on any species. The LOC also does not evaluate potential impacts from the vessels conducting preliminary activities on any listed species—specifically vessel strikes, vessel noise, or vessel discharges. Therefore, the LOC fails to document a rational "review of all potential effects" from the preliminary activities, so it does not meet the requirements for an informal consultation.[64]

For the only stressor NMFS did purport to evaluate—HRG surveys—the LOC explains that some equipment has "the potential to produce acoustics which may produce noise sufficient to produce harm through auditory injury, temporary threshold

---

[63] *See e.g.*, EA at 44.

[64] *ESA Handbook* 3-12; *see* 50 C.F.R. §§ 402.12(a), 402.13; *ESA Handbook* 3-6.

shifts, or behavioral reactions." NMFS nonetheless concluded that no adverse effects would occur from that equipment based on its assumption that MMA "is implementing the criteria that equipment meet certain source levels, transmission frequencies, directionalities, beamwidths, tow depths, and pulse repetition rates to avoid potential adverse effects to the ESA-listed species under consideration." The LOC does not identify any binding way in which MMA is implementing those criteria. And there is nothing in MMA's BA, proposed notice of sale, proposed lease stipulations, or proposed information to lessees that would impose such criteria. NMFS may not, therefore, lawfully rely on this nonbinding mitigation to justify its LOC.

Moreover, NMFS assumed "[n]o equipment will be allowed to operate at decibels greater than 160 dB." The BA indicates that multibeam echosounders, side-scan sonar, and sub-bottom profilers are permissible equipment for preliminary activities. Published operating levels for that equipment are significantly higher than 160 decibels. And given the water depths of the area proposed for lease, it is virtually certain that HRG equipment will need to operate at decibels greater than 160 dB to obtain usable data. NMFS did not consider these factors when assuming equipment will operate below 160 db at the source.

Further, chronic, ongoing sound also has different effects on marine mammals than short, discrete pulses.[65] Chronic exposure to high levels of anthropogenic sound may result in chronic stress and mask important biological sounds.[66] MMA estimates that the proposed lease sale will result in up to 1,716 days of geological, geotechnical, and biological sampling, with surveys occurring 24 hours a day. The LOC does not address the duration of surveys or the effect that lengthy, ongoing surveys will have on marine mammals, even if they were to operate below 160 decibels.

MMA's analysis of preliminary activities is incomplete, and NMFS's concurrence is unsupported by any reasoned analysis and is contrary to the best available science. MMA's reliance on this inadequate consultation violates its duties under ESA section 7(a)(2).

## IV. MMA'S VIOLATION OF THE OUTER CONTINENTAL SHELF LANDS ACT

The Department of the Interior has not previously held an OCSLA lease sale in waters off American Samoa for oil and gas or any mineral. Accordingly, OCSLA

---

[65] *See* Gulf BiOp at 415 (2025).

[66] *Id.*

requires MMA to commence a sufficient environmental study at least six months before holding any lease sale.[67] MMA has not commenced nor completed any such study as of this date, which is less than six months before the planned sale date. MMA thus is in violation of OCSLA requirements.

Mineral leasing, exploration, and development can have multiple effects on a broad swath of the marine and coastal environment. OCSLA requires conducting a study that is sufficient in scope to understand the baseline conditions of the affected environments, as well as the range of ways mineral development may affect those environments.

As explained in comment letters from environmental groups, scientists, and others on the RFI, American Samoa is surrounded by a diverse and unique ocean habitat. The shallow-water coral reefs are home to about 342 coral species, covering 115 square miles, and support over 930 different species of fish and over 2,700 different ocean species in general.[68] The National Marine Sanctuary of American Samoa, which overlaps with the Rose Atoll Marine National Monument, was established in recognition of this immense biodiversity. The productive shelf and slope waters of the Samoan Archipelago, including Rose Atoll, were formally identified as an Important Marine Mammal Area for thirteen marine mammal species by the International Union for Conservation of Nature Marine Mammal Protected Areas Task Force.[69]

The Samoan Basin, including the entirety of the proposed lease area, has been historically under-surveyed. Many scientific studies acknowledge that there is a need for more scientific data and information about the deep sea and how mining may affect it.[70] Specifically, there is a need for "additional baseline data on deep ocean

---

[67] 43 U.S.C. § 1346.

[68] National Park of American Samoa et al., *Natural History Guide to American Samoa* at 38 (2009) https://www.nps.gov/npsa/learn/nature/upload/nathistguideas09.pdf; Office of National Marine Sanctuaries, *Condition Report American Samoa*, at 38 (2022) https://nmssanctuaries.blob.core.windows.net/sanctuaries-prod/media/docs/2022-nmsas-condition-report.pdf.

[69] Marine Mammal Protected Areas Task Force, *Samoan Archipelago IMMA*, https://www.marinemammalhabitat.org/wp-content/uploads/imma-factsheets/PacificIslands/samoan-archipelago-PacificIslands.pdf.

[70] *See, e.g.*, Luc Cuyvers et al., *supra* note 49, at 64; Daniel C. Dunn et al., *A strategy for conservation of biodiversity on mid ocean ridges from deep-sea mining*, SCIENCE ADVANCES

biodiversity, connectivity and life cycles of local species, temporal dynamics of deep-sea ecosystems, benthopelagic coupling via food webs, ecotoxicology associated with exposure to re-suspended metals and materials, modelling of deep ocean currents and associated dispersal of sediment plumes and chemical elements contained therein."[71]

The EA for the lease sale also acknowledges that MMA lacks sufficient environmental information to assess and manage the impacts of leasing. It admits that "[v]ery little is known" about affected habitats and that "baseline data collection is needed to assess biodiversity, connectivity, and potential sensitivity to anthropogenic stressors."[72] OCSLA requires MMA to collect those data *before* leasing, not after.

Two comment letters from scientists in response to the RFI, in particular, explain study needs.[73] Affected habitats, biota, and resources that MMA must study include, but are not limited to:

- Bathymetry: particularly the eastern margin of the American Samoa EEZ
- Abyssal Seafloor: including fishes, corals, and other micro- and macro-fauna and other invertebrates (using visual animal transect surveys); microbial communities, sediment; sound profiles
- Water column: including fishes, marine mammals, sea turtles, and invertebrates; currents; sound profiles; biomass and diversity depth profiles; fisheries.
- Seamounts/knolls: including eddies around seamounts
- Mineral data

---

10 (2018); Pacific Possible, *Precautionary Management of Deep Sea Minerals*, THE WORLD BANK 8 (2017).

[71] Cuyvers et al., *supra* note 49, at 66.

[72] EA at 26–28; *see also, e.g.*, *id.* at 32, 45.

