ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Energy & Natural Resources Division
MEREDITH L. FLAX, Deputy Section Chief
JOHN H. MARTIN, Senior Trial Attorney (Colo. Bar #32667)
JESSICA L. COLE, Trial Attorney (D.C. Bar#1011384)
Wildlife & Marine Resources Section
999 18th St., Suite 600 North Terrace
Denver, CO 80202
Tel: 303-319-5359 (Martin); (202) 598-3105 (Cole)
Fax: 303-844-1350
Email: john.h.martin@usdoj.gov; jessica.cole3@usdoj.gov

*Attorneys for Federal Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| FA‘ASAO AMERIKA SAMOA and CONSERVATION COUNCIL FOR HAWAI‘I,<br><br>Plaintiffs,<br><br>vs.<br><br>NATIONAL MARINE FISHERIES SERVICE and HOWARD LUTNICK, in his official capacity as Secretary of Commerce of the United States,<br><br>Defendants. | CASE NO. 1:26-CV-00438-JAO-KJM<br><br>Federal Defendants' Opposition to Plaintiffs' Motion for Summary Judgment (Dkt. No. 15)<br><br><u>Argument Date</u>: Oct. 30, 2026<br><u>Judge:</u> Hon. Jill A. Otake |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................1
STANDARD OF REVIEW ........................................................................2
STATUTORY BACKGROUND..................................................................3
I. Endangered Species Act Section 7 ........................................................3
II. Outer Continental Shelf Lands Act ("OCSLA")......................................4
ARGUMENT .............................................................................................6
I. Interior's proposed agency action is properly limited to issuance of a lease and approval of limited preliminary activities. ..............................6
II. Post-leasing activities are not indirect effects of lease issuance. ...............11
III. NMFS need not have considered the effects of potential post-leasing activities.................................................................................16
IV. Interior did not request incremental step consultation, and 50 C.F.R. Section 402.14(k) does not apply here. ..................................................18
V. NMFS's Letter of Concurrence is Rational and Supported by the Record..20
A. Neither the ESA nor the Implementing Regulations Require NMFS to Repeat its Effects Analysis in its Letter of Concurrence 20
B. The Record Confirms That NMFS Thoroughly Analyzed all Potential Effects of the Proposed Preliminary Activities 23
C. NMFS Was Not Required to Reach the Same Conclusions From An Unrelated BiOp Involving Vastly Different Activities 25
D. NMFS Did Not Rely on Non-Binding Mitigation Measures. 27
VI. No Remedy is Warranted. ..................................................................29
CONCLUSION ..........................................................................................30

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Cal. Cmtys. Against Toxics v. U.S. EPA*,
688 F.3d 989 (9th Cir. 2012) ....30

*Conner v. Burford*,
848 F.2d 1441 (9th Cir. 1988) .... 10, 11

*Conservation L. Found. v. Andrus*,
623 F.2d 712 (1st Cir. 1979) ....9

*Ctr. for Biological Diversity v. Bernhardt*,
982 F.3d 723 (9th Cir. 2020) ....28

*Ctr. for Biological Diversity v. Haaland*,
87 F.4th 980 (9th Cir. 2023) .... 16-17

*Ctr. for Biological Diversity v. Jewell*,
563 F.3d 466 (D.C. Cir. 2009) .... 5, 9-10

*Ctr. for Biological Diversity v. Moore*,
No. CV-22-00412-TUC-JAS (AMM),
2024 WL 1156863 (D. Ariz. Feb. 16, 2024) .... 29-30

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
141 F.4th 976 (9th Cir. 2025) .... 20-21

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
698 F.3d 1101 (9th Cir. 2012) ....29

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
837 F. Supp. 3d 1080 (N.D. Cal. 2026) ....16

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
807 F.3d 1031 (9th Cir. 2015) .... 7-8

*Defs. of Wildlife v. U.S. Dep't of Navy*,
733 F.3d 1106 (11th Cir. 2013) ....23

*Defs. of Wildlife v. Zinke*,
856 F.3d 1248 (9th Cir. 2017) .... 23, 25

*Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*,
36 F.4th 850 (9th Cir. 2022) ....19

*Fisheries Survival Fund v. Haaland*,
858 F. App'x 371 (D.C. Cir. 2021) ....................10

*Healthy Gulf v. U.S. Dep't of the Interior*,
152 F.4th 180 (D.C. Cir. 2025) ....................10

*Humane Soc'y of the U.S. v. Locke*,
626 F.3d 1040 (9th Cir. 2010) ....................25

*In re Clean Water Act Rulemaking*,
60 F.4th 583 (9th Cir. 2023) ....................29

*Karuk Tribe of Cal. v. U.S. Forest Serv*.,
681 F.3d 1006 (9th Cir. 2012) ....................2

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) ....................29

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ....................23

*N. Slope Borough v. Andrus*,
642 F.2d 589 (D.C. Cir. 1980) ....................9, 19

*Nat'l Wildlife Fed'n v. Espy*,
45 F.3d 1337 (9th Cir. 1995) ....................29

*Pac. Rivers Council v. Thomas*,
30 F.3d 1050 (9th Cir. 1994) ....................11

*Rocky Mountain Wild, Inc. v. U.S. Bureau of Land Mgmt.*,
Case No. 13-cv-1988-JLK,
2018 U.S. Dist. LEXIS 163703 (D. Colo. Sept. 11, 2018) ....................14

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
747 F.3d 581 (9th Cir. 2014) ....................3

*San Luis & Delta-Mendota Water Authority v. Locke*,
776 F.3d 971 (9th Cir. 2014) ....................12

*Save Long Beach Island v. U.S. Dep't of the Interior*,
663 F. Supp. 3d 1 (D.D.C. 2023) ....................10

*Sec'y of Interior v. California*,
464 U.S. 312 (1984) .................... 5, 8-9, 10

*Sierra Club v. Marsh*,
816 F.2d 1376 (9th Cir. 1987) ....................17

*Tribal Vill. of Akutan v. Hodel*,
869 F.2d 1185 (9th Cir. 1988)....................9

