DAVID L. HENKIN #6876
HARLEY M. BROYLES #11640
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawai'i 96813
T: (808) 599-2436
Email: dhenkin@earthjustice.org
hbroyles@earthjustice.org

CHRISTOPHER D. EATON
(*pro hac vice*)
EARTHJUSTICE
810 3rd Avenue, Suite 610
Seattle, Washington 98104
T: (206) 343-7340
Email: ceaton@earthjustice.org

JOSEPH V. LANGKILDE III
(*pro hac vice*)
EARTHJUSTICE
1250 I Street NW, Fourth Floor
Washington, DC 20005
T: (202) 667-4500
Email: jlangkilde@earthjustice.org

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAI'I

| | |
|---|---|
| FA'ASAO AMERIKA SAMOA and CONSERVATION COUNCIL FOR HAWAI'I,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL MARINE FISHERIES SERVICE and HOWARD LUTNICK, in his official capacity as Secretary of Commerce of the United States,<br><br>Defendants. | CIVIL NO. CV-26-438 JAO-KJM<br><br>PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT; CERTIFICATE OF COMPLIANCE<br><br>Hearing: October 30, 2026, at 9:00 a.m.<br>Judge: Hon. Jill A. Otake<br><br>Trial Date: None Set<br><br>Related to ECF 15 |

PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

TABLE OF CONTENTS

I. INTRODUCTION ..... 1

II. ARGUMENT ..... 1

A. NMFS Violated the ESA's Mandate to Evaluate the Entire Agency Action. ..... 1

1. NMFS Violated Requirements for "Staged Consultation." ..... 2

2. NMFS Lacks Any Support for the Cramped Consultation Approach Taken Here. ..... 7

B. Even If Post-Leasing Activities Were Not Part of the Agency Action, NMFS Would Still Be Obligated to Evaluate Their Effects. ..... 12

C. NMFS's Evaluation of Effects from Preliminary Activities Is Arbitrary and Contrary to the ESA. ..... 16

1. Marine Debris ..... 16

2. Non-Binding Mitigation of Acoustic Harms ..... 18

III. THE COURT SHOULD VACATE THE LETTER OF CONCURRENCE ..... 20

IV. CONCLUSION ..... 21

TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Am. Rivers v. U.S. Army Corps of Eng'rs*,
271 F. Supp. 2d 230 (D.D.C. 2003) .......... 6

*Conner v. Burford*,
848 F.2d 1441 (9th Cir. 1988) .......... *passim*

*Ctr. for Biological Diversity v. Bernhardt*,
982 F.3d 723 (9th Cir. 2020) .......... 18, 19

*Ctr. for Biological Diversity v. Haaland*,
87 F.4th 980 (9th Cir. 2023) .......... 15

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
837 F. Supp. 3d 1080 (N.D. Cal. 2026) .......... 15

*Ctr. for Biological Diversity v. U.S. Dep't of Interior* (*CBD*),
563 F.3d 466 (D.C. Cir. 2009) .......... 11, 12

*Defs. of Wildlife v. Zinke*,
856 F.3d 1248 (9th Cir. 2017) .......... 16, 17

*Environmental Defense Center v. Bureau of Ocean Energy Management*
36 F.4th 850 (9th Cir. 2022) .......... 6

*Fisheries Survival Fund v. Haaland*
858 F. App'x 371 (D.C. Cir. 2021) .......... 12

*Greenpeace v. NMFS*,
80 F. Supp. 2d 1137 (W.D. Wash. 2000) .......... 7

*Healthy Gulf v. U.S. Department of the Interior*,
152 F.4th 180 (D.C. Cir. 2025) .......... 11

*Humane Soc'y of U.S. v. Locke*,
626 F.3d 1040 (9th Cir. 2010) .......... 17, 18

**Page(s)**

**CASES (Continued)**

*Mont. Wildlife Fed'n v. Haaland*,
127 F.4th 1 (9th Cir. 2025) ....................................................................20, 21

*N. Slope Borough v. Andrus*,
486 F. Supp. 332 (D.D.C. 1980)..........................................................................2

*N. Slope Borough v. Andrus*,
642 F.2d 589 (D.C. Cir. 1980)..................................................................*passim*

*Nat'l Wildlife Fed'n v. NMFS*,
524 F.3d 917 (9th Cir. 2008) ....................................................................19, 20

*Native Ecosystems Council v. U.S. Forest Serv.*,
428 F.3d 1233 (9th Cir. 2005) ..........................................................................10

*Pac. Rivers Council v. Thomas*,
30 F.3d 1050 (9th Cir. 1994) ..........................................................................7, 8

