IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| FA'ASAO AMERIKA SAMOA, ET AL.,<br><br>Plaintiffs,<br><br>vs.<br><br>NATIONAL MARINE FISHERIES SERVICE, ET AL.,<br><br>Defendants. | CIV. NO. 26-00438 JAO-KJM<br><br>ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 15) |

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 15)**

On November 19, 2026, the United States Department of the Interior, through the Marine Minerals Administration ("MMA"), plans to conduct a marine minerals lease sale for two areas of seabed within the American Samoa Outer Continental Shelf. Although for now these leases would only authorize the lease holder to conduct preliminary surveying activity, they may eventually allow the lease holder to develop marine minerals from polymetallic nodules collected from

the ocean floor—so-called deep-sea mining. The Court understands that the lease sale would be the first of its kind for deep-sea mining in the United States.[1]

Plaintiffs Fa‘asao Amerika Samoa and Conservation Council for Hawai‘i (collectively, "Plaintiffs") claim that the National Marine Fisheries Service ("NMFS") and Secretary of Commerce Howard Lutnick (collectively, "Defendants") violated the Endangered Species Act ("ESA") when they signed off on MMA's proposed lease sale by issuing a Letter of Concurrence that the lease sale was not likely to adversely affect listed species. More specifically, Plaintiffs contend that Defendants failed to sufficiently consider all the potential post-leasing effects of the entire proposed agency action. Plaintiffs move for summary judgment on their claim and seek vacatur of the Letter of Concurrence. *See generally* ECF No. 15 ("Motion for Summary Judgment").

The Court concludes that NMFS wrongfully adopted MMA's overly-narrow definition of the "agency action," which limited the defined action to the lease sale without any post-leasing activity. By doing so, NMFS only considered the preliminary effects of the lease sale and did not even attempt to consider the

---

[1] The second lease sale of its kind is tentatively scheduled for approximately one month later and involves Outer Continental Shelf ("OCS") leases in the waters of the Commonwealth of the Northern Mariana Islands and Guam. That sale is the subject of a similar case maintained by the same plaintiffs' counsel as here. *See Our Common Wealth 670, et al. v. National Marine Fisheries Service, et al.*, Civil No. 26-00469-JAO-KJM.

potential effects of post-leasing activities. NMFS's cramped, expedited, informal consultation is apparently unprecedented in the context of leasing on the OCS. As set forth more fully below, NMFS's failure to consider the entire action violates the ESA.

The Court therefore GRANTS the Motion for Summary Judgment and VACATES the Letter of Concurrence.

## I. BACKGROUND

### A. Statutory Framework

#### 1. Endangered Species Act

"[T]he language, history, and structure" of the ESA demonstrate "beyond doubt that Congress intended endangered species to be afforded the highest of priorities." *TVA v. Hill*, 437 U.S. 153, 174 (1978). The statute protects such species by listing them as threatened or endangered and designating "critical habitat" necessary to ensure the species' continued existence. *See* 16 U.S.C. § 1533(a). One of the most important protections in the ESA is the "consultation" requirement, which provides:

> Each Federal agency shall, in consultation with and with the assistance of the [consulting agency], insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species[.]

16 U.S.C. § 1536(a)(2). NMFS is generally the consulting agency for marine species. *See id.*; 50 C.F.R. § 402.01(b). When evaluating a proposed action's effects, both the action and consulting agencies "shall use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

The action agency, MMA here, first prepares a "biological assessment" to "evaluate the potential effects of the action" on listed species and critical habitat. 50 C.F.R. § 402.12(a). "Effects of the action" is defined as "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action." 50 C.F.R. § 402.02 (2018).[2]

If the action agency concludes that its proposed action "may affect" any listed species or critical habitat, it must engage in either informal or formal consultation with the consulting agency. *See id.* § 402.14. When the action agency determines that the proposed "action is *not likely to adversely affect* listed species or critical habitat," it may initiate "informal consultation." *See id.* §§ 402.13(c) (emphasis added), 402.14. "Informal consultation is an optional process that includes all discussions, correspondence, etc., between the [consulting agency]

[2] A court struck down the version of the "effects of the action" definition promulgated in 2019 and reinstated the pre-2019 version cited here. *See Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 837 F. Supp. 3d 1080, 1118 (N.D. Cal. 2026).

and the [action] agency . . . designed to assist the [action] agency in determining whether formal consultation or a conference is required." *Id.* § 402.13(a).

If the action agency determines, "with the written concurrence of the [consulting agency], that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary." *Id.* § 402.13(c). A written request for concurrence from the action agency to the consulting agency must "include information similar to the types of information described for formal consultation at § 402.14(c)(1) sufficient for the [consulting agency] to determine if it concurs." *Id.* § 402.13(c)(1). Such information includes the purpose, duration, and specific components of the action, as well as other similar descriptions. *See id.* § 402.14(c)(1). When the action agency requests a concurrence, the consulting agency provides "written concurrence or non-concurrence with the [action] agency's determination," i.e., a letter of concurrence or non-concurrence. *Id.* § 402.13(c)(2).

By contrast, if the consulting agency disagrees with the action agency and concludes that the proposed action *is* likely to adversely affect a species or critical habitat, then the action agency must formally consult with the consulting agency. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). Formal consultation requires a more fulsome assessment of the effects of the action and results in a "biological opinion" from the consulting agency as to whether the proposed action is likely to

jeopardize the continued existence of a listed species or result in destruction or adverse modification of critical habitat. *See* 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(c)–(h). If the consulting agency determines that the agency action is likely to jeopardize a listed species or result in adverse modification of a critical habitat, it must "suggest . . . reasonable and prudent alternatives" to avoid such harm. 16 U.S.C. § 1536(b)(3)(A).

In some instances of formal consultation, "[w]hen the action is authorized by a statute that allows the agency to take incremental steps toward the completion of the action, the [consulting agency] shall, if requested by the [action] agency, issue a biological opinion on the incremental step being considered, including its views on the entire action." 50 C.F.R. § 402.14(k).

**2. Outer Continental Shelf Lands Act**

The Outer Continental Shelf Lands Act ("OCSLA") governs the federal leasing of the OCS for oil and gas, as well as other minerals. *See* 43 U.S.C. § 1331 *et seq.*; *id.* § 1337(k). The OCS is the seabed that generally extends from the edge of a state's jurisdiction (three miles) to 200 miles off the United States coast. 43 U.S.C. § 1331(a); *see Ctr. for Bio. Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 473 (D.C. Cir. 2009).