[73] Letter from Dr. Jeffrey C. Drazen et al., Re: Commercial Leasing for Outer Continental Shelf Minerals Offshore American Samoa—Request for Information and Interest, Docket No. BOEM-2025-0035 (2025); Letter from Dr. Beth N. Orcutt et al., RE: Information on Knowledge Gaps Pertaining to Commercial Leasing for Outer Continental Shelf Minerals Offshore American Samoa (90 FR 25369, 2025-10955, BOEM-2025-0035) (Aug. 13, 2025). Both of these letters are part of the regulations.gov docket for this matter. *See also* International Seabed Authority, *Recommendations for the guidance of contractors for the assessment of the possible environmental impacts arising from exploration for marine minerals in the Area* (ISBA/25/LTC/6/Rev.3).

- Identification of indicator taxa or variables
- Ecosystem services provided by seamount and nodule habitats

These studies should be conducted using protocols that can observe seasonal variability.

MMA must also study impacts from mining activities including, but not limited to:

- Biodiversity loss
- Release of metals and toxic substances
- Sediment plumes from both mining on the seabed and discharges after minerals are transported to vessels[74]
- Noise and light
- Increase vessel traffic

MMA has not completed or, to our knowledge, even commenced studies to assess the affected resources and impacts. With its proposal to hold a lease sale in less than six months' time, MMA has failed to comply with its legal obligations under 43 U.S.C. § 1346.

V. NOTICE OF INTENT TO SUE

The ESA requires MMA to consult on the full scope of effects of the entire action. It has failed to do so. MMA may not rely on NMFS's arbitrary and unlawful—and thus invalid—LOC to proceed with leasing.[75] MMA must complete formal consultation with NMFS and obtain a legally sufficient biological opinion that analyzes all effects of deep-sea mining activities on ESA-listed species and critical habitats using the best scientific and commercial data available. If MMA makes a final decision to hold the proposed lease sale before it completes the required ESA consultation, FAS and CCH intend to file suit for declaratory and injunctive relief. *See* 5 U.S.C. § 706(2); 16 U.S.C. § 1540(g)(1)(A).

---

[74] *See* 43 U.S.C. § 1346(a)(3) (requiring that study be sufficient to predict impacts from "chronic low level pollution or large spills").

[75] The complaint that FAS and CCH filed today challenging NMFS's LOC (attached) details the many ways in which NMFS violated the ESA.

Separately, OCLSA does not allow MMA to hold a lease sale in an area where it has not conducted sufficient studies to "establish information needed for assessment and management of environmental impacts on the human, marine, and coastal environments of the outer Continental Shelf and the coastal areas which may be affected by . . . mineral development."[76] Interior has not conducted such studies in or around the area proposed for leasing offshore of American Samoa. If MMA makes a final decision to hold the proposed lease sale before it completes the required studies, FAS and CCH intend to file suit for declaratory and injunctive relief. *See* 5 U.S.C. § 706(2); 43 U.S.C. § 1349(a)(1), (6).

If you believe any of the foregoing is in error, have any questions, or would like to discuss this matter, please do not hesitate to contact us.[77]

Mahalo for your prompt attention to this matter.

Sincerely,

Christopher D. Eaton
David L. Henkin
Harley M. Broyles
JV Langkilde
EARTHJUSTICE

Attorneys for Fa'asao Amerika Samoa
and Conservation Council for Hawai'i

Attachment

[76] 43 U.S.C. § 1346(a)(1).

[77] Kindly contact Chris Eaton at ceaton@earthjustice.org or 206-508-7471 if you wish to discuss the contents of this letter.

DAVID L. HENKIN #6876
HARLEY M. BROYLES #11640
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawai'i 96813
T: (808) 599-2436
Email: dhenkin@earthjustice.org
hbroyles@earthjustice.org

CHRISTOPHER D. EATON
(*pro hac vice* pending)
EARTHJUSTICE
810 3rd Avenue, Suite 610
Seattle, Washington 98104
T: (206) 343-7340
Email: ceaton@earthjustice.org

JOSEPH V. LANGKILDE III
(*pro hac vice* pending)
EARTHJUSTICE
1250 I Street NW, Fourth Floor
Washington, DC 20005
T: (202) 667-4500
Email: jlangkilde@earthjustice.org

Attorneys for Plaintiffs
Fa'asao Amerika Samoa and
Conservation Council for Hawai'i

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAI'I

| | |
|---|---|
| FA'ASAO AMERIKA SAMOA and CONSERVATION COUNCIL FOR HAWAI'I, Plaintiffs, | CIVIL NO. CV-26-438 |
| v. | COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| NATIONAL MARINE FISHERIES SERVICE and HOWARD LUTNICK, in his official capacity as Secretary of Commerce of the United States, Defendants. | |

Case 1:26-cv-00438-JAO-KJM Document 1 Filed 08/26 Page 35 of 56 PageID.57

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Fa'asao Amerika Samoa and Conservation Council for Hawai'i (collectively, Plaintiffs) hereby complain of the actions of Defendants National Marine Fisheries Service (NMFS) and Secretary of Commerce Howard Lutnick as follows:

INTRODUCTION

1. The United States has never opened its waters to deep-sea mining. Until now. The Marine Minerals Administration (MMA) recently announced plans to sell leases allowing mining of over 31 million acres of seabed off American Samoa. Before it can do so, MMA must complete consultation with NMFS under section 7(a)(2) of the Endangered Species Act (ESA), 16 U.S.C. § 1536(a)(2), to ensure that deep-sea mining activities off American Samoa will not push any endangered or threatened species closer to extinction or destroy the critical habitat that those species need to survive and eventually recover. This consultation process is a central feature of the ESA's framework for protecting endangered and threatened species.

2. Earlier this year, NMFS issued a final determination (Letter of Concurrence) that deep-sea-mining leases off American Samoa are not likely to adversely affect any threatened or endangered species or critical habitat, giving MMA the green light under the ESA to hold the sale. Fa'asao Amerika Samoa and

Conservation Council for Hawai'i challenge NMFS's arbitrary and unlawful determination.

3. The Samoan people rely upon a healthy ocean ecosystem in the waters that surround their islands. This ecosystem feeds Samoan households, protects shorelines, and has formed the basis of many cultural practices that have existed for over a millennium. To ensure ocean ecosystems are healthy and abundant, traditional Samoan marine management practices prohibit harming marine mammals, sea turtles, sharks, and other wildlife that today are recognized as endangered or threatened. Many of these animals found around American Samoa also migrate to and are found in Hawai'i's waters.