*Vill. of False Pass v. Clark*,
733 F.2d 605 (9th Cir. 1984).................... 1, 2, 8

*Wildearth Guardians v. U.S. EPA*,
759 F.3d 1196 (10th Cir. 2014)....................7

**Statutes**

5 U.S.C. § 706(2)(A)....................2

16 U.S.C. § 1532(15)....................3

16 U.S.C. § 1533....................3

16 U.S.C. § 1536(a)(2).................... 2, 3, 4, 6

16 U.S.C. § 1536(b)(3)(A)....................4, 20

43 U.S.C. § 1331(a)....................5

43 U.S.C. § 1332(3)....................5

43 U.S.C. § 1337(k)(1)....................5

**Regulations**

30 C.F.R. Part 500....................8

30 C.F.R. Part 581....................5

30 C.F.R. § 581.15....................14

30 C.F.R. Pts. 581-82....................5

30 C.F.R. Part 582....................8, 17

30 C.F.R. § 582.21(a)....................1, 7

30 C.F.R. § 582.21(b)....................6, 11

30 C.F.R. § 582.21(d)....................7, 28

30 C.F.R. § 582.22....................1, 5

30 C.F.R. § 582.23....................1, 5

30 C.F.R. § 582.24....................1, 5

50 C.F.R. § 17.11....................3

50 C.F.R. § 402.01(b) ....................................................................................3
50 C.F.R. § 402.02 .............................................................................. 6, 12, 16
50 C.F.R. § 402.12(a)........................................................................... 4, 22, 23
50 C.F.R. § 402.12(c)(2) ..................................................................................23
50 C.F.R. § 402.13 ................................................................................ 2, 3, 22
50 C.F.R. § 402.13(c)........................................................................................3
50 C.F.R. § 402.13(c)(2) ...............................................................................4, 22
50 C.F.R. § 402.14 ..........................................................................................2, 4
50 C.F.R. § 402.14(g) ........................................................................................4
50 C.F.R. § 402.14(h)(iii) ..............................................................................4, 23
50 C.F.R. § 402.14(k) ..................................................................................... 18, 19

**Federal Register**

51 Fed. Reg. 19922 (June 3, 1986) ....................................................................17
83 Fed. Reg. 35178 (July 25, 2018)....................................................................17
84 Fed. Reg. 44976 (Aug. 27, 2019)...................................................................16

## INTRODUCTION

The Department of the Interior ("Interior") has proposed a mineral lease sale for two areas in the American Samoa Outer Continental Shelf ("OCS"). The National Marine Fisheries Service ("NMFS") has concurred that Interior's sale—and the related limited preliminary activities—are not likely to adversely affect species listed under the Endangered Species Act. That determination is rational and amply supported by the administrative record: these preliminary activities are severely cabined and would have "no significant adverse impact on the natural resources of the OCS." 30 C.F.R. § 582.21(a), (d). And if that were not enough, any further activities require their own environmental review. 30 C.F.R. §§ 582.12(b)(c)(d), 582.22, 582.23, 582.24. Plaintiffs, resisting that reality, have raced into court to prevent not the sale itself, but its formal announcement. This premature challenge fails for several reasons.

To begin, NMFS did all that was required of it at this early stage. NMFS ably assessed the preliminary activities permitted if the proposed lease sale goes forward; once that lease sale becomes finalized, additional ESA consultations that are required will occur as further activities become contemplated. 30 C.F.R. § 582.21(a). The Ninth Circuit has already upheld staged consultation under the Outer Continental Shelf Lands Act. *Village of False Pass v. Clark*, 733 F.2d 605

(9th Cir. 1984). And contrary to Plaintiffs' claim, future activities may not even occur, so post-leasing activities are not indirect effects of the lease sale. Moreover, the ESA requires neither incremental step consultation nor detailed discussion in a letter of concurrence of all potential effects of the preliminary activities. These are only required during *formal* consultation, which is only necessary when a proposed action is *likely* to adversely affect a species or critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14. Because the proposed lease and preliminary activities are *not likely* to adversely affect a species or critical habitat, only *informal* consultation was required. 50 C.F.R. § 402.13. Finally, NMFS's letter of concurrence was rational and supported by the record. For all these reasons, the Court should deny Plaintiffs' motion for summary judgment and dismiss their complaint.

## STANDARD OF REVIEW

Under the deferential standard of review of the Administrative Procedure Act ("APA"), the Court may set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Vill. of False Pass v. Clark*, 733 F.2d 605, 609 (9th Cir. 1984). Under the APA, the Court may direct that summary judgment be granted to either party based on its review of the administrative record. *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc). The Court's review

under the APA standard is limited to the evidence in the administrative record considered by the agency for the challenged decisions, subject to limited exceptions. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014).

## STATUTORY BACKGROUND

### I. Endangered Species Act Section 7

The ESA provides for the listing of species as threatened or endangered, 16 U.S.C. § 1533, and protects listed species in several ways. As relevant here, Section 7(a)(2) directs each federal agency to ensure, in consultation with the Fish and Wildlife Service ("FWS") or NMFS (the "consulting agency"),[1] that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of" any listed species or destroy or adversely modify designated critical habitat. *Id*. § 1536(a)(2). If the "action" agency that is proposing the action, here Interior, determines that an action "may affect" listed species or critical habitat, the action agency must pursue either "informal" or "formal" consultation with the consulting agency, here NMFS. 50 C.F.R. §§ 402.13-402.14.

[1] The Department of the Interior generally has responsibility for non-marine species and administers the ESA through FWS, while the Secretary of Commerce generally has responsibility for marine species and administers the ESA through NMFS. *See* 16 U.S.C. § 1532(15); 50 C.F.R. §§ 17.11, 402.01(b).

Where an agency action "is not likely to adversely affect" listed species or critical habitat, an action agency can engage in informal consultation with NMFS. *Id.* § 402.13(c). If, during informal consultation, the consulting agency concurs with the action agency's determination that the proposed action is "not likely to adversely affect" listed species or critical habitat, consultation terminates. 50 C.F.R. § 402.13(c). Formal consultation is therefore not required, and the consulting agency need only provide "written concurrence or non-concurrence with the [action] agency's determination." *Id.* § 402.13(c)(2).