*Rocky Mountain Wild, Inc. v. U.S. Bureau of Land Management*
No. 1:13-cv-01988-JLK, 2018 U.S. Dist. LEXIS 163703 (D. Colo.
Sept. 11, 2018) ..........................................................................................12, 13, 14

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
747 F.3d 581 (9th Cir. 2014) ..............................................................................9

*San Luis & Delta-Mendota Water Auth. v. Locke*,
776 F.3d 971 (9th Cir. 2014) ............................................................................13

*Save Long Beach Island v. U.S. Department of the Interior*
663 F. Supp. 3d 1 (D.D.C. 2023)..................................................................11, 12

*Tenn. Valley Auth. v. Hill*,
437 U.S. 153 (1978)............................................................................................7

*Tribal Village of Akutan v. Hodel*
869 F.2d 1185 (9th Cir. 1988) ............................................................................4

*Wild Fish Conservancy v. Salazar*,
628 F.3d 513 (9th Cir. 2010) ..............................................................................8

**Page(s)**

**CASES (Continued)**

*Village of False Pass v. Clark*
733 F.2d 605 (9th Cir. 1984) ....................................................................3

**UNITED STATES CODE**

16 U.S.C. § 1536(a)(2)....................................................................9, 20

**CODE OF FEDERAL REGULATIONS**

30 C.F.R. § 582.21(d) ....................................................................19

50 C.F.R. § 402.02 (2018) ....................................................................12, 13

50 C.F.R. § 402.13(c)....................................................................20

50 C.F.R. § 402.14(b)(1)....................................................................20

50 C.F.R. § 402.14(k) ....................................................................4, 5

**FEDERAL REGISTER**

51 Fed. Reg. 19926 (June 3, 1986) ....................................................................5, 15

83 Fed. Reg. 35178 (July 25, 2018)....................................................................15

84 Fed. Reg. 44976 (Aug. 27, 2019)....................................................................15

90 Fed. Reg. 17735 (Apr. 29, 2025) ....................................................................10

90 Fed. Reg. 25369 (June 16, 2025) ....................................................................13

## I. INTRODUCTION

Defendants claim the National Marine Fisheries Service (NMFS) engaged in a lawful "staged" Endangered Species Act (ESA) consultation. But no court has ever upheld what NMFS did here: an informal consultation on an Outer Continental Shelf Lands Act (OCSLA) lease sale whose scope considered only preliminary activities. On the contrary, binding precedent and Defendants' own caselaw establish that consultation on a lease sale must include post-leasing activities like exploration, development, and extraction. NMFS's unprecedented approach to consultation for the American Samoa lease sale violates well-established law.

## II. ARGUMENT

### A. NMFS Violated the ESA's Mandate to Evaluate the Entire Agency Action.

Binding Ninth Circuit precedent requires NMFS to evaluate "the effect of the *entire* agency action," which, in the case of a "lease sale under [OCSLA], … encompasse[s] the entire leasing project, from the issuance of the leases through post-leasing development and production." *Conner v. Burford*, 848 F.2d 1441, 1453 (9th Cir. 1988) (citing *N. Slope Borough v. Andrus*, 642 F.2d 589, 608 (D.C. Cir. 1980)). Defendants do not dispute that NMFS did not do that here. Rather, they claim NMFS engaged in permissible "staged consultation." ECF 43,

PageID.3065-66. But NMFS's narrow evaluation of only preliminary activities is nothing like the lease sale consultations that courts have sanctioned. The cases Defendants cite all involved *formal* consultation culminating in a *biological opinion* that *included* post-leasing activities. None involved an *informal* consultation culminating in a *letter of concurrence* that *did not include* post-leasing activities. There is no authority for the cramped consultation here.

1. <u>NMFS Violated Requirements for "Staged Consultation."</u>

Staged ESA consultation is permissible to a degree for OCSLA lease sales. The problem is that NMFS's approach *here* violates the requirements for the staged consultation endorsed by the courts and codified in NMFS's regulations.

Begin with Defendants' reliance on *North Slope Borough v. Andrus*. *See* ECF 43, PageID.3073-74. In that case, unlike here, NMFS produced a "biological opinion" for the OCSLA lease sale that evaluated effects of post-leasing activities such as oil spills from drilling. *See N. Slope*, 642 F.2d at 609-10; *N. Slope Borough v. Andrus*, 486 F. Supp. 332, 353 (D.D.C. 1980) (quoting NMFS's assessment of oil spill effects). In upholding that biological opinion, the D.C. Circuit began with the principle that "a 'biological opinion' may not deal exclusively with any one particular stage of an outer continental shelf project." *N. Slope*, 642 F.2d at 608. This is because "[e]valuating an outer continental shelf project in the light of all contemplated and congruous actions merely reflects that