The regulations implementing OCSLA leases provide for staged development of a lease. In the oil and gas context, for example, there are four

distinct stages to developing a well: "(1) formulation of a five year leasing plan by the Department of the Interior; (2) lease sales; (3) exploration by the [lease holders]; (4) development and production." *Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984). For leases of other minerals, there is no leasing plan stage, but the Department of the Interior separates its decisions on offshore lease operations into distinct stages for regulatory review. *Compare* 43 U.S.C. § 1344 (establishing that Interior must "prepare and periodically revise, and maintain an oil and gas leasing program") *with id.* § 1337(k) (describing process for leases of other minerals); *see also* ECF No. 43 at 14 n.3 (noting that the action agency considers leases for other minerals in stages).

Upon receipt of a lease, the lease holder may conduct "preliminary activities," which include "bathymetric, geological, geophysical, mapping, and other surveys necessary to develop a comprehensive Delineation, Testing, or Mining Plan." 30 C.F.R. § 582.21(d). Such preliminary activities are defined as "those which have no significant adverse impact on the natural resources of the OCS." *Id.* Still, the lease holder "shall give notice . . . at least 30 days prior to initiating the proposed preliminary activities on the lease" that "describe[s] in detail those activities that are to be conducted and the time schedule for conducting those activities." *Id.*

Further "exploration, testing, development, or production activities," beyond the preliminary activities, "shall [not] be commenced or conducted on any lease except in accordance with a plan submitted by the [lease holder] and approved by the Director. Plans will not be approved before completion of comprehensive technical and environmental evaluations." *Id.* § 582.21(a). In other words, "the lease sale itself is only a preliminary and relatively self-contained stage within an overall . . . development program which requires substantive approval and review prior to implementation of each of the major stages: leasing, exploring, producing." *N. Slope Borough v. Andrus*, 642 F.2d 589, 593 (D.C. Cir. 1980). Thus, the ESA "continue[s] to apply of its own force to major actions taken by the Secretary after the lease sale is held." *Id.* at 608.

**B. Facts**

MMA, formerly known as the Bureau of Ocean Energy Management[3], is the agency within the Department of the Interior responsible for leasing under OCSLA. *See* Secretarial Order 3451, Establishment of the Marine Minerals Administration (July 10, 2026)

https://www.doi.gov/sites/default/files/document_secretarys_orders/so-marine-

[3] The Administrative Record refers to the agency's prior name, or "BOEM" throughout. For readability, the Court uses MMA here to refer to the leasing agency regardless of the agency's name at the time of the action described.

mineralsadministration_final_508.pdf. In June 2025, in response to an unsolicited request from Impossible Metals Inc., an American mining company, MMA published a Request for Information and Interest with a view toward potentially leasing for seabed minerals within the OCS of American Samoa. *See* N02851; 90 Fed. Reg. 25369 (June 16, 2025). That request apparently garnered sufficient interest to convince MMA to formulate plans to issue leases in the area. *See* N02854.

Ahead of any proposed lease sale, MMA drafted a biological assessment ("BA") to evaluate the potential effects of its proposed action—the issuance of up to two leases for seabed mining of marine minerals in the American Samoa OCS—on ESA-listed species and their critical habitat.[4] *See* N02852–54. The BA identifies the "action area" as "waters nearby American Samoa where most of the Proposed Action will take place as well as waters near Hawaii and the West Coast, where vessels may start their transit(s)." N02864. This large area is home to several dozen ESA-listed species including the blue whale, fin whale, sei whale, sperm whale, green sea turtle (Central South Pacific Distinct Population Segment

[4] There are several versions of the BA in the administrative record. The Court primarily cites the April 2026 version as it is the most recent and is materially the same as earlier versions, except as noted below regarding sound impacts. *See* ECF No. 50 at 3 ¶ 3 (Pls. Concise Statement of Facts or "PCSF"); *see also id.* at 14 ¶ 5 (Defs. Concise Statement of Facts or "DCSF").

("DPS")), hawksbill sea turtle, loggerhead sea turtle (South Pacific DPS), leatherback sea turtle, olive ridley sea turtle, oceanic whitetip shark, giant manta ray, scalloped hammerhead shark (Indo-West Pacific DPS), chambered nautilus, and five species of coral. *See* N00546, N02949–53.

By offering up to two commercial leases, MMA "aims to facilitate the potential development of the areas that may contain economically recoverable mineral resources in an environmentally and economically responsible way." N02852. Such potential development of mineral resources "aligns with ensuring secure and sustainable domestic supply of strategic minerals essential for manufacturing, energy technologies, and defense applications." *Id.*

Despite those ultimate motivations for the issuance of the leases, the proposed leases themselves would authorize the lease holders to conduct only preliminary activities defined as "bathymetric, geological, geophysical, mapping, and other surveys necessary to develop a comprehensive Delineation, Testing, or Mining Plan." N02854. MMA characterizes those activities as "early-stage data collection" that "may indicate the presence of mineral resources and, in the case of geological sampling, may involve collection of limited samples of the seabed." *Id.*

Based on the initially narrow scope of activities the leases would allow, MMA defined the "agency action" as limited to the lease sales themselves, excluding the subsequent lease-facilitated development, i.e., mining, of deep-sea

minerals. In so doing, MMA restricted its consideration of potential "effects of the action" on ESA-listed species to those caused by the preliminary activities. *See* PCSF ¶ 5; *see also* N02854–55, N02926–48. In other words, the BA did not include or otherwise analyze as "effects of the action" any effects from post-leasing conduct, including exploration, testing, development, or actual mining on leases. PCSF ¶ 6. MMA maintains that future activities will be subject to future consultation. *See* N00005.

Even limiting the effects analysis to the preliminary activities, the BA considered various stressors that could potentially harm the relevant species, including noise from surveys, aircraft, and vessels; vessel collisions; entanglement in mooring systems for buoys and deep-tow survey systems; disturbance to feeding or modified prey abundance; habitat disturbance; and release of pollutants and marine debris. *See* PCSF ¶ 8. After acknowledging that such stressors "may affect" the listed species, the BA nevertheless concluded that the lease sales and corresponding preliminary activities are "not likely to *adversely* affect" the ESA-listed species and critical habitat. *See* PCSF ¶ 9; N02948 (emphasis added). Because of the "not likely to adversely affect" determination, MMA could initiate informal rather than formal ESA consultation. *See* 50 C.F.R. § 402.14.