4. Deep-sea mining entails using heavy machinery to scour the seabed for potato-sized mineral aggregations called polymetallic nodules or, in some cases, to strip mine mineral-laden crusts from the sea floor. The machinery can destroy nearly all life in its path. Mining stirs up sediments that can introduce toxic substances into the food web and that can smother seafloor ecosystems, like coral reefs, 100 kilometers (over 60 miles) away. Even just exploring for seabed minerals introduces extremely loud noise into the marine environment that can harm marine mammals and other wildlife. While much is known about the threats of environmental destruction that these largely untested activities pose, the full extent of potential harm is still coming into view.

5. In early 2026, MMA (then known as the Bureau of Ocean Energy Management or BOEM[1]) asked NMFS to concur that its lease sale off American Samoa is "not likely to adversely affect" any species or critical habitat. Shortly thereafter, in a four-page letter with no analysis and without even considering the effects from most exploration activities or any mining, NMFS concurred.

6. NMFS's Letter of Concurrence violates key legal requirements under the ESA and reflects a wholly arbitrary and capricious determination. First and foremost, NMFS did not analyze all effects of MMA's action on ESA-listed species or critical habitat, ignoring the effects from the exploration and mining that will result from the lease sale. Even for the more limited "preliminary activities" on a lease that NMFS did consider, the Letter of Concurrence does not address many of the ways those activities harm ESA-listed marine mammals, sea turtles, and other wildlife.

7. Plaintiffs therefore ask this Court to declare that NMFS's Letter of Concurrence is arbitrary and capricious and contrary to law, in violation of the

---

[1] The Secretary of the Interior recently merged BOEM and the Bureau of Safety and Environmental Enforcement into a single agency, the Marine Minerals Administration. *See* Secretarial Order 3451, "Establishment of the Marine Minerals Administration" (July 10, 2026) https://www.doi.gov/sites/default/files/document_secretarys_orders/so-marine-minerals-administration_final_508.pdf. Both the applicable regulations and the Letter of Concurrence challenged here refer to BOEM. This Complaint will use the current name of the agency (MMA) rather than BOEM.

Administrative Procedure Act (APA) and ESA, and to vacate the Letter of Concurrence.

JURISDICTION AND VENUE

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 1361 (actions to compel officers and agencies of the United States to perform their duty); 28 U.S.C. §§ 2201–2202 (power to issue declaratory judgments in cases of actual controversy); and 5 U.S.C. §§ 701–706 (actions under the APA).

9. Venue is proper in this district under 28 U.S.C. § 1391(e)(1) because this is a civil action in which officers or employees of the United States or an agency thereof are acting in their official capacity or under color of legal authority and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district and also because Plaintiff Conservation Council for Hawaiʻi resides in this judicial district.

10. This Court has authority to grant Plaintiffs' requested relief pursuant to the APA, 5 U.S.C. § 706(2), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

11. The Court has authority to award costs and attorneys' fees under 28 U.S.C. § 2412.

## PARTIES

12. Plaintiff FA'ASAO AMERIKA SAMOA (FAS) is a non-profit community organization incorporated in Hawaiʻi and based in American Samoa. FAS's mission is to safeguard American Samoa's culture, traditions, and natural resources from exploitation, and, in doing so, preserve Samoan culture and traditions that are deeply interconnected with the land and sea in American Samoa.

13. FAS members include scientists, educators, fishers, and *matai* (traditional leaders) who live in American Samoa, who regularly visit, study, work, and recreate in areas near the planned lease areas, and who derive recreational, professional, scientific, educational, aesthetic, cultural, and spiritual benefits from those activities. These members also study and observe ESA-listed species that are present within and travel through the planned lease areas. FAS members' use and enjoyment of these imperiled species will be harmed by deep-sea mining-related activities in the planned lease areas.

14. For example, one of FAS's members is a coral ecologist who lives in American Samoa. She researches coral resiliency in American Samoa and is currently working on projects: to grow heat-tolerant corals; to monitor coral health impacted by bleaching and marine debris; and to sample, identify, and categorize corals in American Samoa's marine waters. These projects include work to survey and identify ESA-listed corals in American Samoa, including *Isopora*

*crateriformis* and *Acropora globiceps*. She has participated in scientific research trips to Muliava (also referred to as Rose Atoll)—which is immediately adjacent to the planned lease areas—and has plans to return in the next year to build out a taxonomy of the corals present in American Samoa. In addition to relying on healthy corals for her scientific studies, this member derives pleasure from observing and photographing healthy corals, including ESA-listed corals in American Samoa. Seabed mining and mineral exploration off American Samoa threaten to harm the ESA-listed corals and their ecosystems that this member studies and observes, thereby injuring her professional, scientific, and aesthetic interests.

15. Another FAS member is a conservation educator who lives in American Samoa. She has visited Muliava to conduct foundational *i'a sa* ("sacred fish," referring to sea turtles) population surveys. She teaches place-based science lessons to youth, which involve observing sacred Samoan animals like ESA-listed sea turtles in the oceans around American Samoa. Seabed mining and mineral exploration will harm these sea turtle populations, making it more difficult for her to carry out her place-based education, thereby injuring her professional, cultural, and aesthetic interests.

16. A third FAS member hails from Manu'a, the American Samoa islands closest to the planned lease areas, which have traditionally governed the waters

Case 1:26-cv-00438-JAO-KJM Document 1 Filed 08/... Page 8 of 33 PageID.63

where the lease sale is planned. Traditional Samoan governance standards practiced in Manu'a recognize certain animals as sacred—including all ESA-listed whales, sea turtles, sharks, and giant manta rays in American Samoa's waters—and, accordingly, place traditional prohibitions on catching or harming these species. This member observes and implements these prohibitions, including when he observes these species in American Samoa's waters. Deep-sea mining and exploration would harm these animals that are sacred to the Samoan people and to this member, injuring his cultural and spiritual interests.

17. Plaintiff CONSERVATION COUNCIL FOR HAWAI'I (CCH) is a non-profit citizens' organization incorporated and based in Hawai'i with approximately 4,000 members in Hawai'i, the United States mainland, and foreign countries. CCH is the Hawai'i affiliate of the National Wildlife Federation, a non-profit membership organization with over 5.8 million members and supporters nationwide.

18. CCH's mission is to protect Hawai'i's native wildlife, including threatened and endangered species, and to restore the ecosystems on which those species depend for future generations. The wildlife species that CCH has worked to protect include ESA-listed species of whales, sea turtles, sharks, rays, and seals that are found in American Samoa's and Hawai'i's waters. CCH's members' interests in these species will be harmed by allowing deep-sea mining-related

activities in and around the proposed lease areas in American Samoa, as well as by associated increased vessel traffic in Hawai'i's waters.