By contrast, if the proposed action is likely to adversely affect a species or critical habitat, then the action agency must formally consult with the consulting agency. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14. Formal consultation requires the consulting agency to issue a biological opinion providing the consulting agency's conclusion as to whether the proposed action is likely to jeopardize the continued existence of a listed species or result in destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g). Biological opinions must include "[a] detailed discussion of the effects of the action on listed species or critical habitat." 50 C.F.R §§ 402.12(a), 402.14(h)(iii).

## II. Outer Continental Shelf Lands Act ("OCSLA")

The OCS consists of the submerged lands beyond the U.S. coastal zone, which is generally the area from 3 to 200 nautical miles seaward of the coastline.

*Ctr for Biological Diversity v. Jewell*, 563 F.3d 466, 472 (D.C. Cir. 2009); 43 U.S.C. § 1331(a). Congress declared that the OCS is "a vital national resource" "which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs[.]" 43 U.S.C. § 1332(3). Congress enacted OCSLA to authorize oil and gas leasing as well as leasing for OCS minerals other than oil, gas, and sulfur. *Sec'y of Interior v. California*, 464 U.S. 312, 336 (1984); 43 U.S.C. § 1337(k)(1).

Interior issued regulations governing the leasing and mining of the OCS for such minerals. 30 C.F.R. Pts. 581-82. Interior's issuance of a minerals lease is governed by 30 C.F.R. Part 581. A lessee may, after provision of a detailed advance notice to Interior, conduct "preliminary activities," limited to bathymetric, geological, geophysical, mapping, and other surveys necessary to develop comprehensive Delineation, Testing, or Mining Plan(s) that would have "no significant adverse impact on the natural resources of the OCS." *Id.* Following issuance of a lease and the conduct of any preliminary activities, the OCSLA regulations provide a graduated staged process governing any future post-leasing activity through review and decision by Interior on a lessee's Delineation, Testing, and/or Mining Plan(s). *Id.* §§ 582.12(b)(c)(d), 582.22, 582.23, 582.24. Interior retains the full measure of its discretionary authority to deny approval of a post-

leasing plan, including for reasons related to ESA compliance, among other authorities. *Id.* § 582.21(b).

## ARGUMENT

### I. Interior's proposed agency action is properly limited to issuance of a lease and approval of limited preliminary activities.

Plaintiffs' lead argument, seeking to revise Interior's proposed leasing action to include all possible post-leasing activity, ignores the statutory and regulatory definition of "agency action." Pls.' Br., Dkt. No. 15-1 at 23-24.[2] The ESA does not permit NMFS to ignore an action agency's own description of its proposed action. Moreover, the regulatory scheme for offshore mineral leasing under OCSLA demonstrates that Interior's proposed action is properly limited to its issuance of a lease and minor preliminary activities.

First, the ESA and applicable regulations define "agency action" as "any action authorized, funded, or carried out by [a federal] agency." 16 U.S.C. § 1536(a)(2); *see also* 50 C.F.R. § 402.02 (defining "agency action"). Plaintiffs point to no evidence—and there is none—that Interior's issuance of an OCS lease also authorizes a lessee to undertake any post-leasing activities.

[2] This brief cites to the page numbering that appears in the ECF-endorsed header for each ECF-filed document cited herein.

This is for good reason. Interior's OCSLA regulations for offshore mineral leasing circumscribe what activities a lessee can conduct:

> [n]o exploration, testing, development, or production activities, except preliminary activities, shall be commenced or conducted on any lease except in accordance with a plan submitted by the lessee and approved by the Director. Plans will not be approved before completion of comprehensive technical and environmental evaluations to assure that the activities described will be carried out in a safe and environmentally responsible manner.

30 C.F.R. § 582.21(a); *see also id.* § 582.21(d) (providing for limited preliminary activities). Plaintiffs ignore Interior's OCSLA regulations that separate each stage of post-leasing activity. Moreover, Interior has reserved its authority to disapprove a later plan if such project were determined, after a separate regulatory review process, to not comply with the ESA or other applicable law. *Id.* § 582.12. Plaintiffs mention none of this in their motion.

Second, Plaintiffs are wrong that NMFS should have assumed that Interior will approve future post-leasing activity. One, an action agency has no duty to consult on what it might have the authority to do in the abstract. *See, e.g., Wildearth Guardians v. U.S. EPA*, 759 F.3d 1196, 1209-10 (10th Cir. 2014) ("When an agency action has clearly defined boundaries, we must respect those boundaries and not describe inaction outside those boundaries as merely a component of the agency action."); *see also Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1047 (9th Cir. 2015) (declining to include

state-mandated groundwater pumping as part of an agency action because federal agency did not authorize, fund, or carry out that pumping). Not only does Interior have no duty to consult on what it might have authority to do in the abstract, it would be inappropriate (if not unlawful) for the agency to prejudge potential future actions in the manner plaintiffs argue.

Indeed, multiple courts have refuted Plaintiffs' demand for an overly expansive ESA consultation. Pls'. Br. 23. In *Village of False Pass*, the Ninth Circuit upheld Interior's ESA compliance for multiple oil and gas lease sales under OCSLA and specifically rejected the contention that Interior violated the ESA by failing to "adopt, at the leasing stage, specific measures protecting whales from oil spills and seismic testing, such as seasonal drilling restrictions or tract deletions." 733 F.2d 605, 609-10 (9th Cir. 1984). The Ninth Circuit's decision is based on the multi-step structure under OCSLA regulations that allow Interior to deny or condition post-leasing plans.[3] *Id*. at 611-12; *see also id*. at 608 ("[B]y purchasing a lease, lessees acquire no right to do anything more." (quoting *Sec'y of the Interior*,

[3] OCSLA regulations for offshore oil and gas leasing and minerals leasing differ in some respects. *Compare, e.g.*, 30 C.F.R. Parts 500 and 582. However, regardless of the mineral resource, Interior still separates its decisions on offshore lease operations into distinct stages for regulatory review, including post-lease review and approval or a plan or plans for testing, delineation, and/or commercial production. 733 F.2d 605. Interior also reserves the authority, regardless of the resource type, to approve or disapprove a lessee's separate plan for each stage of post-leasing activity.