'pumping oil' and not 'leasing tracts' is the aim of congressional policy." *Id.* Therefore, the "agency action" for an OCSLA lease sale includes "the lease sale and all subsequent activities." *Id.* at 609. While the court found OCSLA's "checks and balances" relevant to the sufficiency of NMFS's analysis of that entire agency action, "the segmented approach of OCSLA does not attenuate ESA's notion of 'agency action'" itself. *Id*. The court did not hold that consultation could exclude post-leasing activities, as Defendants argue, but that the biological opinion was sufficient because it *did* include "a comprehensive analysis of all the ramifications of the lease sale." *Id.* (citation omitted).

*Village of False Pass v. Clark* also involved a biological opinion that evaluated the effects of post-leasing activities. *See* 733 F.2d 605, 607 (9th Cir. 1984) (noting discussion of effects from exploratory drilling and seismic testing). The two questions before the Ninth Circuit were whether Interior violated the ESA by 1) issuing a final leasing notice before officially receiving the biological opinion and 2) failing to adopt immediately the biological opinion's recommended restrictions on future exploration and drilling approvals. *Id.* at 609. Neither involved the biological opinion's scope, nor did the court hold that NMFS may ignore post-leasing activities. Rather, the court emphasized that "[n]either the regulations, nor OCSLA itself, dilute the full application of ESA to actions" under OCSLA. *Id.* at 612.

*Tribal Village of Akutan v. Hodel* similarly involved a biological opinion that evaluated post-leasing activities; the only question was whether Interior was required to fully adopt NMFS's suggestions. 869 F.2d 1185, 1193 (9th Cir. 1988). The court followed *False Pass* to find Interior's choice of mitigation reasonable. *Id.* at 1194-96. Interior's obligations to adopt a biological opinion's suggested mitigation have no bearing on NMFS's duty to evaluate the entire agency action.

*Conner* is not, as Defendants claim, "inapposite." ECF 43, PageID.3074. Rather, *Conner* discussed the key holding in *North Slope*: for an OCSLA lease sale, "the 'agency action' encompasse[s] the entire leasing project, from the issuance of the leases through post-leasing development and production." 848 F.2d at 1453. *Conner* continued: "Following the District of Columbia Circuit, we hold that agency action in this case entails not only leasing but leasing and all post-leasing activities through production and abandonment." *Id.* Defendants claim *Conner* is somehow inapposite because it involved the Mineral Leasing Act (MLA), ECF 43, PageID.3074-75, but ignore the court's express statement that it was following OCSLA caselaw to determine the scope of "agency action" under the MLA; both include leasing *and* post-leasing activities. Defendants instead focus on a separate section of the opinion that discusses whether MLA sales may use 50 C.F.R. § 402.14(k)'s incremental-step consultation process. *See id.* (citing *Conner*, 848 F.2d at 1455-58). The court concluded incremental-step consultation

may be used for leasing under OCSLA, but not the MLA. *Conner*, 848 F.2d at 1455-57.

NMFS promulgated the incremental-step consultation regulation specifically to codify the "consultation approach sanctioned by the court in *North Slope*." 51 Fed. Reg. 19926, 19955 (June 3, 1986). Consistent with *North Slope*, the regulation requires NMFS to "issue a biological opinion on the incremental step being considered, including its views on the entire action"; NMFS may not consult informally and may not truncate its initial analysis to exclude post-leasing activities. 50 C.F.R. § 402.14(k); *see also* Ex. 2: *ESA Handbook* 5-8. Defendants concede NMFS did not comply with 50 C.F.R. § 402.14(k). ECF 43, PageID.3082-83. It necessarily follows that NMFS did not comply with the "consultation approach sanctioned by the court in *North Slope*." 51 Fed. Reg. at 19955.

That Interior did not "request" incremental-step consultation demonstrates only that the Marine Minerals Administration (MMA) chose (and NMFS adopted) a consultation approach that violates the ESA. *See* ECF 43, PageID.3082. As NMFS explained in promulgating its regulation, "[i]f the Federal agency chooses not to use the incremental step process, [NMFS] must render its biological opinion for the entire action." 51 Fed. Reg. at 19955. Likewise, that the agencies did not "undertake formal consultation" here when they did in *North Slope* does not make

that case inapplicable, as Defendants argue, ECF 43, PageID.3083, but undermines NMFS's claim that its consultation here is consistent with that case.[1]