On January 16, 2026, NMFS received a request from MMA to initiate "expedited informal consultation" on the "proposed action to issue up to two leases

for the purpose of commercial mining and authorize early-stage data collection, consistent with the limited and preliminary scope of activities evaluated in the [BA]." N00544. As of February 3, NMFS determined it had sufficient information to begin the expedited consultation. *See id.* Ten days later, it issued its Letter of Concurrence, concurring with the BA that the preliminary activities associated with the proposed issuance of the two leases "may affect, but [are] not likely to adversely affect" ESA-listed species in the action area. N00546. Like the BA, the Letter of Concurrence only considered potential effects from the authorized preliminary activities and not other post-leasing exploration, testing, development or mining conduct. *See* N00544–46.

As to the preliminary activities themselves, the Letter of Concurrence primarily focused on potential effects from the noise produced by surveying equipment. *See* N00545. For example, it stated that "[m]ost equipment expected to be used in this proposed action are outside the hearing range of the species considered in our analysis," but that some could "produce noise sufficient to produce harm through auditory injury, temporary threshold shifts, or behavioral reactions depending on what operational characteristics are being employed." *Id.* Nevertheless, the Letter of Concurrence relied on criteria that MMA implemented to restrict sound to 160 decibels to conclude that adverse effects likely wouldn't occur. *See id.*

In April 2026, MMA provided NMFS with an updated BA. *See* DCSF ¶ 4. The new BA removed explicit reference to the 160-decibel level restriction and concluded that the equipment used would fall within a "de minimis" category of a new protocol for acoustic sources. *See id.* ¶¶ 6–8. After reviewing the updated BA, NMFS determined it did not need to reinitiate consultation. *See id.* ¶ 9.

**C. Procedural History**

Plaintiffs initiated this case on August 18, 2026, ECF No. 1, and moved for summary judgment just over two weeks later, ECF No. 15. Plaintiffs also filed a Motion for the Court to Consider Extra-Record Evidence ("Extra-Record Motion"). ECF No. 17. The Court set the Motion for Summary Judgment for hearing and briefing in the normal course, ECF No. 18, and initially set the Extra-Record Motion for a hearing on the same date, ECF No. 19. In response, Defendants filed their First Motion to Continue Hearing Dates on Plaintiff's Motion for Summary Judgment ("Motion to Continue), ECF No. 20, and moved for expedited consideration of the Motion to Continue, ECF No. 21 ("Motion to Expedite"). The Court granted the Motion to Expedite, ECF No. 22, and held a hearing on the Motion to Continue on September 17, 2026, ECF No. 27. The Court denied the Motion to Continue. ECF No. 30. In doing so, the Court deemed Plaintiffs' Extra-Record Motion withdrawn, *see id.* at 3, and re-set the briefing schedule on the Motion for Summary Judgment, *see id.* at 2.

Defendants timely filed the administrative record, ECF No. 37, and their opposition to the Motion for Summary Judgment, ECF No. 43. Plaintiffs filed their reply on October 26, 2026, ECF No. 49, and the Court held a hearing on the Motion for Summary Judgment on October 30, ECF No. 55.

After the hearing, the Court ordered the parties to file supplemental briefs "addressing NMFS' obligation and/or authority or lack thereof to reject or recharacterize the action agency's articulation of the proposed 'agency action.'" ECF No. 59. The parties complied. *See* ECF Nos. 60, 61.

## II. LEGAL STANDARD

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is a particularly appropriate tool for resolving claims challenging agency action," because "[i]n such cases the district court's role is not to resolve facts, but to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Ctr. for Biological Diversity v. Haaland*, 562 F. Supp. 3d 68, 76 (D. Ariz. 2021) (internal quotation marks and citations omitted).

The Administrative Procedure Act ("APA") governs whether an agency complied with the ESA. *See Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir.2012) (en banc) (citation omitted). Under the APA, a court

may set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C). Agency action is arbitrary and capricious if:

> [T]he agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

## III. DISCUSSION

Plaintiffs' primary argument, and the one the Court rules on here, is that the ESA requires NMFS to consider the potential effects of the "entire agency action," which Plaintiffs assert is not merely the lease sale, but also the post-leasing development and mining activities. *See* ECF No. 15-1 at 23–24; ECF No. 49 at 6–17. Defendants respond that NMFS must accept MMA's description of the "agency action," *see* ECF No. 43 at 12, and that OCSLA's staged implementation of OCS leases narrows NMFS' ESA obligation such that the agency was only required to consider the effects of the lease sale stage, *see id.* at 13–17. Central to this debate are whether MMA could properly limit its definition of "agency action" to the selling of the leases only—without addressing the allowance of deep-sea mining exploration and development—and whether NMFS was obligated to reject

MMA's description of the agency action. The Court begins with NMFS' obligation to scrutinize MMA's characterization of the "agency action," and then addresses whether, in the context of OCS leases, "agency action" can be limited to the sale of the leases or whether the term necessarily includes post-leasing activity.

Ultimately, the Court concludes that NMFS may be held accountable for accepting MMA's description of the "agency action" and that limiting the "agency action" to the sale of leases was arbitrary and capricious. Thus, the Letter of Concurrence's failure to consider any potential effects beyond the preliminary activities violated the ESA.

**A. NMFS' Obligation to Scrutinize Defined Agency Action**

In some ways, Plaintiffs' challenge to the narrow characterization of "agency action" is better aimed at MMA since that agency initially limited the scope of the agency action to the sale of leases. Regardless, the Court addresses the case before it and, to that end, asked the parties for supplemental briefing on whether NMFS is obligated to reject or recharacterize MMA's limitation on the scope of agency action. *See* ECF No. 59.

Defendants argue that NMFS' role as the consulting agency is purely advisory and that it must "'analyze the project as presented' by the action agency and has no duty to evaluate the agency's claims regarding the scope of the proposed action." ECF No. 60 at 4–5 (quoting *NRDC v. Haaland*, 102 F.4th 1045,

1072–73 (9th Cir. 2024) ("*NRDC*"). Plaintiffs, in turn, direct the Court to Ninth Circuit precedent in which the court concluded that the consulting agency's acceptance of the action agency's narrow definition was arbitrary and capricious. The Court finds Plaintiffs' authority more on point and persuasive and so concludes that NMFS can be held accountable for wrongfully adopting a flawed description of agency action.