19. CCH members include marine biologists and cultural practitioners who regularly visit, study, work, and recreate in marine waters within and near the planned lease areas and in Hawai'i that would be affected by deep-sea mining-related activities. CCH members study, enjoy, and benefit from the threatened and endangered species in waters over American Samoa's outer continental shelf (OCS) and in the affected waters around Hawai'i—including, but not limited to, ESA-listed whales, sea turtles, sharks, and rays that migrate between the two areas—for recreational, professional, scientific, educational, aesthetic, spiritual, and cultural purposes. CCH members' use and enjoyment of the marine environment around American Samoa and around Hawai'i will be harmed by deep-sea mining and mineral exploration activities on the planned leases.

20. For example, one of CCH's members has conducted extensive scientific research regarding the marine environment around American Samoa for more than two decades. This member previously participated in two scientific research trips to the Rose Atoll Marine National Monument to study ESA-listed corals. He is currently working on a study of coral reef health using data collected on ESA-listed corals in American Samoa (particularly *Acropora globiceps*, *Acropora retusa*, *Acropora speciosa*, *Fimbriaphyllia paradivisa*, and *Isopora*

Case 1:26-cv-00438-JAO-KJM Document 1 Filed 08/29/26 Page 30 of 56 PageID.65

*crateriformis*), which will involve additional research trips to Rose Atoll during the next two years. In addition to relying on healthy corals for his scientific studies, this member derives pleasure from observing and photographing healthy corals. Deep-sea mining and mineral exploration activities off American Samoa threaten to harm the ESA-listed corals and their ecosystems that this member studies and observes, thereby injuring his professional, scientific, and aesthetic interests.

21. Another one of CCH's members is a Native Hawaiian professional diver and cultural practitioner who has observed and studied—and will continue to observe and study—ESA-listed species in the ocean surrounding the Hawaiian Islands. This member has a cultural and spiritual connection to the ESA-listed species that occur in Hawai'i's waters that will be affected by deep-sea mining exploration and exploitation activities. This member regularly takes friends and family on nearshore diving tours to *kilo* (Native Hawaiian observational technique) for Central North Pacific green sea turtles, hawksbill turtles, giant Pacific manta rays, Hawaiian monk seals, and oceanic whitetip sharks. This member also regularly ventures on boats to deeper waters around the Hawaiian Islands to *kilo* for species including false killer whales, sperm whales, olive ridley sea turtles, and leatherback sea turtles. This member also has a deep cultural and familial connection to Hawai'i's sharks, including the oceanic whitetip shark, which he regards as *'aumakua* (embodiment of ancestral guardians), and which his family

and ancestors, with lineage as *kahu manō* (shark keepers), have advocated to protect since time immemorial. Deep-sea mining-related activities in American Samoa, as well as related vessel traffic in Hawai'i's waters, threaten to harm the ESA-listed species that this member observes (many of which are highly migratory), thereby injuring his cultural, spiritual, and aesthetic interests.

22. NMFS's failure to comply with the ESA and APA has caused and is causing Plaintiffs' members procedural harms connected to their substantive professional, scientific, educational, aesthetic, spiritual, and cultural interests in ESA-listed species in American Samoa's and Hawai'i's waters. Plaintiffs' members rely on NMFS to comply with the requirements of the ESA to guide federal authorizations of OCS activities so as to protect endangered and threatened species from harmful effects of those activities. MMA will issue mineral leases that result in such harmful effects in reliance on NMFS's Letter of Concurrence.

23. The interests of Plaintiffs and Plaintiffs' members have been, are being, and will be adversely affected by NMFS's violation of federal law, as described herein. These harms can only be remedied if the Court orders NMFS to comply with the ESA and APA and conduct a legally adequate consultation for MMA's planned lease sale. Plaintiffs have no other adequate remedy at law.

24. Defendant NATIONAL MARINE FISHERIES SERVICE is the federal agency within the U.S. Department of Commerce's National Oceanic and

Case 1:26-cv-00438-JAO-KJM Document 1 Filed 08/18/26 Page 12 of 52 PageID.67

Atmospheric Administration with responsibility for administering and implementing the ESA with respect to marine species, including sea turtles while they are in the water. *See* 50 C.F.R. § 402.01(b); *id.* §§ 223.102, 224.101. Among other responsibilities, NMFS is responsible for complying with ESA section 7, 16 U.S.C. § 1536, in connection with the issuance of Letters of Concurrence and biological opinions.

25. Defendant HOWARD LUTNICK is sued in his official capacity as the Secretary of Commerce. In that capacity, Secretary Lutnick is responsible for ensuring that the Department of Commerce and its constituent agencies (including NMFS) comply with applicable law, including the ESA.

## LEGAL FRAMEWORK

### I. ENDANGERED SPECIES ACT

26. Congress enacted the ESA in 1973 in response to the extinction crisis to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

27. The ESA's "language, history, and structure . . . indicate[] beyond doubt that Congress intended endangered species to be afforded the highest of priorities." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174 (1978). "The plain intent

of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184.

28. In broad strokes, the ESA seeks to protect and recover imperiled species and populations by first listing them as threatened or endangered based on enumerated statutory factors. 16 U.S.C. § 1533(a)(1)(A)–(E); *see id.* § 1532(6), (20). The Act further provides for the designation of critical habitat to protect areas essential to the survival and eventual recovery of threatened and endangered species. *Id.* § 1533(a)(3)(A)(i); *see id.* § 1532(5).

29. Section 7(a)(2) of the ESA then requires each federal agency, including MMA, to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." *Id.* § 1536(a)(2). "Jeopardize the continued existence of" is defined as engaging in an action that "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. "Destruction or adverse modification means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." *Id.*

Case 1:26-cv-00438-JAO-KJM Document 1 Filed 08/18/26 Page 14 of 36 PageID.69

30. The ESA and its implementing regulations establish an interagency consultation process to assist federal agencies in complying with this duty. Each agency, including MMA, must "review its actions at the earliest possible time to determine whether any action *may affect*" any endangered or threatened species or critical habitat. *Id.* § 402.14(a) (emphasis added). If so, the agency planning to undertake the action (the action agency) must consult the appropriate wildlife service—the U.S. Fish and Wildlife Service or, as here, NMFS—to ensure compliance with ESA section 7(a)(2)'s mandate. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.01(b), 402.14.