464 U.S. 312)); *see also Tribal Vill. of Akutan v. Hodel*, 869 F.2d 1185, 1194-96 (9th Cir. 1988) (resting ESA compliance for lease sale stage on assurance of ESA consultation at each subsequent stage of oil development).

Other courts have also considered OCSLA's stepwise process of regulatory review when evaluating Interior's compliance with the ESA. *See, e.g.*, *Conservation L. Found. v. Andrus*, 623 F.2d 712, 714-16 (1st Cir. 1979); *N. Slope Borough v. Andrus*, 642 F.2d 589, 609 (D.C. Cir. 1980). In *North Slope,* the D.C. Circuit repeatedly emphasized the stepped process of review that is the hallmark of OCSLA, recognizing the "preliminary" nature of lease sales. 642 F.2d at 593. This decision turns on the fact that OCSLA's staged regulatory reviews include a system of "checks and balances" by requiring "substantive approval and review" before "implementation of each of [OCSLA's] major stages." *Id*. at 609, 593. OCSLA's "[m]andatory stage-by-stage review," the D.C. Circuit cautioned, "prevents the telescoping of any and every projected hazard to endangered life ... into one overwhelming statutory obstacle." *Id*. at 593, 609 (emphasis added). The D.C. Circuit thus reconciled OCSLA and the ESA by holding that "graduated compliance with [the ESA]" is permissible. *Id*.

Moreover, the D.C. Circuit has repeatedly confirmed that "courts must consider the ESA's requirements in light of each particular [OCSLA] leasing program stage at issue because those stages are there by design." *Ctr. for*

*Biological Diversity*, 563 F.3d at 482-83. This stepwise approach under OCSLA "was designed to forestall premature litigation regarding adverse environmental effects that ... will flow, if at all, only from the latter stages of OCS exploration and production." *Id.* (*quoting Sec'y of Interior*, 464 U.S. at 341); *see also Healthy Gulf v. U.S. Dep't of the Interior*, 152 F.4th 180, 198 (D.C. Cir. 2025) ("Because environmental effects must be evaluated [under OCSLA] on a stage-by-stage basis, an ESA consultation obligation arises only when a particular stage of the program will affect listed species or critical habitat. Completion of the first stage does not, by itself, authorize any activity that causes harm to protected species."). Courts have come to similar conclusions regarding the similar staged regulatory review process under OCSLA applicable to leases for renewable energy production (e.g., wind energy). *See, e.g., Save Long Beach Island v. U.S. Dep't of the Interior*, 663 F. Supp. 3d 1, 10 (D.D.C. 2023); *see also Fisheries Survival Fund v. Haaland*, 858 F. App'x 371 (D.C. Cir. 2021).

Plaintiffs ignore the significance of OCSLA and its stepwise regulatory review process. Instead, they rely on inapposite cases like *Conner v. Burford*, 848 F.2d 1441 (9th Cir. 1988), which involved the Minerals Leasing Act. The Ninth Circuit acknowledged there that the outcome in *North Slope* rested principally on the requirements and procedural guarantees found in OCSLA's staged approach. *Conner*, 848 F.2d at 1455-56. The leases at issue under the Mineral Leasing Act

lacked similar safeguards about future post-leasing activity.[4] *Id*. at 1457-58 (holding), 1455 (stipulation). Indeed, that court found the decisions in *False Pass* and *North Slope* inapposite precisely because the "[Minerals Leasing Act], however, contains no system of 'checks and balances' similar to OCSLA." *Id*. at 1456. That is not the case here: before Interior can approve anything more than the preliminary activities at issue here, it will be required to engage in further ESA consultation. 30 C.F.R. § 582.21(b).

Moreover, in *Conner*, the "agency action" at issue "include[d] not just final lease issuance but all resulting subsequent activities." 848 F.2d at 1453 (citation modified). In contrast, Interior's leasing proposal here is intentionally limited to lease issuance and certain preliminary activities. N0544-45; N02854-63. Thus, the proposed agency action cannot be broadened to include all possible post-leasing activity.

## II. Post-leasing activities are not indirect effects of lease issuance.

Plaintiffs' next theory improperly seeks to include speculative post-leasing activities as effects of lease issuance. Pls.' Br. 24-26. This theory ignores the regulatory definition of "effects of the action" and the requirement that any indirect

[4] Plaintiffs also cite to *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1054-55 (9th Cir. 1994) as requiring a broad definition of "agency action." But that case addresses forest management plans adopted under the National Forest Management Act that prescribed future agency projects across those forests.

effects be "reasonably certain to occur." 50 C.F.R. § 402.02. Plaintiffs would instead apply a speculative standard with no basis in the regulatory language. Even had they argued for the correct standard of whether effects are likely, their argument still fails because they point to no available commercial or scientific information demonstrating that any particular post-leasing activity is reasonably certain to occur just because Interior holds a lease sale. This case is unlike any ordinary oil and gas lease or onshore hard-rock mineral lease because there are currently no comparable deep-sea mining initiatives underway to even demonstrate such particular activities are possible. *Infra* at 14.

Plaintiffs essentially ignore the reasonable certainty standard from the regulatory definition, instead arguing that an indirect effect exists if a proposed action makes an effect merely possible or even just "more probable." Pls.' Br. 25. But this Court is not empowered to rewrite the regulatory definition of "effects of the action."[5]

The Services' ESA Consultation Handbook does not support Plaintiffs either. It too instructs agencies to use the reasonable certainty standard. Pls.' Br. 26; *see* N02130. The Handbook specifically states that a future activity must be

[5] The gloss that Plaintiffs extract from *San Luis & Delta-Mendota Water Authority v. Locke*, 776 F.3d 971, 1009 (9th Cir. 2014) is dicta and simply repeats the regulatory standard. *See* Pls'. Br. 25.

reasonably certain to occur "as evidenced by appropriations, work plans, permits issued, or budgeting." *Id*. And Interior has not authorized (and is precluded from authorizing) any post-leasing activity upon lease issuance. Here, the stepwise regulatory reviews required by OCSLA disprove the contention that any particular post-leasing activities will necessarily follow from a lease sale.