In every OCLSA leasing case Defendants cite, the agencies completed formal consultation resulting in a biological opinion that evaluated the effects of post-leasing activities. NMFS promulgated a regulation aimed at OCSLA actions that requires a biological opinion evaluating the effects of the entire action beyond the initial lease-sale step. Defendants offer no authority upholding an informal ESA consultation on an OCSLA lease sale, much less one limited to only preliminary activities. In short, NMFS's unprecedented, narrow approach to consultation on the American Samoa lease sale is contrary to Defendants' own caselaw. NMFS violated the ESA's requirement to evaluate "the effect of the *entire* agency action"—from the issuance of leases through post-leasing exploration, development, testing, and mining. *Conner*, 848 F.2d at 1453; *see Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 255 (D.D.C. 2003) ("[I]mpermissible segmentation would allow agencies to engage in a series of

---

[1] That MMA may later "review and disapprove any post-leasing activities" does not make *Environmental Defense Center v. Bureau of Ocean Energy Management* irrelevant, as Defendants contend, ECF 43, PageID.3083, because that case states: "That the agencies might conduct ESA review on individual permits in the future does not affect our analysis," 36 F.4th 850, 890 (9th Cir. 2022). Nor is the quoted language dicta; it was a basis of the court's irreparable harm finding. *See id.*

limited consultations without ever undertaking a comprehensive assessment of the impacts of their overall activity on protected species.”).

2. NMFS Lacks Any Support for the Cramped Consultation Approach Taken Here.

Faced with established authority prohibiting NMFS’s consultation approach, Defendants attempt to muster a theory to justify limiting the “agency action” to only preliminary activities. Their arguments rely on principles that courts have rejected and on inapposite cases.

First, Defendants advance the Humpty-Dumptian argument that the agency action must be limited to only issuance of a lease and preliminary activities because that is how Interior described it. ECF 43, PageID.3070; *see also Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 173 n.18 (1978) (“‘When *I* use a word,’ Humpty Dumpty said, in rather a scornful tone, ‘it means just what *I* choose it to mean—neither more nor less.’” (quoting *Through the Looking Glass*, in *The Complete Works of Lewis Carroll* 196 (1939))). However, “an agency may not unilaterally relieve itself of its full legal obligations under the ESA by narrowly describing the agency action at issue.” *Greenpeace v. NMFS*, 80 F. Supp. 2d 1137, 1146 (W.D. Wash. 2000). “Ultimately, the meaning of ‘agency action’ is determined as a matter of law by the Court, not by the agency.” *Id.* (citing *Pac. Rivers Council v.*

*Thomas*, 30 F.3d 1050, 1054 (9th Cir. 1994)).[2] Courts find an agency's description of its action arbitrary and capricious if it is inconsistent with "the entire agency action." *E.g.*, *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 521-25 (9th Cir. 2010) ("We interpret the term 'agency action' broadly, because caution can only be exercised if the agency takes a look at all the possible ramifications of the agency action." (citation omitted)). Agencies may not evade the well-established principle that the entire agency action at the lease sale stage includes post-leasing activities by simply not mentioning them.

Second, Defendants emphasize that post-leasing activities require additional approvals that Interior might deny. ECF 43, PageID.3070-73; *see id.*, PageID.3072 n.3 (acknowledging the same is true for oil-and-gas leasing). But the *North Slope* court acknowledged that regulatory structure when it held that post-leasing activities nonetheless are part of the entire agency action at the lease sale stage; even though offshore drilling in the Beaufort Sea had never previously been authorized. *See* 642 F.2d at 593-94, 609. Indeed, the incremental-step consultation process was developed precisely to provide the framework for reconciling ESA compliance at different approval stages.

---

[2] NMFS's attempt to distinguish *Pacific Rivers* on the facts is misplaced because it is the case's statutory interpretation that is relevant here. *See* ECF 43 PageID.3075 n.4.

Third, Defendants attack a strawman by claiming NMFS was not required to assume "Interior will approve future post-leasing activity." ECF 43, PageID.3071. The issue is not whether NMFS needs to make categorical assumptions, but how NMFS must handle uncertainty about post-leasing activities. "[I]ncomplete information about post-leasing activities does not excuse the failure to comply with the statutory requirement of a comprehensive biological opinion using the best information available." *Conner*, 848 F.2d at 1454 (citing 16 U.S.C. § 1536(a)(2)). NMFS "cannot ignore available biological information or fail to develop projections of [post-leasing] activities which may indicate potential conflicts between development and the preservation of protected species." *Id.* Doing that analysis before leasing could, for example, identify areas that should be excluded from leasing or "identif[y] potential conflicts between the protected species and post-leasing activities due to the cumulative impact of" those activities. *Id.*

The ESA commands NMFS to evaluate "the best scientific and commercial data available" on post-leasing activities, even if uncertainties exist. 16 U.S.C. § 1536(a)(2). The discussion from *North Slope* on which Defendants rely simply reflects the principle that, "where the information is not readily available, [courts] cannot insist on perfection." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014); *see* ECF 43, PageID.3073. While the agencies can more fully evaluate environmental effects at later stages "as information and

experience is collected," they still must conduct "a comprehensive analysis" of the scientific and commercial information that *is* available on the entire action at the lease sale stage. *N. Slop*e, 642 F.2d at 609 (citation omitted).