Plaintiffs primarily rely on *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 522 (9th Cir. 2010), for the premise that the consulting agency must justify its acceptance of the action agency's characterization of the scope of the action. *See* ECF No. 61 at 2–4. In that case, the Fish and Wildlife Service ("FWS") managed a fish hatchery, the operation of which would potentially affect ESA-listed bull trout. *See Wild Fish Conservancy*, 628 F.3d at 517–18. FWS typically acts as the consulting agency for non-marine species, and thus served as both the action agency and the consulting agency in the case. *See id.* at 518. The "Hatchery," i.e., the action agency, "defined the agency action as the operation and maintenance of the Hatchery from 2006 through 2011," even though the hatchery had been in operation since the 1930s and would continue beyond 2011. *Id.* at 519. FWS, in its consulting agency role, "endorsed" that definition in its biological opinion and considered only the potential effects on the bull trout during that five-year span. *Id.* at 522. The court ultimately concluded FWS' adoption of the five-year term

without sufficient justification violated its duty to issue a comprehensive biological opinion that considered all stages of the agency action. *See id.* at 524–25.

As Plaintiffs contend, if FWS were required to adopt the Hatchery's definition of the agency action, there would have been no need for the Ninth Circuit to consider FWS' adoption of the five-year term. *See* ECF No. 61 at 3; *see also Intertribal Sinkyone Wilderness Council v. NMFS*, 970 F. Supp. 2d 988, 1005–06 (N.D. Cal. 2013) (discussing *Wild Fish Conservancy*). This suggests that the consulting agency ultimately bears responsibility for the scope of its consultation regardless of the action agency's given definition and must, in the end, consider the entire agency action. *See Conner v. Burford*, 848 F.2d 1441, 1453 (9th Cir. 1988) (citing *N. Slope Borough*, 642 F.2d at 608) (concluding that consulting agency needed to consider the entire agency action in its biological opinion rather than limit the analysis to the leasing stage).

Defendants' authority is not to the contrary. From *NRDC*, they cherry pick a single sentence and attempt to let it speak for itself: "[i]n an ESA consultation, the [consulting] agency must analyze the project as presented." *NRDC*, 102 F.4th at 1072–73. However, from context it's clear that the Ninth Circuit was not addressing the precise issue here. The section in *NRDC* that the sentence is drawn from focused on the plaintiffs' argument that the action agency violated its ESA obligations when it allegedly misrepresented to the consulting agency the full

scope of the action agency's discretion to renew certain settlement contracts. *See id.* The plaintiffs contended that if the action agency had been more forthright, the consulting agency could have proposed different "reasonable and prudent alternatives" to the proposed action that were more favorable to the listed species. *See id.* The Ninth Circuit rejected the argument, explaining that:

> [T]he accuracy of [the action agency's] statements about the scope of its discretion is irrelevant to our analysis. In an ESA consultation, the [consulting] agency must analyze the project as presented. There is no requirement that the action agency consider alternatives to its proposed action. Nor does the [consulting] agency have an obligation to evaluate the action agency's claim that it lacks discretion to make changes to its proposed action.

*Id.* at 1072–73. Put differently, the action agency's discretion didn't matter as the action agency would not have been required to accept any different "reasonably and prudent alternatives" because the given alternatives already "ensured the action would not jeopardize a listed species or critical habitat." *See id.* at 1073. With context, it thus appears the Ninth Circuit was merely stating that the consulting agency could not impose specific alternatives on the action agency,

rather than discussing whether a consulting agency could reject an action agency's given definition of the scope of activity.[5]

In fact, a different section of *NRDC* lends support to Plaintiffs' position that the consulting agency has an obligation to ensure it is considering the full scope of the agency action. *NRDC* involved an ESA challenge to the action agency's

[5] Defendants also cite several district court decisions for the premise that the consulting agency must accept the action agency's definition of the proposed agency action. *See* ECF No. 60 at 5. Besides being non-binding on the Court, the cited cases are also distinguishable. *See Def. of Wildlife v. FWS*, 2016 WL 4382604 at *16–18 (N.D. Cal. Aug 17, 2016) (rejecting argument that consulting agency should have known that certain conservation measures included in the biological opinion were certain to occur where action agency represented it would adopt them); *Pac. Coast Fed'n of Fishermen's Ass'ns v. NMFS*, 1998 WL 1988556, at *10 (W.D. Wash. May 29, 1998) (rejecting argument that consulting agency improperly assumed that action agency would implement action as proposed); *Forest Conservation Council v. Espy*, 835 F. Supp. 1202, 1217 (D. Idaho 1993) (disagreeing with plaintiff's contention that consulting agency was supposed to compare the effects of the proposed action against those of an earlier different action). Further, Defendants cite *Friends of River v. NMFS*, 293 F. Supp. 3d 1151, 1172 (E.D. Cal. 2018), in which the court concluded that the consulting agency was not required to re-define the action proposed by the action agency. However, the Ninth Circuit reversed the district court, concluding that the consulting agency needed to provide a reasoned explanation for why it had changed its conception of the agency action from an earlier biological opinion to now accept the action agency's conception. *See Friends of the River v. NMFS*, 786 F. App'x 666, 669–70 (9th Cir. Oct. 3, 2019). If the consulting agency was required or permitted to accept the action agency's definition, then the Ninth Circuit would not have needed to remand the matter for the consulting agency to explain. Lastly, the Court notes that several of the other district court decisions cite the "Endangered Species Consultation Handbook," but the Court considers the handbook inconclusive as to whether the consulting agency must scrutinize the definition of the proposed agency action.

"operation of the Central Valley Project (CVP), the largest federal water management project in the United States," and the California State Water Project (SWP), which "is a network of reservoirs, canals, dams and hydroelectric powerplants that draws and regulates water from the Sacramento–San Joaquin River Delta." *Id.* at 1056 (internal quotation marks and citation omitted). In the 1960s, the action agency entered into settlement contracts with entities that had rights to the water. *See id.* The contracts allowed the action agency "some rights to the encumbered water," and had 40-year terms. *See id.* (internal quotation marks and citation omitted). The action agency and consulting agency engaged in two "tracks" of ESA consultation: a "broader first-track consultation regarding the coordinated operation of the CVP and SWP as a whole" and a "narrower second-track consultation[] regarding the negotiation of specific water supply contracts or groups of contracts." *Id.* at 1057.