31. In fulfilling the requirements of ESA section 7, both the action agency and the consulting wildlife agency must "use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

32. Moreover, when engaging in ESA section 7 consultation, the consulting wildlife agency must analyze the effects of the entire agency action, which include "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action." 50 C.F.R. § 402.02.[2] "Indirect effects are those

---

[2] On March 30, 2026, the U.S. District Court for the Northern District of California held that the definition of "effects of the action" promulgated in 2019 was facially invalid and reinstated the definition that was in effect prior to 2019.

that are caused by the proposed action and are later in time, but still are reasonably certain to occur." 50 C.F.R. § 402.02. "Interrelated actions are those that are part of a larger action and depend on the larger action for their justification." *Id.* "Interdependent actions are those that have no independent utility apart from the action under consideration." *Id.*

33. To facilitate compliance with ESA section 7(a)(2), the action agency must prepare a biological assessment to "evaluate the potential effects of [its] action on listed and proposed species and designated and proposed critical habitat and determine whether any such species or habitat are likely to be adversely affected by the action." *Id.* § 402.12(a); *see also* 16 U.S.C. § 1536(c)(1).

34. As a general rule, the action agency must then engage in formal consultation with the consulting wildlife agency, unless the action agency determines and the consulting wildlife agency concurs in writing that the action is "not likely to adversely affect" any listed species or critical habitat. 50 C.F.R. §§ 402.13(c), 402.14(a), (b)(1).

35. If the consulting wildlife agency concurs and makes a final determination that the action is not likely to adversely affect any listed species or critical habitat, "the consultation process is terminated, and no further action

---

*Center for Biological Diversity v. U.S. Dep't of Interior*, Case No. 24-cv-04651-JST, 2026 WL 898264, at *15, *25 (N.D. Cal. Mar. 30, 2026).

Case 1:26-cv-00438-JAO-KJM Document 1 Filed 08/18/26 Page 16 of 36 PageID.71

[under ESA section 7(a)(2)] is necessary." *Id.* § 402.13(c). The concurrence letter must, at a minimum, document the consulting wildlife agency's "analysis, based on review of all potential effects, direct and indirect." U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv., *Endangered Species Consultation Handbook* 3-12 (1998) [hereinafter *ESA Handbook*].

36. If the consulting wildlife agency does not concur that the action is not likely to adversely affect any listed species or critical habitat, then formal consultation is required. 50 C.F.R. § 402.14(a). Formal consultation involves a more comprehensive evaluation of the effects of the action that culminates in the consulting wildlife agency's biological opinion on whether the action is likely to jeopardize the continued existence of the species or to destroy or adversely modify critical habitat. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(c)–(h).

37. If the consulting wildlife agency concludes in the biological opinion that the proposed action is likely to jeopardize a species, the agency must specify reasonable and prudent alternatives, if any, that would avoid the likelihood of jeopardy, or specify that no such alternatives exist. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2). If the consulting wildlife agency concludes that the action is not likely to jeopardize the continued existence of the species, but that incidental take of a listed species will occur, the agency must produce a written "statement concerning incidental take" that "[s]pecifies the impact of incidental taking as the

amount or extent of such taking" on the species. 50 C.F.R. § 402.14(i)(1)(i); *see* 16 U.S.C. § 1536(b)(4). An incidental take statement must also specify "reasonable and prudent measures" that are "necessary or appropriate to minimize [the] impact of incidental taking on the species" and the "terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency" to implement the measures. 50 C.F.R. § 402.14(i)(1)(ii), (iv); *see* 16 U.S.C. § 1536(b)(4).

38. The ESA regulations provide for consultation to occur in stages "[w]hen the action is authorized by a statute that allows the [action] agency to take incremental steps toward the completion of the action." 50 C.F.R. § 402.14(k). When such a statute is involved, the consulting wildlife agency "shall, if requested by the [action] agency, issue a biological opinion on the incremental step being considered." *Id.* In its biological opinion, the consulting wildlife agency must "includ[e] its views on the entire action," *id.*—not just the first incremental step—and determine, among other things, whether "[t]here is a reasonable likelihood that the entire action will not violate [ESA] section 7(a)(2)." *Id.* § 402.14(k)(5).

39. Consultation for the first phase of an incremental step action must always be conducted formally, concluding with the consulting wildlife agency issuing a biological opinion. *See id.* § 402.14(k).

Case 1:26-cv-00438-JAO-KJM Document 1 Filed 08/18/26 Page 18 of 38 PageID.73

40. Compliance with the ESA's section 7 consultation requirement is essential to prevent later substantive violations of the ESA.

II. OUTER CONTINENTAL SHELF LANDS ACT

41. OCSLA governs the leasing, exploration, and development of minerals on the "Outer Continental Shelf." 43 U.S.C. § 1331 *et seq.* OCLSA defines the Outer Continental Shelf as the seabed extending from the outer boundary of state waters—typically three miles from shore—to the outer boundary of the United States' Exclusive Economic Zone, 200 nautical miles from shore. *Id.* §§ 1301(a)(2), 1331(a); 48 Fed. Reg. 10605 (Mar. 14, 1983).

42. OCSLA authorizes Interior to sell "leases of any mineral other than oil, gas, and sulphur in any area of the outer Continental Shelf." 43 U.S.C. § 1337(k); *see* 30 C.F.R. § 581.0–.47.

43. Upon receiving a lease, the holder may conduct "preliminary activities," which include "bathymetric, geological, geophysical, mapping, and other surveys." 30 C.F.R. § 582.21(d).

44. Lessees then conduct further exploration, testing, and development activities "in accordance with a plan submitted by the lessee and approved by the Director" of MMA. *Id.* § 582.21(a). "Exploration" includes geophysical surveys, drilling, and sampling of mineral deposits. *Id.* § 582.3. "Testing" includes "removing bulk samples for processing tests and feasibility studies and/or the

testing of mining equipment." *Id.* "Development" includes "geophysical activities, drilling, construction of offshore facilities, and operation of all onshore support facilities" in preparation for production of minerals. *Id.* "Production" is the mining and processing of minerals from the seabed. *See id.* § 582.24.

III. ADMINISTRATIVE PROCEDURE ACT

45. The APA confers a right of judicial review on any person who is adversely affected by agency action. 5 U.S.C. § 702.

46. The APA provides that the reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

## STATEMENT OF FACTS

I. THE WATERS AROUND AMERICAN SAMOA ARE HOME TO THREATENED AND ENDANGERED WILDLIFE.

47. The ocean surrounding American Samoa supports rare and diverse marine species, including a rich mosaic of shallow and mesophotic coral reefs, sponges, crabs, deep-sea cucumbers, sea turtles, hundreds of coral and fish species, and a variety of migratory species. Many of the species found in American Samoa's waters are listed as endangered or threatened under the ESA.

48. The endangered blue whale, fin whale, sei whale, and sperm whale are found in waters around American Samoa.

Case 1:26-cv-00438-JAO-KJM Document 1 Filed 08/18/26 Page 20 of 38 PageID.75

49. All five sea turtle populations found in American Samoa's waters are listed as endangered or threatened: the green sea turtle (Central South Pacific Distinct Population Segment (DPS)),[3] hawksbill sea turtle, loggerhead sea turtle (South Pacific DPS), and leatherback sea turtle are listed as endangered, while the olive ridley sea turtle is listed as threatened.