Plaintiffs also fail to identify any commercial or scientific information that NMFS ignored, showing any particular post-leasing activity is reasonably certain to occur. No statement in Interior's biological assessment ("BA") supports the theory that post-leasing activity beyond preliminary activity is reasonably certain to occur. The BA states the exact opposite: "[c]ommercial-scale seabed mining is a new industry with only a few countries testing seabed mining equipment or recovery within their waters." N02852. The BA explains that the purpose of leasing is "to facilitate the *potential development* of the areas that *may contain* economically recoverable mineral resources in an environmentally and economically responsible way," and that "not all deposits may be economically viable." *Id*. (emphasis added). The BA does not indicate that significant post-leasing activity is likely to occur.

To the contrary, a primary purpose of Interior's issuance of a lease is to develop commercial and scientific information that would inform future assessment of the environmental, technical, and commercial feasibility of mining

in any particular location. *See e.g.*, N03016 ("The presence of any minable orebody is unknown, and additional prospecting is needed to discover and delineate OCS minerals, hence, the size of the tracts for potential leasing is relatively large."); *see also* 30 C.F.R. § 581.15. Interior's BA is replete with statements that support the conclusion that deep sea mining is in its nascent stages and not yet reasonably certain to occur. For example, the BA discusses the status of preliminary survey and exploration efforts in the Cook Islands which have been underway for *58 years* thus far:

> [t]o date, three companies hold exploration licenses, but no commercial mining is underway. Over the next five years, the Cook Islands are expected to collaborate with international partners to continue exploration and baseline science, but commercial extraction is unlikely within this timeframe, with full-scale operations tentatively scheduled for post-2032 pending further approvals.

N02970.

These circumstances describing an unproven industry here are also similar to the saga of unconventional oil shale and tar sands resources in the intermountain western United States. There Interior took a similar approach to staging its ESA compliance as described and upheld in *Rocky Mountain Wild, Inc. v. U.S. Bureau of Land Management*, Case No. 13-cv-1988-JLK, 2018 U.S. Dist. LEXIS 163703 (D. Colo. Sept. 11, 2018). In that case Interior separated its programmatic decisions made in a series of Resource Management Plan amendments from the

effects of the project-level decision that might occur in the future, and determined that its Plan amendments, making close to 800,000 acres available for development and leasing, had no effect that would trigger ESA consultation obligations.

Interior there adopted a three-step approach to commercial development and deferred ESA Section 7(a)(2) consultation until leasing activity was actually proposed or substantially likely to occur. *Id.* at *7. The court upheld Interior's no-effect determination for its Plan Amendments, for much the same reasons at issue here by analogizing to the stage-by-stage OCSLA process for offshore leasing and the fact that Interior had full authority to later deny commercial development and other leasing decisions. *Id*. at *19-*23. That court also rejected the argument (similar to that presented here) that future leasing and development of that mineral resource was an indirect effect of the initial decision to allocate areas for leasing. *Id*. at *28.

Plaintiffs have no good legal or factual basis for their theory that NMFS is obligated now—before Interior even issues a lease—to evaluate all the possible consequences that could result from deep-sea mining just because it is possible that a future lessee might one day surmount all the hurdles necessary to even present a plan for mining activities for Interior's regulatory review.

## III. NMFS need not have considered the effects of potential post-leasing activities.

The Court may summarily dispense with Plaintiffs' separate contention (Pls.' Br. 26) that post-leasing activity is interrelated or interdependent with lease issuance itself. That relict regulatory term from the ESA consultation regulations does not apply here. On February 17, 2026, when NMFS issued its Letter of Concurrence, the concepts of "interrelated action" or "interdependent actions" did not even appear in the applicable definition of "effects of the action" at 50 C.F.R § 402.02. NMFS had removed that language in a rulemaking promulgated in 2019. *See* 84 Fed. Reg. 44976 (Aug. 27, 2019). The concepts were revived in a Court Order issued on March 30, 2026, by the Northern District of California that vacated the 2019 version of the regulatory definition of "effects of the action," and reinstated the pre-2019 version of section 402.02 that included those concepts. *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 837 F. Supp. 3d 1080, 1118 (N.D. Cal. 2026).

Even assuming NMFS should have deemed the future activities of a future OCS minerals lessee to be interrelated or interdependent with lease issuance, Plaintiffs' argument fails because they ignore that such future activities (and their effects) must themselves be likely to occur before NMFS must evaluate them as "effects of the action." *Ctr. for Biological Diversity v. Haaland*, 87 F.4th 980, 988

(9th Cir. 2023) (requiring proof that a mitigation measure and its intended beneficial effect in precluding future groundwater pumping were reasonably certain to occur). NMFS made this point when the agency first incorporated the terms "interrelated or interdependent actions" into the definition of "effects of the action" in 1986. 51 Fed. Reg. 19922, 19932 (June 3, 1986) (explaining that effects of activities that are "interrelated or interdependent" with a proposed action will also be considered as "effects of the action" provided that such effects must still be "reasonably certain to occur" or "likely"); *see also* 84 Fed. Reg. at 44993, 44978, 44989 ("the reasonably certain to occur standard applies to all consequences caused by the proposed action, which include the effects formerly captured by . . . 'interrelated' and 'interdependent' activities") and 83 Fed. Reg. 35178, 35183-84 (July 25, 2018) (same). Plaintiffs' argument fails because they present no argument or evidence—and there is also none in the record—that any future post-leasing activities are sufficiently likely to occur such that any specific effects are likely to result from post-leasing activities.[6]

[6] Nor do Plaintiffs show that future post-leasing activities would not occur "but for" Interior's issuance of a lease. This "but for" causation test is a separate requirement to identify interrelated or interdependent actions. *See Sierra Club v. Marsh*, 816 F.2d 1376, 1387 (9th Cir.1987) ("The test for interrelatedness ... is 'but for' causation: but for the [proposed action], these activities would not occur."). In this case, Interior requires that any post-leasing activities be reviewed through a separate regulatory approval under 30 C.F.R. Part 582. Thus, the entire universe of possible post-leasing activities does not necessarily follow issuance of a lease, and

Plaintiffs are wrong on the law and present no information demonstrating that post-leasing activity is likely.