The one thing NMFS could not do is categorically exclude post-leasing activities. In doing so, NMFS effectively assumed that Interior will not approve *any* post-leasing activities. The record is bereft of any analysis supporting that assumption. Instead, the record reflects that NMFS understood the action to be for "commercial mining." Ex. 4: LOC at 1. The Court can also take judicial notice that MMA is offering the sale to implement an executive order to "Unleash[] America's Offshore Critical Minerals." Ex. 12: 90 Fed. Reg. 17735 (Apr. 29, 2025); *see also* Ex. 11: April BA at N02852 (stating purpose is to facilitate "development" and "supply" of minerals). And the companies spending millions of dollars to acquire leases presumably intend to mine them. *See* Ex. 17: Proposed Leasing Notice at 5 (minimum $3 million bid for each lease area); *see also* April BA at N03013-16 (explaining MMA is holding the sale at the request of one company and that several other companies expressed interest in leases). If leasing truly were unlikely to lead to mineral extraction, the lease sale would not meet Interior's stated "purpose and need," and proceeding with the sale would "not be considered reasonable or appropriate." *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1247 (9th Cir. 2005).

Finally, Defendants rely on several inapposite cases discussing ESA obligations at the *programmatic* stage, which does not exist for leasing minerals other than oil and gas. *See Ctr. for Biological Diversity v. U.S. Dep't of Interior* (*CBD*), 563 F.3d 466, 473 (D.C. Cir. 2009) (discussing OCLSA's four-stage process for oil and gas development). Defendants cite *CBD* and *Healthy Gulf v. U.S. Department of the Interior*, 152 F.4th 180 (D.C. Cir. 2025), to suggest that ESA requirements are weakened at the lease sale stage—the second stage. ECF 43, PageID.3073-74. But those cases involved ESA challenges at the leasing *program* stage—the first stage, which does not exist here—where proposed lease sales "might never come to pass." *CBD*, 563 F.3d at 483; *see also Healthy Gulf*, 152 F.4th at 198. In finding an ESA claim unripe at that stage, the *CBD* court explained that ESA consultation *is* required at each of the subsequent stages (including at the lease sale stage). 563 F.3d at 483. Because this case involves a lease sale, not a leasing program, Defendants' cases do not relieve NMFS of its obligation to evaluate "the entire leasing project." *Conner*, 848 F.2d at 1453.

Defendants also cite *Save Long Beach Island v. U.S. Department of the Interior*, but that court was addressing an offshore wind planning phase akin to "the first stage of a leasing program," which did "not commit the agency to any

decisions about leasing." 663 F. Supp. 3d 1, 10 (D.D.C. 2023).[3] Likewise, *Rocky Mountain Wild, Inc. v. U.S. Bureau of Land Management* involved management plan amendments that were comparable to "the preliminary stage of a leasing program" discussed in *CBD* and that did "not authorize the issuance of any specific leases," No. 1:13-cv-01988-JLK, 2018 U.S. Dist. LEXIS 163703, at *19-20 (D. Colo. Sept. 11, 2018); so "leasing [was] not a direct effect of the action," *id.* at *27. Unlike in those programmatic cases, NMFS *is* consulting on a lease sale here. *Conner*'s statement of consultation obligations for an OCSLA lease sale controls.

B. Even If Post-Leasing Activities Were Not Part of the Agency Action, NMFS Would Still Be Obligated to Evaluate Their Effects.

Even if post-leasing activities were not part of the agency action, NMFS would still be obligated to consider their impacts because they meet the definitions of "indirect effects" of the action and effects of "other activities that are interrelated or interdependent with that action." 50 C.F.R. § 402.02 (2018). Defendants' contrary arguments disregard applicable caselaw, NMFS's own guidance, and the government's intended results from the lease sale.

[3] The unpublished *Fisheries Survival Fund v. Haaland* opinion that Defendants cite is inapposite because it involved the ripeness of a National Environmental Policy Act claim, not the ESA's statutory requirements. 858 F. App'x 371, 372 (D.C. Cir. 2021).