The plaintiffs argued that the consulting agency acted arbitrarily and capriciously in issuing a letter of concurrence that purportedly "failed to consider the effect of renewing" certain settlement contracts. *See id.* at 1069. The court first noted that a consulting agency "must 'analyze the effect of the *entire* agency action'" and where "a proposed agency action consists of multiple distinct phases, the [consulting] agency's consultation cannot be limited to a single phase of the entire action." *Id.* (quoting *Conner*, 848 F.2d at 1453). It then acknowledged that

"[t]here is no dispute that this coordinated operation is an ongoing agency action that cannot be divided into distinct phases." *Id.* at 1070. Thus, it was incumbent upon the consulting agency to consider the effect of the entire CVP and SWP and not simply the settlement contracts at issue in the letter of concurrence. *See id.* at 1070–71. The court concluded that the consulting agency did just that by incorporating a recent biological opinion, completed as part of the first-track consultation, into the letter of concurrence that resulted from the second-track consultation. *See id.* As relevant to the instant issue here, the court's analysis demonstrates that the consulting agency needed to consider the full scope of the project, even if the specific action at issue in the letter of concurrence was narrower.[6] *See id.* at 1069–72.

Based on the foregoing, the Court is convinced that a consulting agency may not blindly accept the action agency's defined scope of the project and must endeavor to consider all potential effects of the entire agency action. If it does not conduct such an inquiry, it may violate the ESA. The opposite result would allow the action agency to define actions so narrowly that it could effectively preclude

---

[6] As discussed below, the Court concludes that the entire agency action here involves more than just the lease sales. *NRDC* would thus be more on point if NMFS had drafted a biological opinion analyzing the effects of all post-leasing activities, and then drafted letters of concurrence at each stage of the lease development that incorporated the overarching biological opinion. Obviously, that isn't what occurred.

the consulting agency from disagreeing with the action agency's effects determination, which is clearly contrary to the purpose of ESA consultation. With that, the Court now turns to whether NMFS' acceptance of MMA's limited definition passes muster.

**B. Entire Agency Action**

Because NMFS can be found to have violated the ESA by accepting a flawed description of the agency action, the Court must examine MMA's limitation of the agency action here. Indeed, Defendants emphasize that NMFS reasonably agreed with MMA's description of the agency action, meaning that MMA's definition is properly at issue. *See* ECF No. 60 at 2, 7. Ultimately, the Court concludes that the limited definition of the agency action that NMFS adopted was arbitrary and capricious because it is contrary to established law and ignores the reality that the leasing of tracts is not the final aim of the proposed lease sales. To explain that determination, the Court starts with some basics.

"The principal substantive import of ESA is in the section 7(a)(2) requirement that the Secretary ensure that all 'agency action' is not likely to jeopardize the continued existence of an endangered species." *N. Slope*, 642 F.2d at 607; 16 U.S.C. § 1536(a)(2). Courts interpret "agency action" broadly to give effect to the high priority Congress afforded to the continued existence of endangered species with the enactment of the ESA. *See Pac. Rivers Council v.*

*Thomas*, 30 F.3d 1050, 1054–55 (9th Cir. 1994). The defined scope of the agency action is therefore "crucial" as the ESA requires agencies "to analyze the effect of the *entire* agency action." *Conner*, 848 F.2d at 1453 (citing *N. Slope Borough*, 642 F.2d at 608); *see also Wild Fish Conservancy*, 628 F.3d at 522 ("The delineation of the scope of an action can have a determinative effect on the ability of a biological opinion fully to describe the impact of the action on the viability of the threatened species[.]"). One concern in the ESA context is that by artificially narrowing the scope of an agency action, the agency "can undermine the consulting agency's ability to determine accurately the species' likelihood of survival." *Wild Fish Conservancy*, 628 F.3d at 522. As such, courts will reject an agency's characterization as arbitrary and capricious if it doesn't accurately describe the full agency action. *See id.* at 521–25.

Here, Defendants argue that the proposed lease sale represents the entire agency action, meaning that NMFS did not need to consider any possible post-leasing activity. *See* ECF No. 43 at 12. But such a limited view of the agency action fails. First, it bears emphasizing that courts are responsible for determining the scope of an agency action and need not accept the agency's own characterization. *See Wild Fish Conservancy*, 628 F.3d at 521–22 (rejecting agency's narrow definition of its proposed action); *see also Greenpeace v. NMFS*, 80 F. Supp. 2d 1137, 1146 (W.D. Wash. 2000) ("The meaning of 'agency action'

is determined as a matter of law by the Court . . . Thus, an agency may not unilaterally relieve itself of its full legal obligations under the ESA by narrowly describing the agency action at issue in a biological opinion" (citation omitted)). Second, and more fundamentally, the Court concludes that Defendants' position that the proposed lease sale represents the entire agency action is foreclosed by caselaw.

Before turning to the caselaw, the Court zooms out for a moment and observes that the agencies' conduct here appears unprecedented. The attempt to limit ESA review of an OCSLA lease to "expedited"[7] informal consultation—that defines the agency action as merely the lease sale, and only considers preliminary activities associated with the lease—appears never to have previously occurred. Defendants effectively conceded as much during the October 30, 2026 hearing on the Motion for Summary Judgment, and have not directed the Court to any such cases. Indeed, the cases they do rely on—*North Slope Borough*, *Village of False Pass*, and *Tribal Village of Akutan*—all involved biological opinions, completed after formal consultation, that considered the effects of at least some post-leasing activities on ESA-listed species.

[7] Neither side comprehensively discusses the "expedited" aspect of the informal consultation. The Court notes that the discussion of expedited consultation in the regulations relate to emergencies, 50 C.F.R. § 402.05, or an "optional *formal* consultation process," *id.* § 402.14(l) (emphasis added).

Although they don't say so explicitly, Defendants seem to attempt to justify their deviation from the typical definition of "agency action" in the context of OCSLA leases by arguing that, unlike oil and gas leases, deep-sea mining is "in its nascent stages and not yet reasonably certain to occur." ECF No. 43 at 18, 20. Yet, Defendants point to no authority that would permit them to limit the definition of "agency action" in the face of uncertainty about the viability of a leasing project. Considering that "Congress intended endangered species to be afforded the highest of priorities," *TVA*, 437 U.S. at 174, the ESA "insist[s] on foresight," when considering a proposed action. *N. Slope Borough*, 642 F.2d at 608. As such, "incomplete information about post-leasing activities does not excuse the failure to comply with the statutory requirement of . . . using the best information available." *Conner*, 848 F.2d at 1454 (citing 16 U.S.C. § 1536(a)(2)). If anything, the ESA suggests "caution" in light of the novelty of deep-sea mining as "[t]he earlier in the progress of a project a conflict (between a species and the project) is recognized, the easier it is to design an alternative consistent with the requirements of the act, or to abandon the proposed action." *N. Slope Borough*, 642 F.2d at 608 (internal quotation marks and citation omitted).