50. The oceanic whitetip shark, giant manta ray, scalloped hammerhead shark (Indo-West Pacific DPS), and chambered nautilus are also found in American Samoa's waters and are listed as threatened.

51. Five coral species in American Samoa's waters (*Acropora globiceps*, *A. retusa*, *A. speciosa*, *Fimbriaphyllia paradivisa*, and *Isopora crateriformis*) are listed as threatened. Additionally, NMFS has designated critical habitat in American Samoa for all five coral species.

## II. DEEP-SEA MINING ACTIVITIES WILL HARM ESA-LISTED SPECIES.

52. Several areas of the deep seabed around the world—including around American Samoa—contain polymetallic nodules, potato-shaped balls of minerals that formed over millions of years as minerals from seawater accrete. They hold

---

[3] The ESA allows NMFS to separately list individual DPSs of species as threatened or endangered. *See* 16 U.S.C. § 1532(16) (defining "species" to include "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature"). NMFS identifies DPSs based on the population's "discreteness," "significance," and "conservation status." 61 Fed. Reg. 4722, 4725 (Feb. 7, 1996).

Case 1:26-cv-00... Document 1 Filed 08/... Page 21 of 36 PageID.76

minerals like nickel, cobalt, and manganese, which can be used to construct electronics, batteries, and other products. Accordingly, companies have expressed interest in mining the nodules from the seabed for profit.

53. To date, there has not been a commercial seabed mining operation established anywhere in the world. Mining the deep sea is technologically and financially difficult. Equipment must operate at depths of thousands to tens of thousands of feet where water pressure is immense.

54. There has been a limited amount of seabed mining exploration and testing activities in international waters and in other countries. Those tests have demonstrated that commercial mining, and even the initial exploration activities, will have devastating effects on the marine environment.

55. Mining activities—whether at the testing phase or production phase—involve scouring the seabed to extract nodules. Mining equipment stirs up toxic sediment and kills the biota in its path. Mining disturbance studies have found that impacts to the ecosystem persist for at least 44 years, with estimates that ecosystem recovery will take over 100 years. Scientists estimate that sediment plumes from mining can extend for up to 100 kilometers (over 60 miles) from the mining site, smothering corals and other habitats even far distant from the mining site. Such plumes harm not only the corals themselves, but also the sea turtles, sharks, rays, and other species that depend on coral reef ecosystems.

Case 1:26-cv-00438-JAO-KJM Document 1 Filed 08/18/26 Page 22 of 36 PageID.77

56. Nodules and the sediment collected with them are then transported to a vessel on the surface, which separates the nodules from the sediment. That sediment waste is then discharged higher in the water column. The sediment waste contains toxic metals such as copper, cadmium, zinc, and lead, as well as rare earth elements, that can enter the food chain and bioaccumulate in species like giant manta rays and whales.

57. Exploration for seabed minerals uses a variety of technologies to map and sample the seafloor, including hull-mounted multibeam echosounders, dynamic positioning vessels, autonomous underwater vehicles, remotely operated vehicles, and other autonomous or robotic equipment. The noise from these activities can damage hearing and interfere with essential behaviors in marine mammals and other animals.

58. There are also numerous ways that the vessels used for surveying and mining can harm ESA-listed species, including injury or death from ship strikes, masking of communication, and behavioral disturbance from noise, and air and water pollution. Vessel impacts can occur not only where exploration or development activities are taking place, but also while vessels are traveling to or from the project location and when mined nodules are transshipped, potentially to distant ports.

59. For example, the issuance of seabed mining leases offshore of American Samoa can increase vessel traffic to and from Hawaiʻi's ports and through Hawaiʻi's waters from the ships conducting activities on those leases. That vessel traffic can harm ESA-listed species in Hawaiʻi's waters.

## III. MMA PLANS TO HOLD THE FIRST EVER DEEP-SEA MINING LEASE SALE OFF AMERICAN SAMOA.

60. On June 16, 2025, MMA published a "Request for information and interest" (RFI) for a potential mineral lease sale in an area offshore of American Samoa. 90 Fed. Reg. 25369 (June 16, 2025). MMA described the "RFI Area" as 18.1 million acres "located near the eastern limit of the American Samoa OCS bordering the Cook Islands Exclusive Economic Zone, northeast of the Manu'a [*sic*] Islands and Rose Atoll (roughly 70 nautical miles northeast of Rose Atoll)." *Id.* at 35371.

61. On November 20, 2025, after receiving over 76,000 comments in response to the RFI—the overwhelming majority of which explained why MMA should not proceed with leasing—MMA announced an "Area ID" that nearly doubled the size of the proposed area for leasing to over 33 million acres.

62. On July 17, 2026, MMA published a notice of availability in the Federal Register of the Proposed Leasing Notice for American Samoa Outer Continental Shelf (OCS) Pacific Mineral Lease Sale 1 (PACM-1). 91 Fed. Reg. 44870 (July 17, 2026). MMA proposes to hold the lease sale on November 19,

2026, and will offer for sale two leases encompassing almost all the area described in the Area ID, over 31 million acres total.

63. The Proposed Leasing Notice specifies, "Any lease(s) that are issued will grant rights to develop these deposit types [polymetallic nodules and ferromanganese crust deposits] and any minerals found in direct association with those specified deposits." The primary lease term will be 20 years, although the term can be extended if a lease enters production. The proposed leases include lease stipulations governing exploration, testing, survey, and mining activities.

64. MMA will publish a final leasing notice at least 30 days before the sale date. *See* 30 C.F.R. § 581.17(a).

## IV. NMFS ISSUES AN ARBITRARY AND UNLAWFUL LETTER OF CONCURRENCE THAT MINERAL LEASING WILL NOT ADVERSELY AFFECT ANY ESA-LISTED SPECIES OR CRITICAL HABITAT.

65. On or about January 16, 2026, NMFS received a written request from MMA to initiate expedited informal consultation under the ESA on the proposed lease sale. MMA sought NMFS's concurrence that the proposed action "may affect, but is not likely to adversely affect" any species listed as threatened or endangered or any critical habitat designated under the ESA, avoiding the need to engage in formal consultation under ESA section 7.

66. On or about February 3, 2026, MMA submitted an updated biological assessment to NMFS on its proposed action.

67. In its biological assessment, MMA determined that the "action area" (*i.e.*, the "areas to be affected directly or indirectly by the Federal action," 50 C.F.R. § 402.02) for the planned lease sales "encompasses a big area which includes waters nearby American Samoa where most of the Proposed Action will take place as well as waters near Hawaii and the West Coast, where vessels may start their transit(s)." *See* Biological Assessment, Figure 1.