## IV. Interior did not request incremental step consultation, and 50 C.F.R. Section 402.14(k) does not apply here.

Plaintiffs' argument that NMFS has not complied with the procedures applicable to incremental step consultation at 50 C.F.R. § 402.14(k) also fails. That regulation would apply only if requested by Interior and only if the proposed action has effects that require formal consultation. Interior did not so request. This same language "if requested by the Federal agency" also disproves any contention that NMFS and Interior were obligated to proceed under subsection 402.14(k) as the sole option to satisfy Section 7(a)(2). Here, Interior proposes to issue a lease and allow only associated preliminary activities. Interior determined that such circumscribed activity was not likely to adversely affect any listed species and obtained NMFS' concurrence in informal consultation. There was no basis for the agencies to complete formal consultation where informal consultation is sufficient. As argued *supra*, Interior has no comprehensive plan of action for the OCSLA mineral leases it proposes to issue, and Interior's decision not to request

---

the requirement for future regulatory reviews demonstrates that lease issuance is not a "but for" cause of all post-leasing activities.

incremental-step consultation under subsection 402.14(k) has no bearing on the validity of the informal ESA consultation that it completed with NMFS.

Plaintiffs cite two cases to argue that, even had NMFS performed an incremental step consultation under subsection 402.14(k), a biological opinion on a first incremental step of lease issuance would still be *per se* unlawful. Pls.' Br. 28. That regulation does not apply—and in any event, Plaintiffs' citations illustrate the overreach in their argument. Plaintiffs' cf. citation to *North Slope*, 642 F.2d at 608, is misleading where, in that case, Interior did undertake formal consultation. Plaintiffs also ignore that the decision reversed the district court as to Interior's ESA compliance, reasoning that "[t]he congressional intent [under OCSLA] to facilitate these lease sales, and to save until concrete a significant portion of substantive environmental determinations, compels this court to sanction the lease sale with confidence that environmental safeguards persist." 642 F.2d at 595, 598.

Nor is Plaintiffs' argument supported by the dicta they quote from *Environmental Defense Center v. Bureau of Ocean Energy Management*, 36 F.4th 850, 890 (9th Cir. 2022). Plaintiffs ignore the fact that, unlike in that decision, Interior has reserved full discretion to review and disapprove any post-leasing activities. There are no credible legal or factual bases for Plaintiffs' several theories to require NMFS to evaluate the speculative effects of unknown future post-leasing activities that might (or might not) occur.

## V. NMFS's Letter of Concurrence is Rational and Supported by the Record.

Finally, the record supports NMFS's letter of concurrence, and Plaintiffs cannot demonstrate otherwise. First, there are no formal requirements regarding the contents of letters of concurrence. Second, NMFS considered all potential effects of the preliminary activities proposed in the agency action. Third, comparison to NMFS's 2025 BiOp involving oil and gas development in the Gulf of America is inapt. Finally, NMFS did not rely on non-binding mitigation efforts in determining that the preliminary activities were not likely to adversely affect listed species or critical habitat.

### A. Neither the ESA nor the Implementing Regulations Require NMFS to Repeat its Effects Analysis in its Letter of Concurrence

NMFS's letter of concurrence fully comports with the law. Neither the ESA nor the Section 7 regulations contain any requirements regarding the contents of a letter of concurrence. Indeed, the ESA merely provides that following consultation, the Secretary "shall provide to the Federal agency . . . a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(a). The Ninth Circuit recently made clear that this provision does not require letters of concurrence "to repeat the entire effects analysis to survive judicial scrutiny." *Ctr. for Biological Diversity v. U.S. Bureau*

*of Land Mgmt.*, 141 F.4th 976, 1014 (9th Cir. 2025).

In *Center for Biological Diversity*, the Ninth Circuit held that a letter of concurrence was not arbitrary and capricious despite failing to discuss climate change as an effect of a proposed action. *Id.* There, the action agency found that consultation on greenhouse gas emissions was not necessary, and NMFS noted in its letter of concurrence, "without commenting on the conclusions that [the action agency] has drawn, we agree that the scope of the ESA Section 7 consultation with respect to [greenhouse gas] emissions is appropriate." *Id.* The Court found that this statement from NMFS provided a "satisfactory explanation" that NMFS agreed with the action agency's reasoning. *Id.*

Here, NMFS's letter of concurrence is much more fulsome. Although NMFS did not repeat Interior's effects analysis from its biological assessment, NMFS described the types of preliminary activities that were proposed, such as "[b]athymetric, geophysical, and mapping surveys util[yzing] dynamic positioning vessels, autonomous underwater vehicles, and remotely operated vehicles (ROVS), along with High-Resolution Geophysical equipment" as well as "geological, geotechnical, and biological [s]ampling and the placement of equipment." N00545. NMFS concluded by noting, "[b]ased on our knowledge, expertise, and the materials you provided, we concur with your conclusions that the proposed action may affect, but is not likely to adversely affect" the ESA-listed species

present in the project area. N00545-46. This discussion of the proposed activities, together with NMFS's statement that it reviewed the materials provided by Interior, provides a satisfactory explanation that NMFS analyzed the effects outlined in Interior's BA and agreed with its reasoning.