First, Defendants claim post-leasing activities are not indirect effects because they are not "reasonably certain to occur." ECF 43, PageID.3076-77 (quoting 50 C.F.R. § 402.02 (2018)). The Ninth Circuit has stated indirect effects encompass effects "that the action makes possible (or indeed, more probable)." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 1009 (9th Cir. 2014). Defendants do not and cannot dispute that a lease sale makes exploration, development, testing, and mining both possible and more probable. Instead, Defendants ask the Court to disregard the Ninth Circuit's standard, without citing any supporting authority. ECF 43, PageID.3076 n.5.

The *ESA Handbook* belies Defendants' argument that post-leasing activities are not reasonably certain. Defendants imply the *Handbook* allows NMFS to find an effect is reasonably certain only if "evidenced by appropriations, work plans, permits issued, or budgeting." *Id.*, PageID.3077 (quoting N02130). But the *Handbook* goes on to explain that effects also are reasonably certain if "they are a logical extension of the proposed action." *ESA Handbook* at 4-29 (N02130). Because the lease sale's justification is "for the purpose of commercial mining," LOC at 1; *see also* 90 Fed. Reg. 25369, 25370 (June 16, 2025) (stating lease sale's purpose is "to accelerate the responsible development of OCS mineral resources [and] ensure secure supply chains"), such mining is a logical extension of the lease sale. *Contra Rocky Mountain Wild*, 2018 U.S. Dist. LEXIS 163703, at *29

(finding "issuing additional leases is not a logical extension of the 2013 Amendments").

Finally, Defendants ask the Court to disregard the government's stated objectives and expectations that leasing will result in commercial mineral production, and instead speculate that the government will abandon its chosen course of action. *But see* 90 Fed. Reg. at 17735 ("It is the policy of the United States to … creat[e] a robust domestic supply chain for critical minerals derived from seabed resources … ."). As a threshold matter, Defendants do not argue that *no* post-leasing activity will occur. Rather they claim MMA's biological assessment does not indicate such activity will be "significant" or that "all deposits" will be mined. ECF 43, PageID.3077. Since at least some post-leasing activities are anticipated, NMFS must evaluate them as indirect effects. Next, Defendants' argument that "a primary purpose" of leasing is to develop information to inform future assessment "of mining in a particular location" does not mean it is the *only* purpose. *Id.*, PageID.3077-78. Both Interior and NMFS have expressly stated that *another* purpose is commercial mining. LOC at 1; April BA at N02852. Fundamentally, Defendants' argument is that the agencies and the Court must assume the lease sale will not achieve its intended purpose. Nothing in the record supports that claim.

Even if not indirect effects, post-leasing activities meet the definition of "interrelated or interdependent" actions. *See* ECF 15-1, PageID.127. Defendants acknowledge a recent court order reinstated the regulation that includes these concepts within "effects of the action," but assert, without support, that they do not apply. ECF 43, PageID.3080.[4] Defendants next claim the Ninth Circuit requires that interrelated or interdependent actions "must themselves be likely to occur before NMFS must evaluate them." ECF 43, PageID.3080 (citing *Ctr. for Biological Diversity v. Haaland*, 87 F.4th 980, 988 (9th Cir. 2023)). But that principle appears nowhere in the cited opinion, which instead evaluated the standard for "indirect effects, which explicitly incorporate the reasonably certain standard." *Haaland*, 87 F.4th at 988. Likewise, the 1986 Federal Register entry that Defendants cite states the "reasonably certain to occur" standard applies to *indirect effects*, while "the 'but for' test should be used to assess whether an activity is interrelated with or interdependent to the proposed action." 51 Fed. Reg. at 19932. Applying the "but for" test here is simple: but for the lease sale, post-leasing activities could not occur. *Contra* ECF 43, PageID.3081-82 n.6

---

[4] Defendants improperly rely on the regulatory history of the vacated definition, *see id.*, PageID.3081 (citing 83 Fed. Reg. 35178 (July 25, 2018) and 84 Fed. Reg. 44976 (Aug. 27, 2019)), which was vacated precisely because it unlawfully applied the "reasonably certain to occur standard" to all effects of the action, *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 837 F. Supp. 3d 1080, 1102 (N.D. Cal. 2026).

(confusing but-for causation with sufficient causation). Post-leasing activities qualify as interrelated or interdependent actions, if not also as indirect effects.

### C. NMFS's Evaluation of Effects from Preliminary Activities Is Arbitrary and Contrary to the ESA.

Even if NMFS lawfully could limit its consideration of effects to only those from preliminary activities, its conclusion regarding those activities is arbitrary and contrary to the ESA. First, given evidence in the record, NMFS's conclusion that marine debris is not likely to adversely affect species is arbitrary. Second, NMFS unlawfully relied on MMA's nonbinding promises to conclude that acoustic surveys are not likely to adversely affect species.