With that, the Court turns to the caselaw on defining agency action within the context of mineral leasing. In *North Slope Borough*, the D.C. Circuit specifically stated that "the segmented approach of OCSLA does not attenuate

ESA's notion of 'agency action,'" and that "[e]valuating an outer continental shelf project in the light of all contemplated and congruous actions merely reflects that 'pumping oil' and not 'leasing tracts' is the aim of congressional policy." *Id.* at 608–09. These statements mark the D.C. Circuit's general agreement with the district court's rejection of the exact argument Defendants express here: that the agency may "assert that it is only . . . the lease sale and pre-exploration activities that constitutes agency action," when proposing an OCSLA lease sale. *See N. Slope Borough v. Andrus*, 486 F. Supp. 332, 350–51 (D.D.C. 1980); *see also N. Slope Borough*, 642 F.2d at 608 (agreeing with district court that OCSLA does not narrow ESA's conception of agency action). The D.C. Circuit was thus in "qualified agreement with the district court's ruling that a 'biological opinion' may not deal *exclusively* with any one particular stage of an outer continental shelf project." *N. Slope Borough*, 642 F.2d at 608 (emphasis added).

Yet, it's also true that the D.C. Circuit's ruling in *North Slope Borough* contains two relevant parts and reversed one aspect of the district court's order. The Court describes the case in some detail to tease out the distinction between the separate rulings as Defendants rely on the second part of the case.

As mentioned, in the first part of its ruling, the court concluded that OCSLA did not limit the scope of "agency action" under the ESA such that an agency could limit it ESA review to the lease stage exclusively. This affirmed the district court's

ruling rejecting the defendants' argument that the agency action was limited to the lease sale stage. *See id.* at 608 n.118 (citing *N. Slope Borough*, 486 F. Supp. at 350–51). However, as the district court explained, that argument was merely a litigation position and that the agency did in fact at least consider some post-leasing activities in its biological opinion:

> The Secretary clearly understood that an expansive vision of the lease sale was required by the ESA. He attempted to perform, and in some respects did perform, a comprehensive analysis of all the ramifications of the lease sale. Yet the Secretary now argues that it is only the lease sale, and not prospective decisions, that constitute agency action under the ESA. His allegation is inconsistent with his behavior prior to this suit, the Supreme Court's ruling in *TVA v. Hill* . . . and subsequent legislation. It is clear that, in the instant case, agency action constitutes the lease sale and all resulting activities.

*N. Slope Borough*, 486 F. Supp. at 351. For example, the consulting agency's biological opinion discussed the possible effect of oil spills on the listed species (Bowhead whales), *id.* at 353, and ultimately, "vouched for the safety of the whales conditionally" if certain alternatives were adopted, 642 F.2d at 610.

In the second portion of *North Slope Borough*, the court determined that the staged nature of the OCSLA process informed the level of detail the agency was required to consider at any given step of the OCSLA process. *See id.* at 609. The court explained that because the ESA also applies to subsequent steps in the OCSLA process, the "Secretary of Interior retains strict control of an outer continental shelf project for its duration, from lease sale to depleted, run-dry well,"

and as "information and experience is collected," as the mineral lease proceeds through the stages, "the Secretary is in better shape to respond sensitively to environmental needs and wisely to oil-strikes." *Id.* Thus, while OCSLA does not attenuate or curtail the concept of "agency action," "[i]t does. . . qualify somewhat the broadest practical effect the term could have," meaning that "satisfaction of the ESA mandate" must be evaluated in light of the "checks and balances" inherent in OCSLA's stage-by-stage approval. *See id.* With that in mind, the court concluded the consulting agency had performed a sufficiently "comprehensive analysis of *all* the ramifications of the lease sale," which included some consideration of post-leasing activities. *Id.* (internal quotation marks and citations omitted, emphasis added).

It is that second part of *North Slope Borough*—that deals with the *depth* of analysis required at various stages of the OCSLA process—that Defendants rely on. *See* ECF No. 43 at 15. But that requisite depth is a separate, subsequent question from the one about how to define the agency action, and the D.C. Circuit could not have been clearer that OCSLA does not affect the definition of the agency action. *See id.* at 608. When it comes to OCSLA leases, the agency action is not limited to "leasing tracts," but also includes exploration and production of the minerals. *See id.* at 608–09. That practical interpretation of the scope of the agency action accords with caselaw that says "agency action" should be defined

broadly and reflects that the ESA "insist[s] on foresight." *Id.* at 608. Limiting the agency action here to the lease sale and preliminary activities ignores the reality that the purpose of the leases being sold is eventually to conduct deep-sea mining.

Ninth Circuit caselaw follows the D.C. Circuit Court's decision in *North Slope Borough*. In *Conner*, the Ninth Circuit considered an ESA challenge to biological opinions that concluded there "was insufficient information about the nature of post-leasing oil and gas activities to render a comprehensive biological opinion considering anything more than the lease sale itself." *Conner*, 848 F.2d at 1444. The consulting agency concluded that "leasing itself was not likely to jeopardize the protected species," and committed to additional consultation before all post-leasing activities. *Id.* at 1452. Citing *North Slope Borough*, the Ninth Circuit explained that the D.C. Circuit had held under OCSLA that "the 'agency action' encompassed the entire leasing project, from the issuance of the leases through post-leasing development and production." *Id.* (citing *N. Slope Borough*, 642 F.2d at 608). The Ninth Circuit thus similarly held that "agency action in this case entails not only leasing but leasing and all post-leasing activities through production and abandonment." *Id.* at 1453. The upshot of this conclusion was:

> [T]he ESA on its face requires the [consulting agency] in this case to consider all phases of the agency action, which includes post-leasing activities, in its biological opinion. Therefore the [consulting agency] was required to prepare, at the leasing stage, a comprehensive biological opinion assessing whether or not the agency action was likely to jeopardize the continued existence of

> protected species, based on "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

*Id.*

Defendants contend that *Conner* is distinguishable because it involved a lease under the Mineral Leasing Act ("MLA"), which lacks the same checks and balances as OCSLA's staged review. *See* ECF No. 43 at 16–17. However, as discussed above, and as *Conner* recognizes, the checks and balances of OCSLA staged review "mitigate[]" the level of detail necessary in an environmental review during any given phase of the OCSLA process, but does not affect the ESA's definition of agency action. *See Conner*, 848 F.2d at 1455–56 (citing *N. Slope Borough*, 642 F.2d at 609). *Conner* also relied on *North Slope Borough*, an OCSLA case, for how to define agency action for mineral leases. Thus, the fact that *Conner* involved a lease under a different statute does not render the court's conclusion about how to define "agency action" inapposite.