**Figure 1. Map of the Proposed Action, which includes the American Samoa OCS, Hawaiian waters, and the U.S. West Coast**

68. MMA's biological assessment states that the "need" for the lease sale is "to provide access to marine minerals that could potentially be an important and

Case 1:26-cv-00438-JAO-KJM Document 1 Filed 08/18/26 Page 26 of 36 PageID.81

underutilized domestic source." The proposed sale "aims to facilitate the potential development" of those minerals. MMA states its proposed "seabed leasing aligns with ensuring secure and sustainable domestic supply of strategic minerals."

69. Despite MMA's stated purpose for the lease sale, its biological assessment does not include the intended mineral exploration, development, and extraction in the "Effects of the Action." Rather, the biological assessment evaluates only the effects of "preliminary activities" on the leases and concludes they will be insignificant.

70. The biological assessment indicates that preliminary activities will entail the use of High-Resolution Geophysical (HRG) surveys (including multibeam echosounders, side-scan sonar, and sub-bottom profilers), seabed sampling by remotely operated vehicles, anchors on the seafloor for buoys and data collection instruments, and seabed box core sampling, among other actions.

71. The biological assessment identifies several potential impacts of preliminary activities to ESA-listed marine mammals and sea turtles, including 1) noise from HRG surveys, geotechnical surveys, aircrafts, and vessels; 2) potential collisions with project-related vessels; 3) potential entanglement in mooring systems associated with the installation of buoys and with the deep-tow survey systems; 4) disturbance to feeding or modified prey abundance; 5) habitat disturbance; and 6) accidental release of pollutants and marine debris. While the

Case 1:26-cv-00438-JAO-KJM Document 1 Filed 08/18/26 Page 27 of 36 PageID.82

biological assessment states the impacts are anticipated to be "insignificant," it indicates that MMA could not estimate the extent of many impacts.

72. The biological assessment states that the effects of preliminary activities on ESA-listed sharks and rays include habitat disturbance, sediment resuspension (from sampling), fish aggregating device effects of buoys and mooring lines, entanglement, noise from surveys and vessels, artificial light, electromagnetic field alteration, ship strikes, and pollution from oil spills and marine debris. The biological assessment concludes the action is not likely to adversely affect listed fishes.

73. The biological assessment concludes that effects to ESA-listed corals and other invertebrates will be "insignificant" because the species "are primarily associated with benthic habitats that do not overlap with the proposed lease areas." However, that conclusion is inconsistent with the biological assessment's inclusion of all five coral species' critical habitats in the "action area," which is defined as "all areas to be affected directly or indirectly by the federal action."

74. Finally, the biological assessment asserts effects to designated critical habitat for several species will be either "discountable" or "short term and temporary," so concludes the action is not likely to adversely affected any designated critical habitat.

Case 1:26-cv-00438-JAO-KJM Document 1 Filed 03/18/26 Page 28 of 56 PageID.83

75. On February 13, 2026, NMFS issued a four-page letter concurring in MMA's assessment that its "proposed action to issue up to two leases for the purpose of commercial mining and authorize early-stage data collection . . . may affect, but is not likely to adversely affect" approximately 60 ESA-listed species, including: endangered blue whales, fin whales, sei whales, and sperm whales, five listed sea turtle populations, five threatened coral species, and threatened oceanic whitetip sharks, giant manta rays, scalloped hammerhead sharks, and chambered nautilus, all of which are found in American Samoa waters. The list of species that NMFS concluded MMA's planned leasing action "may affect" also includes several imperiled species that are endemic to Hawai'i, including the critically endangered Main Hawaiian Island insular false killer whale and Hawaiian monk seal. NMFS's Letter of Concurrence states that it "concludes informal consultation under section 7 of the ESA" for the action.

76. Like MMA's biological assessment, NMFS's Letter of Concurrence does not contain any analysis of the effects of exploration, testing, development, or production on the leases, even though the stated intent of MMA's lease sales is to cause seabed mineral exploration, testing, development, and production in the areas offered for lease. Those post-lease activities are likely to harm ESA-listed marine mammals, sea turtles, sharks, manta rays, and corals, as well as critical habitat for corals, in the numerous ways discussed above.

77. Even for preliminary activities, NMFS's Letter of Concurrence does not evaluate the full scope of their effects. It discusses only potential acoustic impacts from survey equipment. While the Letter of Concurrence mentions the placement of moorings and other equipment during collection of seabed samples, it does not evaluate the potential impacts of any of those activities (*e.g.*, entanglement) on any species. The Letter of Concurrence also does not evaluate potential impacts from the vessels conducting preliminary activities on any listed species—specifically vessel strikes, vessel noise, or vessel discharges.

78. For the only stressor NMFS did purport to evaluate—HRG surveys—the Letter of Concurrence explains that some equipment has "the potential to produce acoustics which may produce noise sufficient to produce harm through auditory injury, temporary threshold shifts, or behavioral reactions." NMFS nonetheless concluded that no adverse effects would occur from that equipment based on its assumption that MMA "is implementing the criteria that equipment meet certain source levels, transmission frequencies, directionalities, beamwidths, tow depths, and pulse repetition rates to avoid potential adverse effects to the ESA-listed species under consideration." The Letter of Concurrence does not identify any binding way in which MMA is implementing those criteria. And there is nothing in MMA's biological assessment, proposed notice of sale, proposed lease stipulations, or proposed information to lessees that would impose such criteria.

Case 1:2... Document 1 Filed 03/18/25 Page 30 of 56 PageID.85

79. NMFS assumed that "[n]o equipment will be allowed to operate at decibels greater than 160 dB." The biological assessment, however, indicates that MMA considers multibeam echosounders, side-scan sonar, and sub-bottom profilers to be permissible equipment for preliminary surveys. Published operating levels for that equipment are significantly higher than 160 decibels. And given the water depths of the area proposed for lease, it is virtually certain that HRG equipment will need to operate at decibels greater than 160 dB to obtain usable data. NMFS did not address these issues in its Letter of Concurrence.

80. Even if the equipment were limited to operating at 160 decibels, published research shows that marine mammals suffer behavioral disturbance at even lower sound levels. Further, published research shows that responses to a given sound level differ among marine mammal species. The Letter of Concurrence does not address this research or assess species-specific effects for the ESA-listed marine mammals that occur in the action area.

81. Chronic, ongoing sound also has different effects on marine mammals than short, discrete pulses. MMA estimates that the proposed lease sale will result in up to 1,716 days of geological, geotechnical, and biological sampling, with surveys occurring 24 hours a day. NMFS did not address the duration of surveys or the effect that lengthy, ongoing surveys will have on marine mammals, even if they were to operate below 160 decibels. Plaintiffs are informed and believe, and

on the basis of that belief allege, that NMFS reached its "not likely to adversely affect" conclusion based solely on its consideration of the acute effects of short bursts of sound below 160 decibels, ignoring impacts from chronic exposure.