Indeed, in asserting that NMFS was required to say more, *see* Pls.' Br. 23, Plaintiffs conflate informal consultation with formal consultation. Where an agency action "is not likely" to adversely affect listed species or critical habitat, an action agency can engage in informal consultation. 50 C.F.R. § 402.13. During informal consultation, the *action agency*—not NMFS—will create a biological assessment that evaluates, "the potential effects of [a proposed agency action] on listed and proposed species and designated and proposed critical habitat and determine[s] whether any such species or habitat are likely to be adversely affected by the action." *Id.* § 402.12(a). If NMFS concurs that the action is not likely to adversely affect listed species or critical habitat, it will issue a letter of concurrence; however, neither the regulations nor the ESA contain any specific requirements regarding the contents of this letter. Instead, the regulations merely note, "the Service shall provide written concurrence or non-concurrence with the Federal agency's determination." *Id.* § 402.13(c)(2).

Because the parties engaged in informal consultation, NMFS was not required to provide a detailed discussion of the effects of the preliminary activities.

Instead, it was merely required to provide Interior with a written concurrence or non-concurrence of Interior's conclusions, which it did. *Id.* § 402.12(c)(2).

### B. The Record Confirms That NMFS Thoroughly Analyzed all Potential Effects of the Proposed Preliminary Activities

Furthermore, the record makes clear that NMFS properly considered all potential effects of the proposed preliminary activities. Courts routinely uphold agency decisions "of less than ideal clarity if the agency's path may reasonably be discerned." *See, e.g., Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 44 (1983) (citation modified). This is true even in the context of biological opinions, which unlike letters of concurrence, must contain certain information. *Compare* 50 C.F.R. §§ 402.12(a) *with* 402.14(h)(iii); *Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1264 (9th Cir. 2017) ("Although the BiOp's explanation of this issue is conclusory, there is sufficient evidence in the record from [which] we can discern the FWS's reasoning" (citation modified)); *Defs. of Wildlife v. U.S. Dep't of Navy*, 733 F.3d 1106, 1119 (11th Cir. 2013) (noting it was clear from BiOp that NMFS' analysis was informed by the Navy's environmental impact statement and biological assessment).

Here, an internal memorandum that NMFS drafted in support of its letter of concurrence reflects that the agency considered all potential effects of the proposed action: exposure to elevated noise from equipment, vessels, and aircraft

overflights; vessel collisions; direct physical impacts from dumped sediment and benthic sampling tools; entanglement with box core samplers and buoys; entrapment of animals in vessels; disturbance from human activity; exposure to chemicals and hazardous waste materials; benthic disturbance of the seafloor with the use of box core samplers and installation of moorings; and potential loss of foraging resources such as plankton. For example, with respect to direct physical impacts, NMFS noted that if ESA-listed species are present at the surface during sampling events, these species are highly mobile and will likely avoid the area when vessels approach before sample occurs. N00540. NMFS further noted:

> Due to the slow speeds to be used during most operations, extreme depths at the sites, temporary nature of the sampling events (both temporally and spatially), and the expectation that ESA-listed marine species would be widely scattered throughout the proposed areas of operation and avoid disturbance, the potential for an incidental direct physical impact is extremely unlikely to occur.

*Id.* NMFS also referred to a video that Interior submitted showing what type of equipment would be used for box core sampling and how the sampling would be conducted, and NMFS noted that the video reflected, "how small the sampling equipment are, and the minimal turbidity expected to occur from their deployment." *Id.* Likewise, NMFS provided a similar detailed analysis for all of the potential effects, explaining why each would be insignificant or discountable.

N00537-43. Thus, the record makes clear that NMFS thoroughly considered all potential effects of the proposed preliminary activities.

### C. NMFS Was Not Required to Reach the Same Conclusions From An Unrelated BiOp Involving Vastly Different Activities

Furthermore, contrary to Plaintiffs' assertion, NMFS was not required to reach the same conclusions that it made in a 2025 BiOp involving oil and gas operations in the Gulf of America. *See* Pls.' Br. 30. "[A]gencies do not have a 'duty to identify any potential tensions between current and earlier factual determinations in marginally related administrative actions.'" *Zinke*, 856 F.3d at 1263 (citing *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1051 (9th Cir. 2010)). The 2025 BiOp that Plaintiffs reference involved entirely different activities in a geographic area with vastly different topography. There is simply no comparison with the current action.[7]

With respect to geography, the preliminary activities near American Samoa will take place 104-150 miles offshore at depths ranging from 1,400-6,000 meters. N00352; N01746. By contrast, the oil and gas exploration at issue in the 2025

[7] The Court should reject Plaintiffs' argument for the additional reason that the 2025 BiOp no longer has any legal effect or force after the Endangered Species Committee exempted oil and gas program activities in the Gulf from the requirements of ESA Section 7(a)(2). *See Sierra Club v. NMFS*, No. 8:25-cv-01627-DLB, ECF Nos. 99, 112.

BiOp was proposed to take place as little as 3.5-10.5 miles offshore and at depths of as little as 3,346 meters. N01061-62. More importantly, the preliminary activities at issue in this case are far more limited than those at issue in the 2025 Gulf BiOp. Interior proposes to allow only the following limited activities offshore American Samoa: use of vessels and remotely operated vehicles; high-resolution video and geophysical surveys using sound; seabed sampling; anchoring of temporary buoys to the seafloor; physical and biological monitoring from a ship or moored anchor; biological surveys from air, ship, or water; and potential operations to recover lost equipment. N00342-51; N02854-63. By contrast, the oil and gas operations at issue in the 2025 Gulf BiOp go far beyond this: they cover thousands of existing leases, and hundreds of proposed exploration and development plans; they also include drilling, N00986-93; the use of barges and tankers to transport oil and gas, N00993-95; the installation of permanent structures, including pipelines, N00997-1002; and decommissioning of oil wells and other removal activities, N01007-1013.[8] Oil and gas development in the Gulf has also been going on for decades, whereas critical mineral mining on the seabed is nascent, and it is unclear if mining is even possible. *See* N00946.

---

[8] Although NMFS did consider the 2025 BiOp with respect to acoustics, it did so only to confirm that the proposed equipment met the *de minimis* criteria in a peer-reviewed study that accompanied that BiOp, and it did not rely on the BiOp's larger findings.