#### 1. Marine Debris

NMFS recently concluded that trash and debris from oil and gas operations in the Gulf are "likely to adversely affect" whales and sea turtles, even though the amount of trash and debris "is expected to be minimal." Ex. 15: Gulf Biological Opinion at N01405-13. NMFS reached the opposite conclusion here. The Gulf biological opinion is in the administrative record, but Defendants admit NMFS did not consider its findings on issues other than acoustics. ECF 43, PageID.3090 n.8.[5]

---

[5] It is irrelevant whether the biological opinion still has "legal effect," *id.*, PageID.3089 n.7, because whether *de minimus* debris is likely to have an adverse effect is a factual issue, *see Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1263 (9th Cir. 2017) (stating agency needs to explain change in views where it makes "factual or scientific findings").

The Gulf biological opinion is not a "marginally related administrative action," as Defendants contend, ECF 43, PageID.3089 (quoting *Zinke*, 856 F.3d at 1263), but rather involves many of the same species (sperm whales and loggerhead, green, and leatherback sea turtles) facing the same threat (trash and marine debris released from vessels conducting activities on OCSLA leases) as here, *see* ECF 15-1, PageID.131. NMFS's admitted failure to consider or address the Gulf biological opinion's contradictory findings renders arbitrary NMFS's concurrence here that those stressors are "not likely to adversely affect" whales or sea turtles. *See Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1051 (9th Cir. 2010) ("NMFS's factual findings in the earlier environmental assessments appear to be 'relevant data,' such that it was incumbent on the agency to offer a 'satisfactory explanation' for its decision in light of the earlier findings.").

Defendants cannot rectify that gap by offering *post hoc* reasons why NMFS's disparate conclusions might be harmonized. The ESA requires NMFS to evaluate effects *before* issuing a letter of concurrence, not "in defendants' briefs" after being sued. *Id.* at 1049. Indeed, "Defendants' post hoc explanations serve only to underscore the absence of an adequate explanation in the administrative record itself." *Id.* at 1050.

Moreover, Defendants' *post hoc* rationalizations do not make sense. For example, Defendants argue the topography is "vastly different" because activities

near American Samoa will occur "at depths ranging from 1,400-6,000 meters," while activities in the Gulf occur "at depths of as little as 3,346 meters." ECF 43, PageID.3089-90. 3,346 meters falls within the 1,400-6,000-meter range. They are not different. And Plaintiffs do not contend, as Defendants imagine, that the magnitude of effect is the same for seabed mining activities as Gulf oil and gas activities. *Contra* ECF 43, PageID.3091. Rather, the issue is that NMFS concluded exposure to a "minimal" amount of debris is likely to adversely affect species in one consultation but is not likely to adversely affect the same species in this consultation. *See ESA Handbook* at xv (N02038) ("If incidental take is anticipated to occur as a result of the proposed action, an 'is likely to adversely affect' determination should be made."). The record's absence of a "satisfactory explanation" for the contradiction renders NMFS's conclusion arbitrary. *See Locke*, 626 F.3d at 1051.

2. <u>Non-Binding Mitigation of Acoustic Harms</u>

NMFS concluded acoustic surveys will not adversely affect species based on unenforceable, non-specific promises from MMA that it would require mitigation. *See* ECF 15-1, PageID.132-33. Defendants concede that NMFS may rely on mitigation only if it is "backed by some form of enforceable obligation." ECF 43, PageID.3092 (citing *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743,

747 (9th Cir. 2020)). But Defendants fail to identify any specific, enforceable obligation that backs up MMA's promise.

Defendants quote the biological assessment's statement that using equipment in excess of *de minimis* criteria "will not [be] permit[ed]." *Id.*, PageID.3091 (quoting N02928-29). Aside from noting that lessees must submit plans to MMA thirty days before commencing operations, the biological assessment cites nothing that places an enforceable obligation on MMA to block such planned activities.

Defendants next claim a mitigation requirement "is backed by" the regulation limiting preliminary activities to "'those which have no significant adverse impact on the natural resources of the OCS.'" *Id.*, PageID.3092 (quoting 30 C.F.R. § 582.21(d)). But the vague limit on "significant adverse impact[s]" is not the same as a "specific and binding plan[]" to implement the detailed acoustic limits. *See Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 935-36 & n.17 (9th Cir. 2008). Moreover, the regulation allows lessees to self-police whether their preliminary activities will have significant adverse impacts because it allows lessees to proceed after they "give notice" to MMA, without needing MMA approval. 30 C.F.R. § 582.21(d). Defendants are wrong that there is "mandatory review by Interior." ECF 43, PageID.3092. The regulations permit a situation where a lessee submits a plan for preliminary activities that then sits on MMA's