Admittedly, *Conner* also discusses earlier Ninth Circuit caselaw in a manner that muddies the water on whether an agency may limit "agency action" to a mineral lease sale itself. *Conner* commented that the Ninth Circuit in *Village of False Pass v. Clark*, 733 F.2d 605, 611 (9th Cir. 1984)—a case involving a challenge to OCSLA leasing—had previously "concluded that the agency action at issue was limited to the sale of leases." *Conner*, 848 F.2d at 1456. *Conner* continued paraphrasing *Village of False Pass*, stating that the court there

"concluded that the requirements of the ESA were satisfied by a biological opinion that was limited to the lease sale and exploration stages." *Id.* Although *Conner* ultimately distinguished *Village of False Pass*, and determined that incremental-step consultation is unavailable under the MLA, its comments about *Village of False Pass* lend some credence to Defendants' position here regarding the proper definition of agency action. *See id.* at 1456–57. Nevertheless, while the Court is hesitant to call *Conner*'s comments about *Village of False Pass* dicta, an examination of *Village of False Pass* demonstrates that the defined scope of the agency action was not at issue in that case, such that *Village of False Pass* did *not* limit the agency action to the sale of leases.

*Village of False Pass* involved an environmental challenge to a planned OCSLA lease sale in the Bering Sea. *See Village of False Pass*, 733 F.2d at 607. The consulting agency prepared a biological opinion that recommended some restrictions on exploratory drilling and seismic testing, i.e., conduct beyond the preliminary activities at issue here and more associated with the post-leasing OCSLA exploration stage. *See id.* Before the Ninth Circuit, the plaintiff-appellants argued that the action agency violated ESA by (1) issuing the Final Notice of Sale for the leases two days before receiving the final biological opinion from the consulting agency and (2) not "adopt[ing] 'concrete measures' at the lease

sale stage, such as tract deletion or seasonal drilling restrictions, to protect gray and right whales under ESA from oil spills and seismic testing." *Id.* at 608.

As to the first contention, the court concluded that the action agency did not violate the ESA because it had been briefed on a draft of the biological opinion and complied with its good faith consultation requirements. *See id.* at 610. On the second point, which is more relevant to the issues here, the court determined that "given the [consulting agency's] general recommendations about oil spills and exploration stage seismic testing, the Secretary could properly limit his action at the lease sale stage to a plan for later implementation." *Id.* at 611. The court continued that the "lease sale decision itself could not directly place gray or right whales in jeopardy, and the plan insures that the many agency actions that may follow indirectly from the sale will not either." *Id.* In other words, because of future potential consultations, the court "affirm[ed] the holding of the district court that the Secretary did not abuse his discretion under ESA at the time of the lease sale action with respect to endangered species protection from oil spills and exploratory seismic testing." *Id.* at 612.

The Court's understanding of this holding is not that the action agency properly limited its definition of "agency action" exclusively to the lease sale and exploration phase, but that the action agency did not abuse its discretion by declining to adopt post-lease activity restrictions at the lease sale stage. If

anything, the fact that the consulting agency included proposed restrictions about post-leasing activities in the biological opinions suggests that the definition of "agency action" was not so cabined. Thus, the Court concludes that *Village of False Pass* did not squarely address the question and simply concluded that the action agency did not violate the ESA by declining to adopt future suggested restrictions at the lease stage.

Perhaps more significantly, the Ninth Circuit unequivocally affirmed the district court's order, which did directly confront the issue of the scope of "agency action." *See id.* at 612. Discussing the interplay of the ESA and OCSLA, the district court commented that the segmentation of OCSLA leases into discrete stages meant that defining "the appropriate 'agency action' may present a difficult problem." *Village of False Pass v. Watt*, 565 F. Supp. 1123, 1155 (D. Alaska 1983). To relieve any tension between the statutes, the district court agreed with the approach in *North Slope Borough* that "agency action" includes post-leasing activities, but that the ESA obligations regarding depth of analysis must be viewed in light of OCSLA's checks and balances. *See id.* at 1156 (citing *N. Slope Borough*, 642 F. 2d at 609). The court explained that such an approach balanced "the potentially competing values" of the ESA and OCSLA, especially because the "leasing stage presents a unique opportunity to take a hard look at the anticipated and potential risks to endangered species at every stage of activity." *Village of*

*False Pass*, 565 F. Supp. at 1156. As such, the agencies had an "affirmative duty to consider the full range of [OCS] activities," albeit a duty "tempered" by the fact that as activities progress through the stages, the agencies will have more information and be better able to address effects on listed species. *Id.* at 1157.

Defendants also cite *Tribal Village of Akutan v. Hodel*, 869 F.2d 1185 (9th Cir. 1988) in support of their contention that MMA—and by extension NMFS—properly limited the scope of its defined agency action to the lease sale stage. But as in *Village of False Pass*, the proper scope of the "agency action" wasn't at issue in *Tribal Village of Akutan*. Rather, in that case, the consulting agency considered possible effects to the ESA-listed gray whales from post-leasing activities, such as oil spills, and suggested restrictions to mitigate the effects. *See Tribal Village of Akutan*, 869 F.2d at 1193. The action agency declined to accept all the suggested restrictions, but adopted other mitigating measures. *See id.* at 1194. Citing *Conner*, *Village of False Pass*, and the fact that the action agency would need to comply with the ESA at subsequent stages of the OCSLA process, the Ninth Circuit concluded that the action agency's rejection of some of the restrictions did not violate the ESA. *See id.* at 1193–96. In short, *Tribal Village of Akutan* confirmed that OCSLA tempered the action agency's ESA obligations, but did not address whether the consulting agency could decline to attempt to consider post-leasing activities at the lease sale stage. *Tribal Village of Akutan* thus says little

about the pertinent issue here, but like *Village of False Pass* and *North Slope Borough*, it also reveals the uniqueness of Defendants' approach in that the consulting agency in those cases drafted complete biological opinions that at least considered some potential effect from post-leasing activities. This is all to say that the line in *Conner* about *Village of False Pass*—and the other cases Defendants present—fail to persuade the Court that the Ninth Circuit has endorsed the notion that "agency action" for an OCSLA lease may be confined to the lease sale stage.