82. Overall, NMFS's concurrence is unsupported by any reasoned analysis and is contrary to the best available science. There is no evidence that NMFS had sufficient information to reach a rational and well-supported conclusion concurring that the action is "not likely to adversely affect" any species or critical habitat.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION – NMFS's Letter of Concurrence Is Arbitrary and Capricious and Contrary to Law, in Violation of the APA and ESA.

83. Plaintiffs reallege and incorporate by this reference the preceding paragraphs of this Complaint.

84. Section 7(a)(2) of the ESA requires each federal agency, in consultation and with the assistance of the relevant wildlife agency, to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2). Such consultations must use the best available scientific information. *Id.*

85. In an informal consultation, NMFS, as the consulting wildlife agency, must review all relevant information and make a reasonable, factually supported decision as to whether to concur in the action agency's determination that the action is not likely to adversely affect any listed species or critical habitat. 50 C.F.R. §§ 402.12(j)–(k), 402.13; *see ESA Handbook* 3-6 ("All decisions reached during the [informal] consultation process must be based on sound science."). If NMFS "do[es] not agree with the action agency's determination of effects or if there is not enough information to adequately determine the nature of the effects," it may not issue a letter of concurrence. *ESA Handbook* 3-13.

86. NMFS's Letter of Concurrence is a final agency action as defined by the APA, for which there is no other adequate remedy in a court.

87. NMFS was required to consider and analyze all effects of the entire agency action in determining whether to concur in MMA's not likely to adversely affect determination. 50 C.F.R. §§ 402.12(a), 402.13; *ESA Handbook* 3-6 (stating concurrence must be "based on review of all potential effects, direct and indirect"). When a federal agency sells leases for resource extraction, the entire agency action includes not just leasing, but also exploration, development, and production from the leases. Accordingly, the entire agency action under consultation here includes leasing, exploration, testing, survey, and mining activities.

88. Even if exploration, testing, survey, and mining activities were not part of the agency action, their effects are nonetheless "indirect effects" of leasing because exploration, testing, survey, and mining activities "are caused by the proposed action." 50 C.F.R. § 402.02. Alternatively, exploration, testing, survey, and mining activities are "interrelated or interdependent with [MMA's leasing] action." *Id.*

89. NMFS did not include the effects of exploration, testing, survey, or mining activities in reaching its concurrence that the action is not likely to adversely affect any species or critical habitat. Therefore, NMFS's concurrence is arbitrary and capricious and contrary to the ESA and its implementing regulations.

90. In evaluating the effects of preliminary activities on leases, the Letter of Concurrence evaluates only impacts from HRG surveys. The Letter of Concurrence does not assess the effects of vessel strikes, vessel noise, vessel discharges, or mooring lines and buoys in reaching its concurrence that the action is not likely to adversely affect any species or critical habitat. Therefore, NMFS's concurrence is arbitrary and capricious and contrary to the ESA and its implementing regulations.

91. NMFS's conclusion that impacts from HRG surveys during preliminary activities would not cause adverse effects on species or critical habitat is premised on the assumption that MMA will implement requirements to limit



Exh A to Defendants' First Motion to
Continue Hearing Date(s)

sound from survey equipment. There is, however, no evidence that MMA has committed to implementing HRG limits through binding measures. The Letter of Concurrence contains no evidence that NMFS considered whether MMA can or will do so, or whether HRG surveys are likely to satisfy such limits given the operating specifications of the equipment. NMFS's reliance on HRG limits to reach its concurrence decision is arbitrary and capricious and contrary to the ESA and its implementing regulations.

92. For the foregoing reasons, NMFS's Letter of Concurrence is arbitrary, capricious, an abuse of discretion, and not in accordance with section 7 of the ESA or its implementing regulations, in violation of the APA. 5 U.S.C. § 706(2)(A).

**SECOND CAUSE OF ACTION – NMFS Failed to Issue a Biological Opinion that Evaluated MMA's Entire Action, in Violation of the APA and ESA.**

93. Plaintiffs reallege and incorporate by this reference the preceding paragraphs of this Complaint.

94. To the extent that NMFS claims to have engaged in incremental step consultation pursuant to 50 C.F.R. § 402.14(k), that regulation requires NMFS to "issue a biological opinion on the incremental step being considered, including its views on the entire action." Among other things, the regulation requires NMFS to determine whether "[t]here is a reasonable likelihood that the entire action will not violate section 7(a)(2) of the Act." *Id.* § 402.14(k)(5).

Case 1:26-cv-00438-JAO-KJM Document 1 Filed 0?/??/26 Page 34 of 35 PageID.90

95. NMFS did not issue a biological opinion for MMA's planned lease sale and did not express any views on whether the entire action, including exploration, testing, survey, and mining activities, would likely violate ESA section 7(a)(2).

96. For the foregoing reasons, NMFS's failures to issue a biological opinion and to express the required views are arbitrary, capricious, an abuse of discretion, and not in accordance with section 7 of the ESA or its implementing regulations, in violation of the APA. 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

97. Enter a declaratory judgment that NMFS's Letter of Concurrence violates the ESA, its implementing regulations, and the APA;

98. Hold unlawful and set aside NMFS's Letter of Concurrence;

99. Issue appropriate injunctive relief;

100. Maintain jurisdiction over this action until NMFS complies with the ESA, APA, and every order of this Court;

101. Award Plaintiffs the costs of this litigation, including reasonable attorney fees; and

102. Provide such other relief as may be just and proper.

Case 1:26-cv-00438-JAO-KJM Document 1 Filed 08/18/26 Page 38 of 38 PageID.91

DATED: Honolulu, Hawai'i, August 18, 2026.

Respectfully submitted,

/s/ David L. Henkin
DAVID L. HENKIN
HARLEY M. BROYLES
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawai'i 96813
T: (808) 599-2436
Email: dhenkin@earthjustice.org
hbroyles@earthjustice.org

CHRISTOPHER D. EATON
(*pro hac vice* pending)
EARTHJUSTICE
810 3rd Avenue, Suite 610
Seattle, Washington 98104
T: (206) 343-7340
Email: ceaton@earthjustice.org

JOSEPH V. LANGKILDE III
(*pro hac vice* pending)
EARTHJUSTICE
1250 I Street NW, Fourth Floor
Washington, DC 20005
T: (202) 667-4500
Email: jlangkilde@earthjustice.org

Attorneys for Plaintiffs
Fa'asao Amerika Samoa and
Conservation Council for Hawai'i