At bottom, Plaintiffs compare apples to oranges: there is simply no comparison between the long-term oil and gas drilling in the Gulf and the short-term surveys and assessments here. NMFS acted entirely rationally in reaching different conclusions in these cases.

**D. NMFS Did Not Rely on Non-Binding Mitigation Measures.**

Finally, Plaintiffs unpersuasively argue that Interior has made no commitment to "mitigation" for any High-Resolution Geographic ("HRG") surveys, and the absence of such a commitment renders arbitrary NMFS' conclusion that HRG surveys are not likely to adversely affect any listed species or critical habitat. Pls.' Br. 31-32. Plaintiffs ignore Interior's clear explanation that it only will allow the use of equipment that the best available science indicates will have *de minimis* effect on listed species. N02855-57; N02926-29. Interior recognized that some HRG sources can potentially cause acoustic injury and/or disturbance to marine mammals. *Id*. Thus, Interior's BA expressly committed the agency to require that:

> the precise equipment types, equipment settings and uses of planned surveys will be submitted to [Interior] 30 days or more prior to use for review to confirm that the sources comply with the de minimis criteria described in Ruppel et al. (2022) and the ONMP. If Lessees propose to use equipment not described in the Proposed Action, and which exceeds impacts covered by this analysis, [Interior] will not permit the activity or use of equipment, and consultation with NMFS would be reinitiated.

N02928-29.[9] Interior has specifically committed to enforce this limit and review a lessee's proposed preliminary activities to ensure the lessee will only utilize equipment that has been classified in the ONMP and under Ruppell et al. (2022) as a *de minimis* acoustic source.

This requirement is backed by Interior's OCSLA regulation that expressly limits preliminary activities to "those which have no significant adverse impact on the natural resources of the OCS" and requires that a lessee give Interior at least 30-days' notice of the HRG equipment that it proposes to use. 30 C.F.R. § 582.21(d). This mandatory review by Interior is a sufficient commitment to limit the acoustic sources that a lessee might employ to those with a *de minimis* impact.

Plaintiffs also err in arguing that Interior has an obligation to provide NMFS with binding mitigation plans. Pls.' Br. 31. Mitigation measures are reasonably certain to occur so long as they are backed by some form of enforceable obligation. *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743, 747 (9th Cir. 2020) (describing special requirements for mitigation). That requirement is satisfied by Interior's requirement that it review a lessee's detailed survey plans.[10] Interior has

[9] The ONMP details a tiered system for categorizing geophysical sound sources based on their relative potential to affect marine mammals. N01810.

[10] Although Plaintiffs only challenge mitigation measures for acoustics, to the extent they challenge other proposed mitigation measures, this mitigation would be embodied in Interior's lease stipulations and would therefore be enforceable as part

appropriately included the limits on acoustic sources as part of its proposed action, and thus the commitment is "subject to the ESA's consultation and enforcement provisions." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1119 (9th Cir. 2012).

## VI. No Remedy is Warranted.

As demonstrated above, NMFS's letter of concurrence is rational, supported by the record, and should be upheld. Even if the Court were to disagree, vacatur is not warranted. *See* Pls.' Br. 32-33.

Vacatur of an agency action is an equitable remedy. *In re Clean Water Act Rulemaking*, 60 F.4th 583, 593-94 (9th Cir. 2023). Traditional equitable principles require any remedy to be tailored to the violation. *See, e.g., Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010). Moreover, the Court is not automatically "required to set aside every unlawful agency action." *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995); *see also Ctr. for Biological Diversity v. Moore*, No. CV-22-00412-TUC-JAS (AMM), 2024 WL 1156863, at

---

of the lease. BOEM, Proposed Leasing Notice American Samoa OCS Mineral Lease Sale PACM-1, Lease Stipulations, https://www.boem.gov/sites/default/files/documents/marine-minerals/critical-minerals/Proposed%20LN%20Stipulations%20-%20OCS%20Mineral%20Sale%20-%20PACM-1%20American%20Samoa%202026.pdf?VersionId=5EOVl6vgE0oQujPr8F8rR2Ax39TDNsVH (last visited Oct. 14, 2026).

*3 (D. Ariz. Feb. 16, 2024) (noting that courts will not vacate an agency's decision absent egregious error). Thus, a procedural deficiency that may not affect the substance of the agency's decision would not support vacatur.

"Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (per curiam) (internal citation omitted). Many of Plaintiffs' arguments assert errors that, even if found to be true, likely require only updated descriptions and explanations by NMFS based on the science and data in the record. Leaving the letter of concurrence in place would preserve environmental protections and avoid regulatory disruption while the agency addresses discrete issues on remand. Thus, vacatur is not warranted.

## CONCLUSION

NMFS respectfully requests that the Court deny Plaintiffs' motion for summary judgment and dismiss its complaint.

Respectfully submitted this 19th day of October 2026,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
MEREDITH L. FLAX, Deputy Section Chief
United States Department of Justice
Energy & Natural Resources Division

/s/ *Jessica L. Cole*
JESSICA L. COLE (D.C. Bar # 1011384)
Wildlife & Marine Resources Section
Ben Franklin Station
P.O. Box 7611
Washington, D.C. 20044-7611
T: (202) 598-3105
Email: jessica.cole3@usdoj.gov

JOHN H. MARTIN (Colo. Bar #32667)
Wildlife & Marine Resources Section
999 18th St., Suite 600 North Terrace
Denver, CO 80202
Tel: 303-319-5359
Fax: 303-844-1350
Email: john.h.martin@usdoj.gov

*Attorneys for Federal Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.4(e) and the Court's October 16, 2026, Order (Dkt. No. 42), I certify that the foregoing memorandum contains 6,856 words, exclusive of the caption, tables, and signature block. I have relied upon Microsoft Word to determine the word count.

*/s/ Jessica L. Cole*

CERTIFICATE OF SERVICE

I hereby certify that, on October 19, 2026, the foregoing was electronically filed through the ECF filing system and will be sent electronically to the registered participants as identified in the Notice of Electronic Filing.

*/s/ Jessica L. Cole*