shelf without any review, and acoustic activities exceeding the *de minimis* criteria proceed. Defendants cite no enforceable authority mandating a different result. Finally, the lease stipulations also allow lessees to conduct "other activities not included in the [environmental assessment]" if they give notice to MMA. Ex. 16: Proposed Lease Stipulation No. 1; Ex. 19: Final Lease Stipulation No. 1; *see* Apr. 2026 BA at N02854 (stating ESA consultation's scope is "consistent with the limited and preliminary scope of activities evaluated in the environmental assessment"). Even if MMA reviewed the submissions, the ESA does not permit the action agency to self-consult on whether these "other activities"—which the consultation did not evaluate—would have "a *de minimus* impact." ECF 43, PageID.3092; *see* 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.13(c), 402.14(b)(1) (requiring NMFS's "written concurrence").

NMFS's reliance on hypothetical, nonbinding acoustic criteria for its concurrence determination violates the ESA. *Nat'l Wildlife Fed'n*, 524 F.3d at 936.

## III. THE COURT SHOULD VACATE THE LETTER OF CONCURRENCE.

While Defendants equivocate about the remedy standards, the Ninth Circuit has been clear: "vacatur and remand is the default remedy under the APA, but the court retains equitable discretion in 'limited circumstances' to remand a decision without vacatur while the agency corrects its errors." *Mont. Wildlife Fed'n v.*

*Haaland*, 127 F.4th 1, 50 (9th Cir. 2025) (citation omitted). Whether to exercise that discretion "depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Id.* (citation omitted). Defendants' assertion that NMFS's errors "likely require only updated descriptions and explanations," ECF 43, PageID.3094, ignores the biggest problem with its consultation: the ESA prohibits NMFS's constrained scope of consultation entirely. "There is no 'serious possibility that [NMFS] will be able to substantiate [that] decision.'" *Mont. Wildlife*, 127 F.4th at 50 (citation omitted). Defendants oddly claim that leaving the Letter of Concurrence in place would "preserve environmental protections," ECF 43, PageID.3094, when doing so would allow leasing to proceed, causing environmental harms that vacatur would avoid. Defendants' unsupported assertion that leaving the Letter in place would avoid some unidentified "regulatory disruption" also fails to meet their burden to deviate from the default vacatur remedy. *Id.* There would be far more regulatory disruption if leases were issued next month in reliance on an unlawful consultation, only to be revoked or amended if NMFS identifies adverse effects on remand.

## IV. CONCLUSION

Established law bars NMFS's unprecedented, cramped approach to consultation here, which no court has ever sanctioned. The Court should reject NMFS's gambit to avoid looking at effects from the entire agency action.

DATED: October 26, 2026.

DAVID L. HENKIN
HARLEY M. BROYLES
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawaiʻi 96813
T: (808) 599-2436
Email: dhenkin@earthjustice.org
hbroyles@earthjustice.org

/s/ Christopher D. Eaton
CHRISTOPHER D. EATON
(*pro hac vice*)
EARTHJUSTICE
810 3rd Avenue, Suite 610
Seattle, Washington 98104
T: (206) 343-7340
Email: ceaton@earthjustice.org

JOSEPH V. LANGKILDE III
*(pro hac vice*)
EARTHJUSTICE
1250 I Street NW, Fourth Floor
Washington, DC 20005
T: (202) 667-4500
Email: jlangkilde@earthjustice.org

Attorneys for Plaintiffs
Faʻasao Amerika Samoa and
Conservation Council for Hawaiʻi

CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.4(e), I certify that the foregoing reply brief is set in a proportionally spaced 14-point font (Times New Roman) and contains 4,750 words, exclusive of the caption and signature block. I have relied upon Microsoft Word to determine the word count.

DATED: October 26, 2026.

DAVID L. HENKIN
HARLEY M. BROYLES
EARTHJUSTICE
850 Richards Street, Suite 400
Honolulu, Hawai‘i 96813
T: (808) 599-2436
Email: dhenkin@earthjustice.org
hbroyles@earthjustice.org

/s/ Christopher D. Eaton
CHRISTOPHER D. EATON
(*pro hac vice*)
EARTHJUSTICE
810 3rd Avenue, Suite 610
Seattle, Washington 98104
T: (206) 343-7340
Email: ceaton@earthjustice.org

JOSEPH V. LANGKILDE III
*(pro hac vice*)
EARTHJUSTICE
1250 I Street NW, Fourth Floor
Washington, DC 20005
T: (202) 667-4500
Email: jlangkilde@earthjustice.org

Attorneys for Plaintiffs