Such uniformity in the caselaw suggests a recognition among the relevant agencies that for OCSLA projects, "'agency action' encompasse[s] the entire leasing project, from the issuance of the leases through post-leasing development and production." *Conner*, 848 F.2d at 1453 (citing *North Slope*, 642 F.2d at 608). That recognition accords with the notion that "if a proposed agency action consists of multiple distinct phases, the resource agency's consultation cannot be limited to a single phase of the entire action." *NRDC*, 102 F.4th at 1070.

Further, even if post-leasing activities would be subject to subsequent authorizations, NMFS' acceptance of the cabined view of agency action ignores the commonsense reality that MMA is not leasing for leasing's sake. *See N. Slope Borough*, 642 F.2d at 608 ("'[P]umping oil' and not 'leasing tracts' is the aim of congressional policy."). Indeed, MMA "aims to facilitate the potential development of the areas that may contain economically recoverable mineral

resources in an environmentally and economically responsible way." N02852. The fact that the genesis of the proposed lease sale was an unsolicited request from a mining company, and that MMA intends to issue up to two leases to "promote[] competition," N02854, also suggest that the end goal is not merely leasing, but mining. Ignoring this reality by artificially limiting the scope of the agency action to the lease sale violates the ESA's call for foresight ahead of any proposed agency action.

The regulations allowing for an "incremental approach" to formal ESA consultation also belie Defendants' position regarding the proper scope of the action. *See* 50 C.F.R. § 402.14(k). Incremental step consultation allows the consulting agency "to issue a biological opinion on the incremental step being considered." *See id.* Still, notwithstanding that carveout, the consulting agency must "includ[e] its views on the entire action" in the biological opinion, *id.*, and the action agency must only proceed to the next incremental step if "[t]here is a reasonable likelihood that the *entire action* will not violate section 7(a)(2) of the [ESA]," *id.* § 402.14(k)(5) (emphasis added). By requiring the agencies to consider the effect of the entire action in a biological opinion on any given step in the leasing process, the regulations rebut the idea that the agencies may limit the definition of the entire action to any given step. It's irrelevant that MMA and NMFS did not engage in formal incremental step consultation—the regulations

make clear that any given step cannot constitute the entire action in an OCSLA lease. Defendants' attempt here to limit the action as such conflates two distinct concepts: the proper definition of agency action and the depth of ESA analysis required at any given OCSLA stage.

The Court's conclusion that NMFS' acceptance of the limited definition of agency action was arbitrary and capricious also ensures that the purpose of the ESA—to prevent harm to vulnerable species—is served. *See* 16 U.S.C. § 1536(a)(2). As extinction is permanent, caution and foresight before acting are necessary and "caution can only be exercised if the agency takes a look at all the possible ramifications of the agency action." *N. Slope Borough*, 642 F.2d at 608 (alteration omitted). This analysis is especially important at the leasing stage because the "leasing stage presents a unique opportunity to take a hard look at the anticipated and potential risks to endangered species at every stage of activity." *Village of False Pass*, 565 F. Supp. at 1156.

In sum, the Court concludes that NMFS' adoption of the definition of the agency action as merely the lease sale was arbitrary and capricious because it conflicts with Ninth Circuit caselaw; because courts have never approved such an abbreviated approach to ESA consultation for an OCSLA lease; because the incremental step regulations suggest that the entire action involves more than just the leasing phase; and because the ESA requires foresight to ensure species are

protected. By accepting such a constrained notion of agency action, NMFS did not even attempt to consider potential effects of post-leasing activities on the relevant listed species and critical habitat. The Letter of Concurrence therefore fails to comply with the ESA. As the Court concludes that NMFS violated the ESA by failing to even attempt to consider the effects of the entire action, the Court need not, and will not address, Plaintiffs' arguments regarding "indirect effects" or the Letter of Concurrence's discussion of preliminary activities.

### C. Remedy

Plaintiffs argue that the Court should vacate and remand the Letter of Concurrence, *see* ECF No. 15-1 at 32–33, while Defendants assert that remand without vacatur is appropriate, *see* ECF No. 43 at 36.

"Where a court holds an agency action unlawful, vacatur and remand is the default remedy under the APA, but the court retains equitable discretion in limited circumstances to remand a decision without vacatur while the agency corrects its errors." *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025) (internal quotation marks and citations omitted). "Whether agency action should be vacated depends on how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed." *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012) (quoting *Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)).

The Court considers Defendants' error "fundamental." *See Mont. Wildlife Fed'n*, 127 F.4th at 51. The ESA requires NMFS to "insure that any action . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." 16 U.S.C. § 1536(a)(2). NMFS failed to even attempt to consider the potential effects on ESA-listed species from the *entire* agency action proposed: deep-sea mining of the OCS near American Samoa. Defendants nevertheless assert that, if their request for remand without vacatur is granted, NMFS will likely need to provide "only updated descriptions and explanations . . . based on the science and data in the record." ECF No. 43 at 36. This single statement fails to convince the Court, considering that NMFS needs to do the bulk of its consultation duty for the first time.

Similarly, Defendants' vague statement that "[l]eaving the letter of concurrence in place would preserve environmental protections and avoid regulatory disruption while the agency addresses discrete issues on remand," *id.*, fails to persuade the Court that vacatur would be disruptive. While courts have left faulty rules in place if vacatur would risk more environmental harm, *see Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (citations omitted), Defendants fail to explain how leaving the Letter of Concurrence in place would

preserve environmental protections or what type of “regulatory disruption,” vacatur would cause.

The Court sees no reason to deviate from the typical APA remedy and thus vacates the Letter of Concurrence.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiffs’ Motion for Summary Judgment and VACATES the Letter of Concurrence. The Court orders the Clerk to enter Judgment and close the case.

IT IS SO ORDERED.

DATED: Honolulu, Hawaiʻi, November 16, 2026.

Jill A. Otake
United States District Judge